Michael E. Tankersley
Naomi Takagi
Brian Berggren
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC  20580
mtankersley@ftc.gov
(202) 326-2991
ntakagi@ftc.gov
(202) 326-3668
bberggren@ftc.gov
(202) 326-3229

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Federal Trade Commission,<br><br>     Plaintiff,<br><br>     vs.<br><br>Grand Canyon Education, Inc.;<br><br>Grand Canyon University; and<br><br>Brian E. Mueller,<br><br>     Defendants. | Case Number:<br>CV-23-02711-PHX-JZB<br><br>**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT AND OTHER RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its complaint alleges:

1.    The FTC brings this action for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FTC's Telemarketing Sales Rule, as amended, 16 C.F.R. Part 310.  For these violations, the FTC seeks

relief, including monetary relief, a permanent injunction, and other relief pursuant to Sections 13(b), and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), 56(a), and 57b, and Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Telemarketing Act"), 15 U.S.C. § 6105.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

3.      Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(1), and (c)(2), and 15 U.S.C. § 53(b). Defendants reside in and transact business in this District.

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Sales Rule, 16 C.F.R. Part 310 (the "TSR" or "Rule"), which prohibits deceptive and abusive telemarketing practices.

## DEFENDANTS

5.      Defendant GRAND CANYON EDUCATION, INC. ("GCE") is a Delaware corporation with its principal place of business at 2600 W.

Camelback Road, Phoenix, AZ 85017.  GCE stock is publicly traded under the trading symbol LOPE.  GCE was previously named "Significant Education, LLC" and "Significant Education, Inc." and changed its name to GCE in 2008.  Through June 30, 2018, GCE owned and operated the university known as "Grand Canyon University" as a for-profit institution. Since July 1, 2018, as a result of a series of transactions orchestrated by GCE and its officers, GCE has been the exclusive provider of marketing services for Defendant GCU and receives most of Grand Canyon University's revenue.

6. Defendant GRAND CANYON UNIVERSITY ("GCU") is an Arizona corporation formerly known as Gazelle University.  It acquired rights to the name "Grand Canyon University" and began using that name in July 2018.  Its principal place of business is 3300 W. Camelback Road, Phoenix, AZ 85017.

7. Defendant BRIAN E. MUELLER is the President of GCU, and the Chief Executive Officer, Chairman of the Board and a director of Defendant GCE.  He directed GCE's efforts to re-brand the University as a nonprofit, and promoted representations that the July 2018 division of operations between GCE and GCU resulted in the University returning to operation as a traditional nonprofit university.  At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and

practices of GCU and GCE, including the acts and practices described in this Complaint.

## COMMERCE

8.    At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

9.    Defendants market postsecondary educational services online and through telemarketing.  Despite operating the school for the profit of GCE and its investors, Defendants have deceptively advertised Grand Canyon University as a nonprofit to prospective students.  Defendants' marketing activities have also resulted in millions of abusive telemarketing calls to consumers who have specifically requested that Defendants not solicit them, and to individuals on the National Do Not Call Registry.  In addition, Defendants have marketed "accelerated" doctoral programs requiring only twenty courses (or 60 credits) when, in fact, Grand Canyon University requires almost all doctoral students to take many more "continuation courses" that add thousands of dollars to the costs.

### GCE's Creation of Gazelle University and Transfer of the GCU Name

10.    In 2004, GCE purchased the assets of a nonprofit college that had been operating in Phoenix, Arizona since 1951 under the names "Grand Canyon College" or "Grand Canyon University" and began operating the school as a for-profit educational institution.  GCE became a publicly traded

company in November 2008, published business plans for maximizing the financial performance of the institution, and solicited investment based on the reported and projected profit from GCE's operation of this institution.

11.     Beginning on or about 2014, GCE and Defendant Mueller formulated a plan to transfer the name and some of the assets of Grand Canyon University to a new corporation with the goal of characterizing it as a nonprofit university.  In furtherance of this plan, on November 18, 2014, Defendant Mueller, who was at the time the Chief Executive Officer ("CEO") of GCE, chartered a new corporation, named "Gazelle University" (later renamed Grand Canyon University, hereinafter "GCU" or "Gazelle University/GCU"), under the Arizona Nonprofit Corporation Act, A.R.S. §§ 10-3101 – 10-11702.

12.     Defendant Mueller also became the President of Gazelle University/GCU.  In 2017, Defendant Mueller became Chairman of the Board of GCE.  Since 2017, he has continuously held the offices of CEO of GCE, Chairman of the Board of GCE, and President of Gazelle University/GCU.  Mueller receives salary, bonuses, and other compensation from both Defendants GCU and GCE.  His compensation includes cash and stock incentives that are linked to GCE's financial performance and are explicitly designed to align his interests with those of GCE stockholders.  He holds GCE stock of significant value.  As CEO and Chairman of the Board of GCE, Defendant Mueller is GCE's principal representative in dealings

with stockholders and reporting to investors on GCE's financial results and prospects.

13.     The articles of incorporation of Gazelle University/GCU represent that it is organized and operated exclusively for charitable, religious, and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.  Notwithstanding these articles of incorporation, Gazelle University/GCU was, in fact, organized by GCE and Defendant Mueller to advance GCE's for-profit business and advance Defendant Mueller's interests as officer, chairman, director, stockholder and promoter of investment in GCE.  Accordingly, Defendant Gazelle University/GCU has been operated to carry on business for its own profit or that of its members, within the meaning of Section 4 of the FTC Act. 15 U.S.C. § 44.

14.     On July 1, 2018, GCE executed interrelated agreements that resulted in Gazelle University assuming its current name, Grand Canyon University.  As a result of these agreements, GCE transferred the trademarks, campus, and certain assets and liabilities of the institution that GCE had operated as "Grand Canyon University," to GCU in exchange for GCU agreeing to pay GCE more than $870 million plus 6% annual interest. A "Master Services Agreement" executed as part of this transaction makes GCE the service provider for certain essential GCU operations in exchange for a bundled fee that is equal to 60% of GCU's "Adjusted Gross Revenue."

15.     Since July 1, 2018, pursuant to the Master Services Agreement, GCE has been the exclusive provider of marketing for GCU and services

related to communicating with prospective GCU students regarding applications, program requirements, and financing options.  GCE, pursuant to the Master Services Agreement, is also the exclusive provider for GCU of student support services and counseling, technology (including GCU's platform for online education) and budget analysis services.  GCU is not permitted to contract with any third party for these services.  Since July 1, 2018, GCE has also been the sole provider of GCU's student records management, curriculum services, accounting services, technology services, financial aid services, human resources services, procurement, and faculty payroll and training.

16.     The fees GCE receives from GCU are not subject to any limit and are not proportionate to GCE's costs for providing services to GCE.  GCE receives 60% of GCU's revenue from tuition and fees from students, including 60% of charitable contributions to GCU for payment of student tuition and fees.  If GCU revenue from these sources increases at a rate faster than operating costs, GCE disproportionately benefits from the increased revenue.  In addition, GCE does not provide services for student housing, food services, operation of the GCU hotel conference center, or athletic arena, but still receives 60% of the revenue from these operations.  If GCU revenue from these activities increases, GCE disproportionately benefits.

17.     The Master Services Agreement makes it impractical for GCU to use any provider other than GCE for essential services.  GCU must receive

services designated as exclusive from GCE, and if GCU elects to use a third party to provide services that are not designated as exclusive to GCE, GCU is still obligated to pay GCE the entire bundled fee, equal to 60% of GCU's Adjusted Gross Revenue. As a result of the July 1, 2018 agreements, GCE also controls technology and licenses essential to GCU's online educational services.

18. The transfer of assets and creation of obligations implemented in the July 1, 2018 agreements between GCE and GCU benefited the business interest of GCE and its stockholders. After the transaction was completed, GCE adjusted its bonus compensation standards to pay bonuses totaling more than one million dollars to the GCE executives responsible for the Master Services Agreement entitling GCE to 60% of GCU's revenue.

19. Since July 1, 2018, GCU's revenue has generated profit for GCE and its investors. GCE reports to investors that it has profited, and projects that it will continue to profit, from GCU's obligations to GCE. GCU continues to be GCE's most significant source of revenue.

20. GCU's operations since July 1, 2018, are not comparable to Grand Canyon University's operation as a nonprofit prior to 2004, as GCU is largely operated by, and most of its revenue is paid to, GCE – the for-profit corporation that owned and operated the University from 2004 until July 1, 2018.

**Defendants Have Marketed GCU as a Nonprofit**

21.    Beginning shortly after transfer of the "Grand Canyon University" name to GCU on July 1, 2018, Defendants began promoting GCU in advertising and telemarketing as a private "nonprofit" university and disseminated digital and print advertising like the following, stating that GCU had gone "Back to Non-Profit Roots" and "transitioned back to a nonprofit institution."



## Back to Non-Profit Roots

In 2018, GCU transitioned back to a non-profit institution, which provided faculty and students with equitable opportunities to:

- Participate in academic and co-curricular opportunities with peer institutions
- Operate a philanthropic foundation
- Provide grant writing and research opportunities for faculty and students
- Invest in educational infrastructure
- Allow the university to continue offering tuition at levels that make private higher education affordable to all Americans despite socio-economic class

- Provide employment and career growth opportunities for faculty and staff
- Continue to invest in the communities where the university serves
- Permit student athletes to participate in governance opportunities afforded by the NCAA

22.    Defendants disseminated the advertisement above and similar statements representing that GCU had transitioned back to a nonprofit on websites, social media, press releases, video marketing and social media. Defendants used claims that GCU is a nonprofit to induce enrollment in

GCU, and to induce consumers to provide their telephone numbers and other information for the use of GCE telemarketers.  For example, the digital advertisement shown in Paragraph 21 appears adjacent to an online form urging consumers to "Let Us Know How To Contact You," with boxes for the consumer to submit their name, telephone number and information about their interest in educational services.

23.    The representations that GCU was a nonprofit and had "transitioned back" to its non-profit roots were material to consumers and benefited GCE.

    a.  In December 2018, Defendant Mueller, the Chief Executive Officer of GCE and President of GCU, stated in an interview that the characterization of GCU as a non-profit educational institution "is a tremendous advantage . . .  We can recruit in high schools that would not let us in the past . . .  We're just 90 days into this, but we're experiencing, we believe, a tailwind already just because of how many students didn't pick up the phone because we were for-profit."

    b.  On February 20, 2019, CEO Mueller stated during GCE's earnings call for the fourth quarter of 2018: "[N]ew student online growth [after the conversion of Gazelle to GCU] was more than we expected and I think it's evidence that being out there now a million times a day saying we're non-profit has had an impact."

24.     Defendants discontinued and removed most statements characterizing GCU as a nonprofit shortly after November 6, 2019.  On that date, the Department of Education rejected GCU's request that it be recognized as a nonprofit institution under the Higher Education Act, and classified GCU as a *for-profit* participant in federal education programs.  As part of the Department's action on GCU's application, the Department concluded that "GCU must cease any advertising or notices that refer to its 'nonprofit status.'  Such statements are confusing to students and the public, who may interpret such statements to mean that the Department considers GCU a nonprofit under its regulations."

25.     The Department of Education determined that GCU does not meet the "operational test" for nonprofit status "that both the primary activities of the organization and its stream of revenue benefit the nonprofit itself."  The Department concluded that materials GCU submitted to the Department concerning the July 1, 2018 transactions "demonstrate that GCE and its stockholders – rather than Gazelle/GCU – are the primary beneficiaries of the operation of GCU under the terms of the Master Services Agreement. This violates the most basic tenet of nonprofit status – that the nonprofit be primarily operated for a tax-exempt purpose and not substantially for the benefit of any other person or entity."

26.     GCU is challenging the Department of Education's November 6, 2019 decision.  *See Grand Canyon University v. Cardona,* No. 2:21-cv-00177, Order (D. Ariz., Dec. 1, 2022) (ruling the Department of Education

lawfully concluded GCU is not nonprofit), *appeal pending*, No. 23-15124 (9th Cir.).  GCU specifically seeks a declaration that GCU is entitled to refer to itself publicly as a nonprofit institution for all purposes.

**Defendants' Telemarketing**

27.    GCU currently has approximately 118,000 students; over 90,000 of them are enrolled in online programs.

28.    GCE, in the name of and on behalf of GCU, induces consumers to purchase educational services from GCU, including through nationwide marketing campaigns.

29.    Defendants use online and social media advertisements, and in-person solicitations, to obtain information about consumers interested in educational services, including their name, contact information, and interests.  Defendants use that information to conduct further marketing, including telemarketing.

30.    GCE has hundreds of sales representatives that solicit prospective students through a variety of means, including telemarketing.  GCE's telemarketers tell prospective students that they are GCU counselors.  The telemarketers' duties include describing the central characteristics of GCU to prospective students, and the requirements, costs, and projected length of GCU educational programs.

31.    GCE has established job "performance metrics" for telemarketers that include "Annual Student Counts" that specify the number of consumers each telemarketer should enroll and retain.  GCE tracks, and its managers

regularly review, the number of consumers each telemarketer enrolls, and the number of telemarketing calls telemarketers make to fulfill sales expectations. Telemarketers who fail to meet GCE's telemarketing metrics are placed on "Corrective Action Plans" that routinely include requiring telemarketers to make 80-89 telemarketing calls each day, and to spend three to four and a half hours a day on the telephone. Telemarketers that fail to comply with Corrective Action Plans are subject to disciplinary action, including termination.

32. Since at least 2017, GCE has used its customer relationship management ("CRM") system to give telemarketers telephone numbers and other information about consumers that GCE telemarketers use to initiate telephone calls that urge individuals to purchase educational services from GCU.

33. Since July 2018, Defendant GCE has initiated tens of millions of telemarketing calls on behalf of GCU.

34. Consumers have requested that GCU and telemarketers acting on its behalf not make telemarketing calls to their numbers. GCE maintains a list of telephone numbers that have been identified in such requests.

35. Until at least March 2023, GCE did not remove from the CRM system, or block their telemarketers' access to, the telephone numbers of individuals who had requested that telemarketers acting on behalf of GCU not call their numbers.

36.     GCE telemarketers acting on behalf of GCU have initiated more than a million telemarketing calls to telephone numbers of consumers who had, prior to the call, specifically requested that telemarketing calls for GCU not be made to that telephone number.

37.     GCU and GCE have access to the National Do Not Call Registry maintained by the Federal Trade Commission.

38.     Until at least March 2023, GCE did not remove from the CRM system, or block their telemarketers' access to, the telephone numbers of any individuals whose telephone numbers were listed on the Registry.  GCE, in fact, provided its telemarketers with telephone numbers listed on the Registry even if GCE had no basis for claiming that telemarketing calls on behalf of GCU to a given number were permissible.

39.     GCE telemarketers have initiated millions of telemarketing calls on behalf of GCU to telephone numbers of consumers who had, prior to the call, placed their numbers on the National Do Not Call Registry even though GCU did not have an established business relationship with the person receiving the call or the consumer's express agreement, in writing, to place such telemarketing calls to the person's telephone number.

40.     Defendants also have made millions of telemarketing calls to telephone numbers on the National Do Not Call Registry after GCE notified telemarketers that the telephone numbers are exempt from do-not-call restrictions.  In fact, many of these telephone numbers were collected through online and social media advertisements that do not clearly disclose

to consumers the language purporting to authorize telemarketing because they:

    a.  Present the language regarding telephone calls in small type;

    b.  Present the language regarding telephone calls in pale print or colors that barely contrast with the background (*e.g.*, Paragraph 42);

    c.  Surround the language regarding telephone calls with text in more prominent, contrasting type, that states that the purpose of the form is to confirm entries (*e.g.*, Paragraph 44);

    d.  Instruct the consumer to advance to the next screen with terms that do not indicate that doing so constitutes an agreement or authorization;

    e.  Place the language regarding telephone calls below the graphic the consumer engages with to submit the form or advance to the next screen (*e.g.*, Paragraphs 41, 43 and 44);

    f.  Do not name GCU as the entity that is being authorized to place telemarketing calls to the consumer (*e.g.*, Paragraph 43); or

    g.  Do not include the telephone number that is the subject of the purported authorization (*e.g.*, Paragraphs 41, 42).

41.     For example, at Grand Canyon University's main website (gcu.edu), Defendants have acquired telephone numbers by presenting the following and similar online forms to solicit consumers:



42.     Defendants have acquired telephone numbers by presenting the following and similar online forms to solicit consumers at other websites and digital advertising media:



43.     Defendants also purchase information about consumers from lead generators.  Defendants have purchased telephone numbers and other information from lead generators that have used the following and similar online forms to solicit the information Defendants purchased:



44.     Defendants have also purchased information from lead generators that used the following and similar online forms to solicit the information Defendants purchased:



45.     An individual who has been prompted to press or click "Next", "see results!", "Submit Info" or similar prompts on the forms in Paragraphs 41, 42, 43, and 44, or similar forms used by Defendants and lead generators from which Defendants have purchased leads, has not signed a written agreement that clearly evidences the person's authorization that calls made by or on behalf of GCU may be placed to a telephone number included in the writing.

46.     In public guidance available throughout the relevant time period, the FTC has advised that, to obtain valid express authorization to call a consumer, a seller must obtain the consumers' affirmative assent to a written authorization that is not hidden; printed in small, pale, or non-contrasting type; or buried in unrelated information where a person would not expect to find such a request.  GCE and GCU had actual notice of this FTC guidance

and were warned by professional telemarketing compliance services that, to constitute valid express written agreement authorizing GCU telemarketing calls, a purported agreement must clearly and conspicuously disclose that the person authorizes the seller to make telemarketing calls; must specifically indicate the seller to whom consent is being provided; must include the telephone number at which the person consents to receive calls; and must require that the consumer take some affirmative action that indicates the consumer's assent.

47.    Until the FTC inquired into GCE's history of calling telephone numbers on do-not-call lists in 2022, Defendants did not examine GCE's call records to determine whether telemarketers were initiating calls to telephone numbers of individuals who had requested that GCU telemarketers not call their numbers and individuals who had placed their telephone numbers on the Registry.  Defendants also took no action to deter telemarketers who initiated telemarketing calls that were contrary to GCE's own do-not-call policies.  Defendants' written plan for do-not-call compliance did not provide for monitoring or enforcement.

48.    After the FTC inquired into GCE's history of calling telephone numbers on do-not-call lists, GCE examined its telemarketer call logs and identified millions of illegal calls.  In March 2023, GCE initiated changes to its CRM system to curtail telemarketer access to telephone numbers GCE deemed to be inconsistent with its do-not-call policy.  The March 2023 changes, however, did not alter GCE's practice of using its CRM system to

furnish telemarketers with telephone numbers provided on forms that do not authorize GCU calls, and encouraging GCE's telemarketers to call telephone numbers obtained through such forms by using the CRM to furnish these numbers to telemarketers with symbols indicating that GCE deems telemarketing calls to these numbers to be exempt from do-not-call restrictions.

### Defendants' Marketing of GCU's Doctoral Programs

49.     Defendants market educational services for doctoral studies in the fields of psychology, education, health and business that promise training in independent research and supervised preparation of a doctoral dissertation. Defendants represent that GCU's College of Doctoral Studies will award individuals who complete the prescribed courses and produce a dissertation of academic quality research in their chosen field a Doctor of Philosophy (PhD), Doctor of Education (EdD), Doctor of Health Administration (DHA) or Doctor of Business Administration (DBA).

50.     Since at least 2018, in marketing GCU's doctoral programs, Defendants have described these programs as "accelerated" programs that enable students to quickly complete their degree, including quickly completing a dissertation.  Among other statements, Defendants' marketing for these programs has included the following:

> The College of Doctoral Studies at Grand Canyon University places doctoral learners on an accelerated path from the first day.

From day one, you are on an accelerated path with the support needed to grow & thrive.  Concerned about your dissertation? Don't be. At GCU, dissertations are built into your coursework so you move forward to graduation step by step.

At Grand Canyon University, the doctoral journey is truly unique. From day one, you are placed on an accelerated path that will prepare you to succeed in your academic journey and career.

51.    Defendants have distributed descriptions of the doctoral programs to prospective students in online publications, catalogues, and charts.  These materials describe the GCU programs as twenty course programs that require a total of 60 credits.  For example, the description of requirements for an online Doctor of Education (EdD) on GCU's main website (https://www.gcu.edu/degree-programs/edd-organizational-leadership-development-qualitative), includes the following list of courses:



52.     Defendants have distributed enrollment agreements to prospective doctoral students for doctoral degrees like the enrollment agreement below. Many of these enrollment agreements, like the agreement below, include a list of twenty courses, and an itemized list of per credit costs and fees, and then state a specific amount as the "Total Program Tuition and Fees," for the doctoral program covered by the agreement.  The "Total Program Tuition and Fees" listed in such agreements is based on the tuition and fees for twenty courses.  The specific amounts in these agreements were between $40,850 and $50,000, depending on the program and date of the agreement.

In the agreement below, the specific amount quoted for Total Program Tuition and Fees" is $43,720:



Arizona      Grand Canyon University • 3300 W Camelback Road, Phoenix Arizona 85017 • 1-800-800-9776     NDBAMQL12B

## Doctor of Business Administration: Marketing (Qualitative Research)
### Enrollment Agreement

| Student Name | | SSN | |
| --- | --- | --- | --- |
| Street Address | | | |
| City | | State | Zip |
| Start Date | | | |

| Program Major: | | 60 credits |
| --- | --- | --- |
| **Total Degree Requirements:** | | **60 credits** |
| **Required Program Major Courses** | | **Credits** |
| RES-815 | Introduction to Research | 3 |
| RES-820E | The Literature Landscape: Business | 3 |
| DBA-820 | Emerging Issues in Financial Management | 3 |
| MKT-830 | The History and Philosophy of Marketing | 3 |
| RES-831 | Foundations of Research Design 1 | 3 |
| RSD-851 | Residency: Dissertation | 3 |
| RES-832 | Foundations of Research Design 2 | 3 |
| MKT-832 | Digital Technology and Consumer Behavior | 3 |
| MKT-834 | Data-Driven Marketing Management | 3 |
| DBA-815 | Economics for Business Decisions | 3 |
| RES-841 | Designing a Qualitative Study 1 | 3 |
| RES-843 | Designing a Qualitative Study 2 | 3 |
| DBA-835 | The Sustainable Future | 3 |
| RSD-883 | Residency: The Qualitative Dissertation | 3 |
| MKT-838 | Complexity of Marketing | 3 |
| DBA-955 | Dissertation I | 3 |
| RES-873 | Qualitative Data Collection and Management | 3 |
| DBA-960 | Dissertation II | 3 |
| RES-883 | Qualitative Data Analysis, Results and Findings | 3 |
| DBA-965 | Dissertation III | 3 |
| **Required Program Major Course Total Credits** | | **60** |

**A minimum of 60 credits are required for completion of this program of study.**
**If taking one course at a time, this program will take a minimum of 39 months. Students with transfer credit that applies to this program will shorten the time to completion from that stated on this enrollment agreement.**

Total Program Credits: 60
Cost Per Credit: $702
Learning Service Management Fee Per Program: $500
Graduation Fee Per Program: $150
Course Fees: $950
Total Program Tuition and Fees: $43,720

Estimated Additional Costs
Book Costs: $910

Program cost is estimated based on current tuition rates and fees.
Costs for courses that require students to purchase a print textbook are based upon retail pricing provided by publishers and are subject to change. Costs for courses where materials are provided digitally are based upon the standard Canyon Connect fees. Costs may increase or decrease depending on electronic availability or publishers' book costs. A one-time Learning Management Service Fee will be charged to new students only. Students continuing from one degree program to another with Grand Canyon University will only be charged this fee for the first program.

**Grand Canyon University™**     3300 W Camelback Rd, Phoenix, AZ 85017 | www.gcu.edu | 1-855-GCU-LOPE

page 7 of 15

53.     Defendants also distribute estimates of tuition costs for doctoral programs to prospective doctoral students that describe the cost of the degree based on the cost for 60 credits, representing twenty courses.

54.     Defendants train telemarketers for GCU doctoral degree marketing campaigns with materials that describe the GCU doctoral programs as requiring twenty courses, which include only three dissertation courses. Defendants' telemarketers solicit doctoral candidates with statements like the following:

> The doctorate goes for 20 courses, which is 60 credits.  And what you're doing a little differently is you're working towards your dissertation at the same time you're doing your courses.  So rather than a typical seven year doctorate, it could be completed a lot faster than that. . . . The ultimate goal is that you finish your coursework in about three years and then pretty soon after you have the opportunity to finish your dissertation and therefore graduate. So it's a very unique system.

55.     Defendants' telemarketers also direct prospective students to, or provide prospective students with, enrollment agreements, catalogues, online publications, charts, and other material, as described in Paragraphs 51 through 53.

56.     In fact, GCU doctoral programs are not limited to the twenty courses identified in enrollment agreements, and dissertation courses in these programs are not limited to the three dissertation courses listed in these agreements (Dissertation I, II, and III).  GCU's requirements for dissertations include eight distinct levels of review that students must complete from the initial prospectus to final approval.  Throughout the

multi-level review process, GCU requires students to produce multiple drafts with extensive revisions.  After a student has completed two years of coursework, GCU appoints one or more faculty members to supervise satisfaction of the requirements.  GCU often imposes these dissertation requirements in courses after the three dissertation courses listed in the agreements and requires any student satisfying these requirements to enroll in, and pay additional tuition for, "continuation courses."

57.    Continuation courses do not involve traditional instruction but are required by GCU while the student is conducting research and making revisions to satisfy dissertation requirements.

58.    The number of continuation courses and time required for doctoral students to advance through GCU's doctoral program depends, in substantial part, on services provided by GCU.  Students' ability to satisfy GCU's requirements may be, and has been, thwarted and delayed by GCU's actions or inaction, such as reassignment of faculty, inconsistent demands during the dissertation review process, and delays caused by the conduct of faculty appointed by GCU to various roles in the dissertation review process.

59.    The enrollment agreements Defendants have distributed to prospective doctoral students with statements that identify the "Total Degree Requirements," "Total Program Credits," or "Total Program Tuition and Fees" do not list the continuation courses that GCU typically requires of doctoral candidates and do not include credits or costs associated with such courses.

60.     GCU very rarely awards doctoral degrees to students upon completion of 60 credits, representing twenty courses.  For example, between July 1, 2018, and December 31, 2022, of the students who obtained GCU doctoral degrees requiring a dissertation:

a.   GCU required continuation courses for 98.5% of the doctoral students to whom it awarded degrees; only 3 out of every 200 successful doctoral students received a degree from GCU upon completing just 60 credits;

b.   For 78% of these students, GCU required five or more continuation courses;

c.   For more than half of these students, GCU required ten or more continuation courses;

d.   For fourteen percent of these students, GCU required twenty or more continuation courses in addition to the twenty courses listed as the required courses for their degree.

61.     The average number of courses GCU required of doctoral graduates awarded degrees in 2019, 2020, 2021 and 2022 was thirty-one – the twenty courses listed in the enrollment agreements described above in Paragraph 52, plus eleven continuation courses.  GCU's charges for eleven continuation courses exceed $10,000.

62.     Most of the students that enroll in GCU doctoral programs never receive the doctoral degree for which they enrolled.  Many of these students are thwarted because they cannot afford the additional costs and time

necessary to fulfill GCU's requirements beyond the twenty courses identified as required.  Many students discover that GCU requires more funds or time than Defendants represented only after they have paid thousands of dollars in tuition and devoted years to GCU courses.  Many of these students withdraw or are compelled to leave GCU without a doctoral degree.

63.     To the extent that Defendants have communicated to prospective students that GCU doctoral programs require more than the twenty courses, they have done so in buried disclaimers, misleading statements, or presentations that distort the program requirements.  For example, in some enrollment agreements and other materials, Defendants have included a buried disclaimer, stating that "on average, doctoral students who graduated required 5.2 continuation courses to complete their doctoral degree."  The 5.2 average was based on information about students graduating between 2011 and early 2017, and did not reflect the experience of recent graduates.  Defendants, however, distributed materials referencing the 5.2 average to prospective students in 2019, 2020, 2021, and 2022.  In fact, GCU has required recent graduates to complete substantially more than 5.2 continuation courses.  For example, the average number of continuation courses GCU required of the students who graduated in 2019 was 10.6 – more than twice the number stated in this disclaimer.  The average number of continuation courses for students who graduated in 2022 was more than 12.

64.     After Defendants received notice of the Commission's investigation, Defendants added a section to GCU's website that acknowledged that GCU, on average, required doctoral students to complete significantly more than 5.2 continuation courses.  Initially, GCU posted a statement in this section that the average number of continuation courses for doctoral graduates since 2011 was 9.5.  GCU later revised this section to state that, by the end of 2022, the average for all doctoral graduates since 2011 was 9.9 continuation courses.  These statements acknowledging the number of continuation courses GCU has required are buried in the gcu.edu website and come too late for students enrolled prior to their release.  Moreover, this addition to GCU's website does not acknowledge the cost of these continuation courses.  Nor does GCU include these statements about the average number of continuation courses in the descriptions of the requirements for doctoral degrees, like those described in Paragraph 51, that appear on GCU's main website.  Additionally, the number of continuation courses GCU has required has increased since 2011, and the average GCU reports in these statements understates the number of continuation courses GCU has required of recent doctoral graduates.

65.     Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission because, among other things:

a.     Defendants continued their unlawful acts or practices despite complaints and lawsuits;

b.    Defendants acted to mitigate their abusive telemarketing practices only after Civil Investigative Demand from the FTC required that GCE acknowledge the extent of GCE's violations;

c.    Defendants continued their deceptive marketing of doctoral practices despite investigations by the Department of Education and the FTC;

d.    Defendants have continued to characterize GCU as a nonprofit; and

e.    Defendants GCU and GCE engaged in their unlawful acts and practices willfully, and knowing that their representations were misleading and their telemarketing practices did not comply with restrictions on abusive telemarketing practices.

## VIOLATIONS OF THE FTC ACT

66.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

67.    Misrepresentations or deceptive omissions of material fact are deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### Count I
### Deceptive Representation of Being a Non-profit Institution

68.    In numerous instances in connection with the advertising, marketing promotion, offering for sale, or sale of educational services, Defendants have represented, directly or indirectly, expressly or by implication, that GCU:

a.  is a non-profit institution; and

    b.  transitioned back to its prior manner of operating as a non-profit institution.

69.    The representations set forth in Paragraph 68 are false or misleading, or were not substantiated at the time the representations were made.

70.    Therefore, Defendants' representations as set forth in Paragraph 68 constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count II
## Deceptive Representation of Doctoral Programs

71.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of GCU educational services, Defendants have represented, directly or indirectly, expressly or by implication, that:

    a.  GCU doctoral degrees that include a dissertation are typically completed in twenty courses or 60 credits; and

    b.  GCU's total charges for doctoral degrees that include a dissertation are the tuition and fees for twenty courses.

72.    The representations set forth in Paragraph 71 are false or misleading, or were not substantiated at the time the representations were made.

73.     Therefore, Defendants' representations as set forth in Paragraph 71 constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

74.     Congress directed the Commission to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The Commission adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter.  16 C.F.R. Part 310.

75.     Among other things, the 2003 amendments to the TSR established a do-not-call registry, maintained by the Commission (the "National Do Not Call Registry" or "Registry"), of consumers who do not wish to receive certain types of telemarketing calls.  Consumers can register their telephone numbers on the Registry without charge either through a toll-free telephone call or over the Internet at donotcall.gov.

76.     Consumers who receive telemarketing calls to their registered numbers can complain of Registry violations the same way they registered, through a toll-free telephone call or over the Internet at donotcall.gov, or by otherwise contacting law enforcement authorities.

77.     The FTC allows sellers, telemarketers, and other permitted organizations to access the Registry over the Internet at telemarketing.donotcall.gov, to pay the fee(s) if required, and to download the numbers not to call.

78.     Under the TSR, a "telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor.  16 C.F.R. § 310.2(ff).  A "seller" means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration.  *Id.* § 301.2(dd).

79.     It is a deceptive telemarketing act or practice and a violation of the TSR for any seller or telemarketer to misrepresent, directly or by implication, in the sale of goods or services, any of the following material information:

   a.  The total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of a sales offer;

   b.  Any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer.

16 C.F.R. § 310.3(a)(2)(i), (iii).

80.     Under the TSR, an "outbound telephone call" means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution.  16 C.F.R. § 310.2(x).

81.     The TSR prohibits sellers and telemarketers from initiating outbound telephone calls to any consumer who has previously stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered, or made by or

on behalf of the charitable organization for which a charitable contribution is being solicited (an "Entity-Specific Do Not Call request").  16 C.F.R. § 310.4(b)(l)(iii)(A).

82.     The TSR prohibits sellers and telemarketers from initiating an outbound telephone call to numbers on the Registry unless the seller (1) has obtained the consumer's express agreement, in writing, to place such calls, or (2) has an established business relationship with that consumer, and the consumer has not stated that he or she does not wish to receive such calls. 16 C.F.R. § 310.4(b)(1)(iii)(B).  Valid written agreement to receive a live telemarketing call to a number on the Registry requires a writing: (i) signed by the consumer, (ii) clearly evidencing authorization to receive calls placed on behalf of a specific seller, and (iii) stating the phone number to which such calls may be placed.  *Id.* § 310.4(b)(1)(iii)(B)(1).

83.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

84.     Defendant GCE is a "telemarketer" engaged in "telemarketing" as those terms are defined in the TSR.

85.     Defendant GCU is a "seller" engaged in "telemarketing" as those terms are defined in the TSR.

86.     Defendants have engaged in telemarketing by a plan, program, or campaign conducted to induce the purchase of educational services by the

use of one or more telephones and which involves more than one interstate telephone call.

87.    Defendants initiated outbound telephone calls to consumers in the United States to induce the purchase of educational services.

## Count III

## Deceptive Telemarketing Acts or Practices

88.    In numerous instances, in connection with the telemarketing of educational services, Defendants have misrepresented, directly or indirectly, expressly or by implication, material information regarding GCU and its services, including, but not limited to representations that:

a.  GCU is a non-profit institution;

b.  GCU transitioned back to its prior manner of operation as a non-profit educational institution;

c.  GCU doctoral degrees that include a dissertation are typically completed in twenty courses or 60 credits; and

d.  GCU's total charges for doctoral degrees that include a dissertation are the tuition and fees for twenty courses.

89.    Therefore, Defendants' acts or practices as set forth in Paragraph 88 violate Section 3103(a)(2)(i), (iii) of the TSR.  16 C.F.R. § 310.3(a)(2)(i), (iii).

**Count IV**

**Calls to Persons Who Have Requested GCU Not Contact Them Through Telemarketing**

90.     In numerous instances, in connection with telemarketing, Defendants have initiated or caused others to initiate an outbound telephone call to a person who has previously stated that he or she does not wish to receive such a call made by or on behalf of the seller whose goods or services are being offered in violation of the TSR.  16 C.F.R. § 310.4(b)(1)(iii)(A).

**Count V**

**Calls to Persons Registered on the National Do Not Call Registry**

91.     In numerous instances, in connection with telemarketing, Defendants have initiated or caused others to initiate an outbound telephone call to a person's telephone number on the National Do Not Call Registry in violation of the TSR.  16 C.F.R. § 310.4(b)(1)(iii)(B).

**<u>CONSUMER INJURY</u>**

92.     Consumers are suffering, have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the TSR.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, the FTC requests that the Court:

A. Enter a permanent injunction to prevent future violations of the TSR and the FTC Act by Defendants;

B. Award monetary and other relief within the Court's power to grant; and

C. Award any additional relief the Court determines to be just and proper.

Dated this 27th day of December, 2023

Respectfully submitted,

/S/

_____
Michael E. Tankersley
Naomi Takagi
Brian Berggren

Attorneys for Plaintiff Federal Trade Commission