1
2
3
4
5
6 **IN THE UNITED STATES DISTRICT COURT**

7 **FOR THE DISTRICT OF ARIZONA**

8

9 Federal Trade Commission,

No. CV-23-02711-PHX-DWL

10           Plaintiff

**ORDER**

11 v.

12 Grand Canyon Education, Inc.; Grand
Canyon University; and Brian E. Mueller

13

14           Defendants.

15       In advance of the motion hearing on July 30, 2024, the Court wishes to provide the

16 parties with its tentative ruling.  The point of providing it beforehand is to streamline oral

17 argument and enhance the parties' ability to address any perceived errors in the Court's

18 tentative analysis.  This is not an invitation to submit additional evidence or briefing.

19       Dated this 24th day of July, 2024.

20

21

22 _____

23           Dominic W. Lanza
           United States District Judge

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
TENTATIVE RULING
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In this action, the Federal Trade Commission ("FTC") asserts claims against Grand Canyon Education, Inc. ("GCE"), Grand Canyon University ("GCU"), and Brian E. Mueller ("Mueller"), who is GCU's president and GCE's CEO and chairman of the board, for (1) making deceptive representations concerning GCU's status as a non-profit institution; (2) making deceptive representations concerning GCU's doctoral programs; (3) making both sets of deceptive representations in connection with the telemarketing of educational services; (4) initiating telemarketing calls to persons who requested that GCU not contact them; and (5) initiating telemarketing calls to persons registered on the national Do-Not-Call Registry.

Now pending before the Court are a motion to dismiss filed by GCU and Mueller (Doc. 27) and a partial motion to dismiss filed by GCE (Doc. 30). Additionally, Defendants have sought judicial notice of various documents. (Docs. 28, 30-2.) For the reasons that follow, each motion to dismiss is granted in part and denied in part, while the requests for judicial notice are largely granted.

## BACKGROUND

I.   <u>Factual Allegations</u>

The following factual allegations are set forth in the FTC's operative pleading, the unredacted version of the Complaint. (Doc. 25.)

A.   **The Parties**

The "FTC is an independent agency of the United States." (*Id.* ¶ 4.) It "enforces Section 5(a) of the FTC Act," which prohibits certain "unfair or deceptive acts or practices," as well as 16 C.F.R. Part 310 ("the Telemarketing Sales Rule"), "which prohibits deceptive and abusive telemarketing practices." (*Id.*)

GCE is a publicly traded Delaware corporation. (*Id.* ¶ 5.) "Through June 30, 2018, GCE owned and operated [GCU] as a for-profit institution." (*Id.*) "Since July 1, 2018, as a result of a series of transactions orchestrated by GCE and its officers, GCE has been the exclusive provider of marketing services for . . . GCU and receives most of [GCU]'s revenue." (*Id.*)

GCU "is an Arizona corporation formerly known as Gazelle University" that "acquired rights to the name [GCU] and began using that name in July 2018." (*Id.* ¶ 6.)

Mueller is "the President of GCU, and the Chief Executive Officer, Chairman of the Board and a director of . . . GCE." (*Id.* ¶ 7.) The FTC alleges that Mueller "directed GCE's efforts to re-brand the University as a nonprofit, and promoted representations that the July 2018 division of operations between GCE and GCU resulted in the University returning to operation as a traditional nonprofit university." (*Id.*) The FTC further alleges that "[a]t all times relevant to this Complaint, acting alone or in concert with others, [Mueller] has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of GCU and GCE, including the acts and practices described in this Complaint." (*Id.*)

## B.    Non-Profit Allegations

In 2004, GCE purchased what is now GCU and began operating it as a for-profit institution. (*Id.* ¶ 10.) "GCE became a publicly traded company in November 2008, published business plans for maximizing the financial performance of the institution, and solicited investment based on the reported and projected profit from GCE's operation of this institution." (*Id.*)

In 2014, GCE chartered GCU as an Arizona nonprofit corporation under the new name Gazelle University. (*Id.* ¶ 11.) "Since 2017, [Mueller] has continuously held the offices of CEO of GCE, Chairman of the Board of GCE, and President of Gazelle University/GCU." (*Id.* ¶ 12.) "Mueller receives salary, bonuses, and other compensation from both Defendants GCU and GCE. His compensation includes cash and stock incentives that are linked to GCE's financial performance and are explicitly designed to align his interests with those of GCE stockholders." (*Id.*) Despite GCU's classification as a nonprofit, the FTC alleges that it "was, in fact, organized by GCE and Defendant Mueller to advance GCE's for-profit business and advance Defendant Mueller's interests as officer, chairman, director, stockholder and promoter of investment in GCE" and therefore is "operated to carry on business for its own profit or that of its members, within the meaning

of Section 4 of the FTC Act."  (*Id.* ¶ 13.)

"On July 1, 2018, GCE executed interrelated agreements that resulted in Gazelle University assuming its current name, Grand Canyon University.  As a result of these agreements, GCE transferred the trademarks, campus, and certain assets and liabilities of the institution that GCE had operated as 'Grand Canyon University,' to GCU in exchange for GCU agreeing to pay GCE more than $870 million plus 6% annual interest."  (*Id.* ¶ 14.) A Master Services Agreement (the "MSA" or the "Master Services Agreement") "executed as part of this transaction makes GCE the service provider for certain essential GCU operations in exchange for a bundled fee that is equal to 60% of GCU's 'Adjusted Gross Revenue.'"  (*Id.*)

"Since July 1, 2018, pursuant to the Master Services Agreement, GCE has been the exclusive provider of marketing for GCU and services related to communicating with prospective GCU students regarding applications, program requirements, and financing options.  GCE, pursuant to the Master Services Agreement, is also the exclusive provider for GCU of student support services and counseling, technology (including GCU's platform for online education) and budget analysis services.  GCU is not permitted to contract with any third party for these services.  Since July 1, 2018, GCE has also been the sole provider of GCU's student records management, curriculum services, accounting services, technology services, financial aid services, human resources services, procurement, and faculty payroll and training."  (*Id.* ¶ 15.)

The FTC alleges that "[t]he fees GCE receives from GCU are not subject to any limit and are not proportionate to GCE's costs for providing services to GCE.  GCE receives 60% of GCU's revenue from tuition and fees from students, including 60% of charitable contributions to GCU for payment of student tuition and fees.  If GCU revenue from these sources increases at a rate faster than operating costs, GCE disproportionately benefits from the increased revenue.  In addition, GCE does not provide services for student housing, food services, operation of the GCU hotel conference center, or athletic arena, but still receives 60% of the revenue from these operations.  If GCU revenue from these

activities increases, GCE disproportionately benefits." (*Id.* ¶ 16.)  The MSA also "makes it impractical for GCU to use any provider other than GCE for essential services." (*Id.* ¶ 17.)  "Since July 1, 2018, GCU's revenue has generated profit for GCE and its investors. GCE reports to investors that it has profited, and projects that it will continue to profit, from GCU's obligations to GCE.  GCU continues to be GCE's most significant source of revenue." (*Id.* ¶ 19.)

The FTC alleges that "GCU's operations since July 1, 2018, are not comparable to Grand Canyon University's operation as a nonprofit prior to 2004, as GCU is largely operated by, and most of its revenue is paid to, GCE—the for-profit corporation that owned and operated the University from 2004 until July 1, 2018." (*Id.* ¶ 20.)  Nonetheless, "[b]eginning shortly after transfer of the 'Grand Canyon University' name to GCU on July 1, 2018, Defendants began promoting GCU in advertising and telemarketing as a private 'nonprofit' university and disseminated digital and print advertising" suggesting that "GCU had gone 'Back to Non-Profit Roots' and 'transitioned back to a nonprofit institution.'" (*Id.* ¶ 21.)

In December 2018, Mueller stated during an interview that "the characterization of GCU as a non-profit educational institution is a tremendous advantage.  We can recruit in high schools that would not let us in the past.  We're just 90 days into this, but we're experiencing, we believe, a tailwind already just because of how many students didn't pick up the phone because we were for-profit." (*Id.* ¶ 23.a, cleaned up.)

In February 2019, Mueller stated during a GCE earnings call that "new student online growth after the conversion of Gazelle to GCU was more than we expected and I think it's evidence that being out there now a million times a day saying we're non-profit has had an impact." (*Id.* ¶ 23.b, cleaned up.)

On November 6, 2019, the United States Department of Education ("DOE") "rejected GCU's request that it be recognized as a nonprofit institution under the Higher Education Act, and classified GCU as a for-profit participant in federal education programs." (*Id.* ¶ 24, emphasis omitted.)  The DOE also stated that "GCU must cease any

advertising or notices that refer to its 'nonprofit status.'  Such statements are confusing to students and the public, who may interpret such statements to mean that the [DOE] considers GCU a nonprofit under its regulations." (*Id.*)  The DOE explained that "GCU does not meet the 'operational test' for nonprofit status 'that both the primary activities of the organization and its stream of revenue benefit the nonprofit itself'" because "GCE and its stockholders—rather than Gazelle/GCU—are the primary beneficiaries of the operation of GCU under the terms of the Master Services Agreement." (*Id.* ¶ 25.)[1]  "Defendants discontinued and removed most statements characterizing GCU as a nonprofit shortly after November 6, 2019." (*Id.* ¶ 24.)

C.     **Telemarketing Allegations**

"GCE has hundreds of sales representatives that solicit prospective students through a variety of means, including telemarketing . . . .  The telemarketers' duties include describing the central characteristics of GCU to prospective students, and the requirements, costs, and projected length of GCU educational programs." (*Id.* ¶ 30.)

"Since July 2018, Defendant GCE has initiated tens of millions of telemarketing calls on behalf of GCU." (*Id.* ¶ 33.)  "Until at least March 2023, GCE did not remove from . . . its customer relationship management . . . , system, or block their telemarketers' access to, the telephone numbers of individuals who had requested that telemarketers acting on behalf of GCU not call their numbers" or "of any individuals whose telephone numbers were listed on the . . . National Do Not Call Registry." (*Id.* ¶¶ 32, 35, 37-38.)  "GCE telemarketers acting on behalf of GCU have initiated more than a million telemarketing calls to telephone numbers of consumers who had, prior to the call, specifically requested that telemarketing calls for GCU not be made to that telephone number" and/or "placed their numbers on the National Do Not Call Registry." (*Id.* ¶¶ 36, 39.)

D.     **Doctoral Program Allegations**

"Defendants market educational services for doctoral studies in the fields of

---

[1]     GCU challenged the DOE's decision. (*Id.* ¶ 26.)  The District of Arizona upheld the decision, and GCU's appeal is currently before the Ninth Circuit. (*Id.*)

psychology, education, health and business that promise training in independent research and supervised preparation of a doctoral dissertation." (*Id.* ¶ 49.) "Since at least 2018, in marketing GCU's doctoral programs, Defendants have described these programs as 'accelerated' programs that enable students to quickly complete their degree, including quickly completing a dissertation." (*Id.* ¶ 50.) As one example, Defendants have marketed the doctoral programs by stating: "The College of Doctoral Studies at [GCU] places doctoral learners on an accelerated path from the first day. . . . Concerned about your dissertation? Don't be. At GCU, dissertations are built into your coursework so you move forward to graduation step by step." (*Id.*)

"Defendants have distributed descriptions of the doctoral programs to prospective students in online publications, catalogues, and charts. These materials describe the GCU programs as twenty course programs that require a total of 60 credits. For example, the description of requirements for an online Doctor of Education . . . on GCU's main website" lists 20 courses including "Residency: Dissertation," "Dissertation I," "Dissertation II," and "Dissertation III," along with various substantive courses. (*Id.* ¶ 51.)

"Defendants have distributed enrollment agreements to prospective doctoral students for doctoral degrees," many of which "include a list of twenty courses, and an itemized list of per credit costs and fees, and then state a specific amount as the 'Total Program Tuition and Fees,' for the doctoral program covered by the agreement . . . based on the tuition and fees for twenty courses." (*Id.* ¶ 52.) As one example, an enrollment agreement for a "Doctor of Business Administration: Marketing (Qualitative Research)" lists 20 courses (totaling 60 credits) including the same four dissertation courses as the doctorate in education program. (*Id.*) It states the program costs $702 per credit, lists a "Total Program Tuition and Fees" of "$43,720" based on the 60 credits, and also states that "[p]rogram cost is estimated based on current tuition rates and fees." (*Id.*) The agreement also states in bold that "[a] minimum of 60 credits are required for completion of this program of study." (*Id.*)

Also, "Defendants train telemarketers for GCU doctoral degree marketing

campaigns with materials that describe the GCU doctoral programs as requiring twenty courses, which include only three dissertation courses." (*Id.* ¶ 54.) As one example, telemarketers have been trained to say the following to prospective students:

> The doctorate goes for 20 courses, which is 60 credits. And what you're doing a little differently is you're working towards your dissertation at the same time you're doing your courses. So rather than a typical seven year doctorate, it could be completed a lot faster than that. . . . The ultimate goal is that you finish your coursework in about three years and then pretty soon after you have the opportunity to finish your dissertation and therefore graduate. So it's a very unique system.

(*Id.*)

However, the FTC alleges that "GCU doctoral programs are not limited to the twenty courses identified in enrollment agreements, and dissertation courses in these programs are not limited to the three dissertation courses listed in these agreements (Dissertation I, II, and III)." (*Id.* ¶ 56.) The FTC alleges that: "GCU's requirements for dissertations include eight distinct levels of review that students must complete from the initial prospectus to final approval. Throughout the multi-level review process, GCU requires students to produce multiple drafts with extensive revisions. After a student has completed two years of coursework, GCU appoints one or more faculty members to supervise satisfaction of the requirements. GCU often imposes these dissertation requirements in courses after the three dissertation courses listed in the agreements and requires any student satisfying these requirements to enroll in, and pay additional tuition for, 'continuation courses.'" (*Id.*) The FTC further alleges that "[c]ontinuation courses do not involve traditional instruction but are required by GCU while the student is conducting research and making revisions to satisfy dissertation requirements." (*Id.* ¶ 57.) The FTC contends that "[t]he number of continuation courses and time required for doctoral students to advance through GCU's doctoral program depends, in substantial part, on services provided by GCU. Students' ability to satisfy GCU's requirements may be, and has been, thwarted and delayed by GCU's actions or inaction, such as reassignment of faculty, inconsistent demands during the dissertation review process, and delays caused by the conduct of faculty appointed by GCU to various roles in the dissertation review process."

1    (*Id.* ¶ 58.)

2         The FTC alleges that, in practice, "GCU very rarely awards doctoral degrees to

3    students upon completion of 60 credits, representing twenty courses."  (*Id.* ¶ 60.)  "The

4    average number of courses GCU required of doctoral graduates awarded degrees in 2019,

5    2020, 2021 and 2022 was thirty-one . . . .  GCU's charges for eleven continuation courses

6    exceed $10,000."  (*Id.* ¶ 61.)  "Most of the students that enroll in GCU doctoral programs

7    never receive the doctoral degree for which they enrolled.  Many of these students are

8    thwarted because they cannot afford the additional costs and time necessary to fulfill

9    GCU's requirements beyond the twenty courses identified as required."  (*Id.* ¶ 62.)  The

10   FTC contends that "[t]o the extent that Defendants have communicated to prospective

11   students that GCU doctoral programs require more than the twenty courses, they have done

12   so in buried disclaimers, misleading statements, or presentations that distort the program

13   requirements."  (*Id.* ¶ 63.)

14   II.   <u>Procedural History</u>

15        On December 27, 2023, the FTC initiated this action by filing a redacted complaint.

16   (Doc. 1.)

17        On January 29, 2024, after some wrangling, a fully unredacted version of the

18   Complaint was publicly filed.  (Doc. 25.)

19        On February 9, 2024, GCU and Mueller moved to dismiss the Complaint (Doc. 27)

20   and GCE filed a separate partial motion to dismiss (Doc. 30).  That same day, GCU and

21   Mueller filed a request for judicial notice.  (Doc. 28.)  GCE also included a request for

22   judicial notice as an attachment to its motion.  (Doc. 30-2.)

23        On February 29, 2024, the FTC filed a consolidated response to both motions to

24   dismiss and the requests for judicial notice.  (Doc. 44.)

25        On March 1, 2024, GCU and Mueller filed a reply in support of their motion to

26   dismiss.  (Doc. 45.)

27        On March 7, 2024, GCE filed a reply in support of its partial motion to dismiss.

28   (Doc. 46.)

On April 10, 2024, the Court held the Rule 16 scheduling conference.  (Doc. 51.) Pursuant to Defendants' request in the Rule 26(f) report (Doc. 47 at 10-12), and over the FTC's objection, the Court stayed discovery pending the resolution of the motions to dismiss.  (Doc. 51.)

On July 24, 2024, the Court issued a tentative ruling.  (Doc. 53.)

On July 30, 2024, the Court heard oral argument.

## DISCUSSION

### I.    Legal Standard

Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (citation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party."  *Id.* at 1444-45 (citation omitted).  However, the Court need not accept legal conclusions couched as factual allegations.  *Iqbal*, 556 U.S. at 678-80.  Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 678.  The Court also may dismiss due to "a lack of a cognizable legal theory."  *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

### II.    Constitutionality Of The FTC's Enforcement Authority

#### A.    **The Parties' Arguments**

GCU and Mueller contend that "the FTC's complaint suffers from [a] fundamental and fatal defect: it reflects an unconstitutional assertion of power."  (Doc. 27 at 15.)  GCU and Mueller acknowledge that "[i]n the 1970s, Congress enacted new legislation empowering the FTC to bring civil lawsuits seeking permanent injunctions and monetary awards" but contend that because the FTC is an "agency whose heads are insulated from

the President's removal authority," that legislation was unconstitutional.  (*Id.* at 15-17.)
GCU and Mueller acknowledge that *Humphrey's Executor v. United States*, 295 U.S. 602
(1935), rejected a constitutional challenge to the FTC's structure but contend that
*Humphrey's Executor* was wrongly decided and is, in any event, no longer applicable
because the FTC now exercises executive power in a manner it did not in 1935.  (Doc. 27
at 15-17.)  GCU and Mueller conclude: "[B]ecause Congress violated the Constitution
when it amended the FTC Act to grant the FTC . . . core executive powers . . . , each of
those unconstitutional statutory amendments is a nullity and was void when enacted.  The
net effect is that the FTC lacks authority to bring this lawsuit, necessitating dismissal."  (*Id.*
at 17, cleaned up.)

The FTC responds that GCU's and Mueller's "constitutional attack . . . fails for two
independent reasons."  (Doc. 44 at 25.)  First, the FTC contends that GCU and Mueller
cannot establish they were "actually harmed," as this would require "showing that (1) the
President expressed a desire to remove the Commissioners but could not do so, and (2) the
enforcement proceeding resulted from the President's inability to remove those officials."
(*Id.* at 25-26, emphasis omitted.)  Second, the FTC contends that any "challenge to the
FTC's removal provision is foreclosed by Supreme Court and Ninth Circuit precedent that
specifically addresses the constitutionality of the FTC."  (*Id.* at 26.)  The FTC also contends
that recent Supreme Court opinions like *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020), do
not compel a reexamination of those precedents because they "involved agency structures
that differ from those of the FTC" and "decided to leave *Humphrey's Executor* in place."
(Doc. 44 at 26-27.)

In reply, GCU and Mueller dispute that they need to show they were harmed by the
removal provision because they "take the constitutionality of the removal provision as a
given at this stage and challenge only the 1970s-era statutes purporting to give the FTC
quintessentially executive power—statutes not addressed in *Humphrey's Executor*."  (Doc.
45 at 10, cleaned up.)  GCU and Mueller also contend that, for reasons discussed in more
detail below, their challenge is not foreclosed by *Humphrey's Executor*.  (*Id.* at 11.)

B.     **Analysis**

The constitutional challenge raised by GCU and Mueller is foreclosed by settled Ninth Circuit law.  In *FTC v. American National Cellular, Inc.*, 810 F.2d 1511 (9th Cir. 1987), the defendants argued—just as GCU and Mueller argue here—that an enforcement action brought by the FTC following the 1970s-era amendments to the FTC Act should be dismissed because Congress "violated . . . the United States Constitution by authorizing the FTC to enforce federal law." *Id.* at 1512 (footnote omitted).  The defendants further argued—just as GCU and Mueller argue here—that because "section 13(b) of the Act was not yet enacted when *Humphrey's Executor* was decided, *Humphrey's Executor* is not controlling." *Id.* at 1514.  The Ninth Circuit rejected those arguments and "found the Act constitutional." *Id.*

GCU and Mueller attempt to distinguish *American National Cellular* by arguing that it dealt with injunctive relief rather than monetary penalties (Doc. 45 at 11), but the opinion explicitly upheld the amended FTC Act's constitutionality before proceeding to the separate analytical step of evaluating the use of that statute to obtain an injunction.  *Am. Nat. Cellular,* 810 F.2d at 1514 ("We hold, therefore, that the enforcement provisions of the Act are constitutional, under *Humphrey's Executor*.   Having found the Act constitutional, we now proceed to review the district court's grant of the preliminary injunction.").

GCU and Mueller also urge the Court not to follow *American National Cellular*, both because it took a "remarkably weak view of the separation of powers" and because it has been "gravely undermine[d]" by "[i]ntervening Supreme Court decisions."  (Doc. 45 at 11.)   The former argument requires little discussion, as this Court has no license to second-guess whether *American National Cellular* was correctly decided at the time it was issued.  *Hasbrouck v. Texaco, Inc.*, 663 F.2d 930, 933 (9th Cir. 1981) ("District courts are bound by the law of their own circuit . . . no matter how egregiously in error they may feel their own circuit to be.") (citation omitted).

As for the latter argument, the rule in the Ninth Circuit is that "a district court or a

three-judge panel is free to reexamine the holding of a prior panel" only if "the relevant court of last resort [has] undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc).  This principle does not aid GCU and Mueller here because *American National Cellular* is not "clearly irreconcilable" with *Seila Law*.  GCU and Mueller are correct that in *Seila Law*, the Supreme Court recognized that seeking substantial financial penalties is a quintessential executive function.  591 U.S. at 219.  Nonetheless, the Supreme Court also stated that it was not revisiting its prior precedent that had allowed some restrictions on the President's removal powers, including in the context of the FTC.  *Id.* at 204, 228.  Rather, the Supreme Court rejected restrictions on the President's power to remove the director of the CFPB because the CFPB was "an independent agency led by a single Director" and was unlike "nearly every other independent administrative agency in our history" including the FTC, which is "under the leadership of a board with multiple members."  *Id.* at 203-04, 218 ("Unlike the New Deal-era FTC upheld [in *Humphrey's Executor*], the CFPB is led by a single Director who cannot be described as a 'body of experts' and cannot be considered 'non-partisan' in the same sense as a group of officials drawn from both sides of the aisle.  Moreover, while the staggered terms of the FTC Commissioners prevented complete turnovers in agency leadership and guaranteed that there would always be some Commissioners who had accrued significant expertise, the CFPB's single-Director structure and five-year term guarantee abrupt shifts in agency leadership and with it the loss of accumulated expertise.") (citation omitted).  As many other courts (including the Fifth Circuit) have concluded, these details mean that *Seila Law* should not be interpreted as overruling prior cases upholding the constitutionality of the FTC or the FTC's enforcement authority under the amended FTC Act.  *See, e.g.*, *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1047 (5th Cir. 2023) ("[A]lthough the FTC's powers may have changed since *Humphrey's Executor* was decided, the question of whether the FTC's authority has changed so fundamentally as to render *Humphrey's Executor* no longer binding is for the Supreme Court, not us, to answer."); *United States v.*

*Stratics Networks Inc.*, 2024 WL 966380, *16 (S.D. Cal. 2024) ("Defendants argue the responsibility and functions of the FTC have grown in the years since *Humphrey's Executor* such that the FTC now exercises executive powers . . . [but the] Ninth Circuit has previously addressed this question . . . and determined Section 45 did not offend the principle of separation of powers.") (citations omitted); *FTC v. Kochava, Inc.*, 671 F. Supp. 3d 1161, 1179 (D. Idaho 2023) ("[A]lthough the Supreme Court expressed some skepticism toward *Humphrey's Executor* in *Seila Law*, this Court is not persuaded that *Seila Law* invalidates the Ninth Circuit's clear holding in *American National Cellular*.") (footnote omitted).

III.   Whether GCU Is A "Corporation" Under The FTC Act And The Telemarketing Sales Rule

A.   **The Parties' Arguments**

GCU argues that the "FTC lacks jurisdiction under the FTC Act and Telemarketing Act to pursue claims against GCU" because the FTC "has jurisdiction over 'persons, partnerships, or corporations,'" but GCU does not fall within any of those statutory definitions.  (Doc. 27 at 6.)[2]  According to GCU, the FTC Act only applies to a corporation that is "organized to carry on business for its own profit or that of its members," and "[a]s a nonprofit entity created under Arizona law, GCU is decidedly not organized to carry on business for its own profit."  (*Id.*, emphasis omitted.)  GCU further contends that even if it were organized to benefit GCE and Mueller, they are not its members.  (*Id.* at 7.)

The FTC responds that it has sufficiently alleged that "GCU is a for-profit entity because it was organized to, and does, benefit its for-profit founder, GCE, and President,

_____

[2]     Although GCU frames this as a jurisdictional challenge, it is properly conceptualized as a merits-based challenge under Rule 12(b)(6), not a challenge to the Court's subject-matter jurisdiction under Rule 12(b)(1).  *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) (distinguishing between a "lack of statutory standing [that] requires dismissal for failure to state a claim" and a "lack of Article III standing [that] requires dismissal for lack of subject matter jurisdiction") (emphasis omitted); *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89 (1998) ("It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional power to adjudicate the case.") (emphasis omitted).

Defendant Mueller" and because "[a] genuine nonprofit does not siphon its earnings to its founder, or the members of its board, or their families, or anyone else fairly to be described as an insider." (Doc. 44 at 3, cleaned up.)  The FTC contends that it "is authorized to act against companies, like GCU, that purport to be nonprofit, but are organized to promote a for-profit business or funnel income to officers or other insiders." (*Id.* at 5.)  The FTC further argues that "GCE's observation that Arizona and IRS statutes reference nonprofit or tax-exempt status is beside the point" because "those statutes do not supplant the FTC's authority." (*Id.* at 6, citation omitted.)

In reply, GCU contends that because the FTC does not argue that GCU is a "person" or "partnership" under the FTC Act, it "lacks authority to bring this suit against GCU unless it can establish that GCU is a 'corporation' under the FTC Act's limited definition of that term—*i.e.*, a company that is organized to carry on business for its own profit or that of its members." (Doc. 45 at 1, cleaned up.)  GCU contends that the FTC has not made that showing because it merely alleges that GCU executed the MSA, which "generates profit for an entirely different corporation and its members," and "[t]he FTC likewise does not allege that GCU is organized for the profit of its sole member: the non-profit Grand Canyon University Foundation." (*Id.*, cleaned up.)  GCU concludes: "There is simply no case holding that the FTC may bring an enforcement action against a recognized non-profit under a theory that its activities allow a separate, for-profit company and its shareholders to generate a profit, [a]nd understandably so, as non-profits routinely contract with for-profit companies, which (as the name of the latter implies) invariably hope to turn a profit off such deals." (*Id.* at 3, cleaned up.)

## B.    **Analysis**

GCU's challenge turns on a legal issue that is, at least from the Court's perspective, surprisingly undeveloped—the FTC's authority to assert claims against nonprofit entities under § 5 of the FTC Act.  Although the Supreme Court and several circuit courts issued opinions a few decades ago addressing the FTC's authority to assert claims under § 5 against one particular type of nonprofit entity—a nonprofit corporation with for-profit

members that is expressly organized to benefit those members—there is a dearth of authority addressing the FTC's authority to pursue claims under § 5 against an entity like GCU that, although formally organized as a non-profit corporation under state and federal law, is allegedly being operated to generate profits for "insiders" who are not members.

With that backdrop in mind, and "[a]s in all statutory construction cases, we begin with the language itself and the specific context in which that language is used." *McNeill v. United States*, 563 U.S. 816, 819 (2011) (cleaned up). Under § 5 of the FTC Act, the FTC may sue a "person, partnership, or corporation." 15 U.S.C. § 45(m)(1)(A). GCU argues—and the FTC does not seem to dispute—that GCU is not a "person" or "partnership" under the Act, so the dismissal analysis turns on whether GCU qualifies as a "corporation." (Doc. 44 at 1, 3-4; Doc. 45 at 1.) Section 4 of the FTC Act defines a "corporation" as:

> any company, trust, so-called Massachusetts trust, or association, incorporated or unincorporated, which is organized to carry on business for its own profit or that of its members, and has shares of capital or capital stock or certificates of interest, and any company, trust, so-called Massachusetts trust, or association, incorporated or unincorporated, without shares of capital or capital stock or certificates of interest, except partnerships, which is organized to carry on business for its own profit or that of its members.

15 U.S.C. § 44. Thus, as relevant here, one way an entity may qualify as a "corporation" under this definition is if it is a (1) "company," (2) "incorporated or incorporated," (3) "without shares of capital or capital stock or certificates of interest," (4) "which is organized to carry on business for its own profit or that of its members." *Id.*

The Complaint sufficiently alleges that GCU meets the first three requirements via its allegations that GCU "is an Arizona corporation formerly known as Gazelle University," that Mueller "chartered" Gazelle University in November 2014 "under the Arizona Nonprofit Corporation Act," and that "[t]he articles of incorporation of Gazelle University/GCU represent that it is organized and operated exclusively for charitable, religious, and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code." (Doc. 25 ¶¶ 6, 11, 13.) The dispute over whether GCU qualifies as a "corporation" thus turns on the fourth requirement—whether GCU is also "organized to

carry on business for its own profit or that of its members." 15 U.S.C. § 44.  The Complaint alleges this requirement is satisfied because "GCU has been operated to carry on business for its own profit or that of its members, within the meaning of Section 4 of the FTC Act." (Doc. 25 ¶ 13.)

As an initial matter, there is a subtle but potentially significant difference between the Complaint's allegation on this point and the statutory language.  As noted, the Complaint alleges that GCU qualifies as a "corporation" because it "*has been operated*" to carry on business for its profit or the profit of its members.  However, the statute does not speak to how an entity has been operated in practice—it speaks to how the entity is "*organized*."  And as noted, the Complaint acknowledges that GCU was "chartered . . . under the Arizona Nonprofit Corporation Act" and that GCU's "articles of incorporation . . . represent that it is organized and operated exclusively for charitable, religious, and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code." (Doc. 25 ¶¶ 11, 13.)

The FTC contends these formal organizational details are irrelevant because "its authority is not dependent on state corporation filings or IRS status" and because "a state charter does not control whether an entity is subject to FTC enforcement authority." (Doc. 44 at 5-6.)[3]  Although several courts have agreed with the FTC on this point,[4] the potential

---

[3]  In the past, FTC representatives have taken a somewhat different position on this issue, stating that "[a]bsent some other grounds for jurisdiction, we are unlikely to open an investigation into charities that have been granted tax-exempt status by the IRS under Section 501(c)(3) of the Internal Revenue Code."  *Matter of Adventist Health Sys./West*, 1991 WL 11008533, *13 (F.T.C. 1991) (quoting the congressional testimony of "then-Director of the FTC Bureau of Consumer Protection MacLeod").

[4]  *Community Blood Bank of Kansas City Area, Inc. v. FTC*, 405 F.2d 1011, 1018-19 (8th Cir. 1969) (stating that "Congress took pains in drafting § 4 to authorize the Commission to regulate so-called nonprofit corporations, associations and all other entities if they are in fact profit-making enterprises," that "the question of the jurisdiction over the corporations or other associations involved should be determined on an ad hoc basis," and that "we do not mean to hold or even suggest that the charter of a corporation and its statutory source are alone controlling"); *FTC v. Fin. Educ. Servs.*, 2023 WL 8101841, *2-3 (E.D. Mich. 2023) (allegation that nonprofit carried on business for the benefit of its "owner, officer, director, or manager" was sufficient to "plausibly demonstrate that [it] operates as a for-profit business within the FTC Act's jurisdiction"); *FTC v. AmeriDebt, Inc.*, 343 F. Supp. 2d 451, 460-61 (D. Md. 2004) (denying motion to dismiss, where movant argued that it did not qualify as a "corporation" because it was "incorporated as a non-stock corporation with tax-exempt status" and "the Complaint fatally omits any allegation that

- 18 -

difficulty with this argument is that the statute uses the word "organized," not "operated." Those terms have distinct meanings, and Congress has specified in other contexts that an entity should be treated as a nonprofit only if it was both "organized" as a nonprofit and thereafter "operated" as a nonprofit.  26 U.S.C. § 501(c)(3) (creating an exemption from taxation for "[c]orporations, and any community chest, fund, or foundation, *organized and operated* exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes . . . .") (emphasis added).  Congress did not follow the same approach in § 4 of the FTC Act—it only authorized the FTC to pursue claims against an entity that is "organized to carry on business for its own profit or that of its members." This raises at least an inference that Congress only intended to vest the FTC with authority over entities that are formally organized to carry on business for their own profit or that of their members—which GCU is not.  *Cf. Sebastian-Lathe Co. v. Johnson*, 110 F. Supp. 245, 246 (S.D.N.Y. 1952) ("Congress used the word 'organized' in addition to the word 'operated.'  The courts have been unwilling to treat this as meaningless tautology.  The word 'operated' refers to the actual activities of a corporation and the word 'organized' refers to its corporate structure.  A[] corporation which is confined to charitable activities by its certificate of incorporation is obviously 'organized' for charitable purposes.").

With that said, GCU does not seek to advance the argument that its "status as a non-profit in the eyes of the State of Arizona and the [IRS] is 'dispositive' of the § 44 inquiry." (Doc. 45 at 2-3.)  Instead, GCU's more limited position is that even if it were permissible to look past an entity's formal organizational status when evaluating whether that entity is "organized to carry on business for its own profit or that of its members," the FTC has not made the necessary showing here.  (*Id.*, emphasis omitted.)  More specifically, GCU contends that the Complaint's allegation that GCU was "organized . . . to advance *GCE's*

---

[it] was 'organized for its own profit or that of its members,'" because "the allegations of the Complaint support the characterization of AmeriDebt as a de-facto for-profit organization"); *FTC v. Gill*, 183 F. Supp. 2d 1171, 1184 (C.D. Cal. 2001) ("[W]hile certain nonprofit corporations are exempt from liability for violations of section 5(a)(1) of the FTC Act, the exemption does not apply to sham corporations that are the mere alter ego of the contemnor.").

for-profit business and advance *Defendant Mueller's* interests as officer, chairman, director, stockholder and promoter of investment in GCE" (Doc. 25 ¶ 13, emphases added) is insufficient because the Complaint does not allege that GCE or Mueller is a member of GCU.  In fact, GCU submits judicially noticeable evidence that its sole member is the Grand Canyon Foundation.[5]

When analyzing GCU's narrow dismissal argument,[6] it is helpful to begin by summarizing the relevant jurisdictional landscape.  The first case addressing the FTC's authority to pursue claims against a nonprofit entity under § 5 of the FTC Act appears to be *Community Blood Bank of Kansas City Area, Inc. v. FTC*, 405 F.2d 1011 (8th Cir. 1969), which involved a dispute over whether the FTC had authority to enforce a cease-and-desist order against, *inter alia*, a blood bank and a hospital association that were organized as nonprofit corporations under state law.  *Id.* at 1013.  The FTC argued that both entities qualified as "corporations" simply because they "receive[d] income in excess of expenses" but the Eighth Circuit rejected that argument, holding that "the test to be applied in determining whether a corporation without shares of stock is exempt is whether it engages in business for profit within the traditional and generally accepted meaning of that word."  *Id.* at 1016-17.  Applying that test, the court concluded that the FTC lacked authority to pursue claims against both entities because they were "true nonprofit corporations, not engaged in business for profit for themselves or their members."  *Id.* at 1022.

---

[5]    The first document that is the subject of GCU's and Mueller's request for judicial notice is "GCU's Second Amended and Restated Articles of Incorporation."  (Doc. 28 at 1.) That document provides that "[t]he sole member of the Corporation shall be Grand Canyon University Foundation, an Arizona nonprofit corporation."  (Doc. 27-1 at 5.) Although the FTC notes that "judicial notice only establishes the existence of such documents and does not extend to the truth of the statements therein or facts that may reasonably be disputed" (Doc. 44 at 10 n.4), the FTC does not specifically dispute that the Grand Canyon Foundation is GCU's sole member.  At any rate, the Court may take this fact as established for purposes of ruling on the motions to dismiss, because the Complaint specifically references GCU's articles of incorporation (Doc. 25 ¶ 13) and a court may "consider certain materials," including "documents incorporated by reference in the complaint," "without converting the motion to dismiss into a motion for summary judgment."  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

[6]    *United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020) (discussing "the principle of party presentation" under which courts should "normally decide only questions presented by the parties") (cleaned up).

- 20 -

Several years later, in *FTC v. National Commission on Egg Nutrition*, 517 F.2d 485 (7th Cir. 1975), the Seventh Circuit considered whether the FTC's statutory authority encompassed the "National Commission on Egg Nutrition (NCEN), a private, not-for-profit corporation composed of representatives of various associations of egg producers throughout the United States." *Id.* at 487.  The court concluded that even though "NCEN is a non-profit corporation, it was formed to promote the general interests of the egg industry, according to its articles of incorporation and bylaws.  Thus, it comes within the scope of section 4 of the Act, which defines 'corporation' as 'any company . . . which is organized to carry on business for its own profit or that of its members.'" *Id.* at 487-88 (cleaned up).

Several years later, in *American Medical Association v. FTC*, 638 F.2d 443 (2d Cir. 1980), the Second Circuit considered whether the FTC had statutory authority to issue a cease-and-desist order against the American Medical Association ("an Illinois not-for-profit corporation" whose membership was composed "of physicians, osteopaths, and medical students"), the Connecticut State Medical Society (a nonprofit corporation whose membership included "82% of Connecticut physicians"), and the New Haven County Medical Association, Inc. (a nonprofit corporation whose membership included "71% of New Haven physicians").  *Id.* at 445-47.  The appellants argued "that as nonprofit corporations, they are not subject to the jurisdiction of the FTC as set forth in Section 4 of the Federal Trade Commission Act" but the court rejected that argument, holding that each entity qualified as a "corporation" under § 4 because they "serve both the business and non-business interests of their member physicians." *Id.* at 447-48.

Finally, about two decades later, in *California Dental Association v. FTC*, 526 U.S. 756 (1999), the Supreme Court "granted certiorari to resolve conflicts among the Circuits" concerning the FTC's authority "over a nonprofit professional association."  *Id.* at 764.  The Court identified the circuit split as between *Community Blood Bank*, on the one hand, and *American Medical Association* and *National Commission on Egg Nutrition*, on the other.  *Id.* at 764 n.4.  The professional association at issue in *California Dental*

*Association*, the CDA, was "a nonprofit professional association . . . of local dental societies to which some 19,000 dentists belong." *Id.* at 759.  As an initial matter, the Supreme Court clarified that the definition of "corporation" under § 4 of the FTC Act is broad enough to encompass some nonprofit entities.  *Id.* at 768-69 ("Although the versions of the FTC Act first passed by the House and the Senate defined 'corporation' to refer only to incorporated, joint stock, and share-capital companies organized to carry on business for profit, the Conference Committee subsequently revised the definition to its present form, an alteration that indicates an intention to include nonprofit entities.") (citation omitted).  As for which nonprofit entities fall within that definition, the Court noted that "[t]he FTC Act is at pains to include not only an entity 'organized to carry on business for its own profit,' but also one that carries on business for the profit 'of its members.'"  *Id.* at 766 (citations omitted).  The Court concluded that the CDA qualified as a "corporation" under the latter part of that definition because its "contributions to the profits of its individual members are proximate and apparent.  Through for-profit subsidiaries, the CDA provides advantageous insurance and preferential financing arrangements for its members, and it engages in lobbying, litigation, marketing, and public relations for the benefit of its members' interests.  This congeries of activities confers far more than *de minimis* or merely presumed economic benefits on CDA members; the economic benefits conferred upon the CDA's profit-seeking professionals plainly fall within the object of enhancing its members' 'profit,' which the FTC Act makes the jurisdictional touchstone."  *Id.* at 767.  The Court also approvingly cited *National Commission on Egg Nutrition* and *American Medical Association* as "consistent with our conclusion that an entity organized to carry on activities that will confer greater than *de minimis* or presumed economic benefits on profit-seeking members certainly falls within the Commission's" authority.  *Id.* at 767 n.6.  The Court added: "It should go without saying that the FTC Act does not require . . . that members of an entity turn a profit on their membership, but only that the entity be organized to carry on business for members' profit."  *Id.*  Finally, the Court clarified that "we do not, and indeed, on the facts here, could not, decide today whether the Commission has [authority]

over nonprofit organizations that do not confer profit on for-profit members but do, for example, show annual income surpluses, engage in significant commerce, or compete in relevant markets with for-profit players." *Id.*

Although these decisions do not speak directly to the current dispute, they are still instructive. *National Commission on Egg Nutrition, American Medical Association*, and *California Dental Association* each addressed the FTC's authority to pursue claims against a particular type of nonprofit entity—a nonprofit corporation *with profit-seeking members* that was expressly organized to benefit those members. Indeed, *California Dental Association* explained that the "jurisdictional touchstone" under § 4 is that a nonprofit entity have "the object of enhancing its *members'* 'profit.'" *Id.* at 767 (emphasis added). Meanwhile, although the analysis in *Community Blood Bank* did not seem to turn on whether the object of the alleged profit-seeking activities was to benefit the members of the nonprofit entities—instead, the Eighth Circuit seemed to focus more broadly on whether the entities were "engag[ing] in business for profit within the traditional and generally accepted meaning of that word," 405 F.2d at 1016-17—the Supreme Court did not seem to endorse all of *Community Blood Bank*'s reasoning in the course of resolving the "conflict[]" between that decision and the decisions in *National Commission on Egg Nutrition* and *American Medical Association*. *California Dental Ass'n*, 526 U.S. at 764 & n.4. Instead, it simply indicated in a footnote that its decision was "fully consistent with *Community Blood Bank*, because the CDA contributes to the profits of *at least some of its members*, even on a restrictive definition of profit as gain above expenditures." *Id.* at 767 n.6 (emphasis added).

As this summary reveals, the FTC is attempting in this case to assert jurisdiction over a nonprofit entity in a manner that no federal appellate court has previously allowed. *California Dental Ass'n*, 526 U.S. at 767 n.6 ("[W]e do not, and indeed, on the facts here, could not, decide today whether the Commission has jurisdiction over nonprofit organizations that do not confer profit on for-profit members . . . ."). Although such courts have, in the past, agreed with the FTC that a nonprofit corporation organized to benefit its

members may qualify as a "corporation" under § 4 of the FTC Act—a conclusion consistent with the statutory text, which specifically contemplates an inquiry into whether a nonprofit is "organized to carry on business for . . . [the profit] of its members," 15 U.S.C. § 44—no appellate court has previously allowed the FTC to assert jurisdiction over an entity organized as a nonprofit based on the theory that the entity is being operated to benefit "insiders," "related . . . businesses," or "officers" that are not members.  (Doc. 44 at 1, emphasis omitted ["[T]he FTC Act authorizes action against corporations like GCU that purport to be nonprofits but are organized to advance the pecuniary interests of officers and related for-profit businesses . . . ."]; *id.* at 7-8 ["[A] company that is organized to provide income and other benefits to insiders is organized to 'carry-on business for its own profit.'"].)  The Court agrees with GCU that any such interpretation cannot be squared with the plain language of the statute.  If Congress had intended for § 4 to encompass nonprofit entities organized to carry on business for the profit of non-member "insiders," "related businesses," and "officers," it could have said so.  But for whatever reason, Congress chose only to vest the FTC with authority to pursue claims against an entity organized to carry on business for its "own" profit or the profit of its "members."  Here, the only alleged beneficiaries of GCU's profit-making activities are GCE and Mueller.  (Doc. 25 ¶ 13.)  Neither is a "member" of GCU—as discussed earlier, GCU's only member is the Grand Canyon Foundation.  Nor can the Court see how activity intended to profit GCE and Mueller could be characterized as activity for GCU's "own" profit.  Indeed, the Complaint alleges that GCE essentially sucks all of the profits out of GCU.  (*Id.* ¶¶ 16, 19-20 [alleging that "GCE does not provide services for student housing, food services, operation of the GCU hotel conference center, or athletic arena, but still receives 60% of [GCU's] revenue from these operations," that "[s]ince July 1, 2018, GCU's revenue has generated profit for GCE and its investors," and that "GCU is largely operated by, and most of its revenue is paid to, GCE"].)  Although there may be persuasive policy reasons why the FTC should be allowed to pursue claims against nonprofits that operate for the benefit of non-member insiders, related businesses, and officers, the Court must take the statute as written.  *Cf.*

*Manufacturers Hanover Trust Co. v. C.I.R.*, 431 F.2d 664, 668 (2d Cir. 1970) ("[I]t transcends the judicial function to rewrite the statute to conform to considerations of policy. If the facts of this case demonstrate a . . . loophole Congress, not the courts, should plug it.") (cleaned up).[7]

These conclusions are not undermined by the FTC's citation to several of its own decisions in which it adopted a more capacious definition of the term "corporation" that would include a nonprofit entity organized to benefit an "insider" who is not a "member." As an initial matter, in some of those decisions, the entity did operate for the benefit of a member. *Matter of Daniel Chapter One*, 2009 WL 5160000, *11-12 (F.T.C. 2009), *aff'd sub. nom. Daniel Chapter One v. FTC*, 405 F. App'x 505 (D.C. Cir. 2010) (concluding that DCO qualified as a "corporation," even though it claimed it was "a religious ministry organized and operated for charitable purposes," where "the 'destination' of the profits of DCO's for-profit activities was James Feijo . . . [who was] *DCO's sole 'member'*") (emphasis added). But more important, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority" and "need not . . . defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). *See also Advanced Energy United, Inc. v. FERC,* 82 F.4th 1095, 1108 (D.C. Cir. 2023) ("[A]gencies get no deference in interpreting jurisdictional statutes.") (cleaned up).

Finally, because the FTC cannot assert claims against GCU under the FTC Act, it also cannot assert claims against GCU under the Telemarketing Sales Rule. *See* 15 U.S.C. § 6105(a) ("[N]o activity which is outside the jurisdiction of [the FTC] Act shall be affected by this chapter.").

IV.    Misrepresentation Claims

In Counts One and Two of the Complaint, the FTC alleges violations of the FTC Act's prohibition on "unfair or deceptive acts or practices in or affecting commerce."  15

---

[7]    To the extent the FTC has identified lower-court decisions reaching a contrary conclusion, the Court respectfully declines to follow them for the reasons stated herein.

U.S.C. § 45(a)(1).  One way a defendant may violate this prohibition is through "the dissemination of [a] false advertisement."  *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994) (cleaned up).  *See also FTC v. Gill*, 265 F.3d 944, 955 (9th Cir. 2001) ("[M]aking or using any untrue . . . representation [regarding a company's services] . . . [is] an unfair or deceptive act or practice in commerce in violation of section 5(a) of the FTC Act").  In addition, "[t]he failure to disclose material information may cause an advertisement to be deceptive, even if it does not state false facts."  *Sterling Drug, Inc. v. FTC*, 741 F.2d 1146, 1154 (9th Cir. 1984).  "An act or practice is deceptive if 'first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material.'"  *Gill*, 265 F.3d at 950.  "Deception may be found based on the 'net impression' created by a representation."  *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009).  Thus, "[a] solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures."  *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006).  *See also Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 188 (1948) ("Advertisements as a whole may be completely misleading although every sentence separately considered is literally true.").

In Count Three of the Complaint, the FTC alleges a violation of "provisions of the Telemarketing Sales Rule . . . that prohibit misrepresentations in the course of telemarketing."  (Doc. 44 at 8, citing 16 C.F.R. § 310.3(a)(2).)  As the FTC notes, "[a]llegations that actions are deceptive under the [Telemarketing Sales Rule] are evaluated under the same principles of deception as claims under the FTC Act."  (*Id.* at 9.)

### A.   **Nonprofit Misrepresentation Claims**

#### 1.   The Parties' Arguments

GCU and Mueller[8] contend that "[t]he FTC's claims that it was deceptive for Defendants to represent that GCU 'transitioned back' to being a 'nonprofit institution,' fail

---

[8]   As discussed in the previous section, all of the FTC's claims against GCU are dismissed.  Nevertheless, this order will address GCU's additional dismissal arguments to the extent they are jointly advanced with Mueller.

as a matter of law." (Doc. 27 at 8, citation omitted.) They argue this statement was "truthful" because GCU is "organized as a nonprofit under Arizona law and recognized by the IRS as a 501(c)(3) tax-exempt entity." (*Id.* at 8-9.) They acknowledge that "the [DOE] has refused to recognize GCU's nonprofit status for Title IV purposes" but claim this determination was based on the DOE's "own nonprofit definition" and that the DOE "conceded that GCU is an IRS 501(c)(3) tax-exempt entity and an Arizona nonprofit." (*Id.*) Finally, GCU and Mueller contend that "the FTC acknowledges that GCU 'discontinued and removed most statements characterizing GCU as a nonprofit shortly after' th[e] [DOE] made its determination" and that "[t]he FTC fails to explain how the [DOE]'s decision could retrospectively taint GCU's prior general references to its nonprofit status, let alone provide a basis for prospectively barring GCU from ever referencing that status in the future." (*Id.* at 10-11.)[9]

Similarly, GCE argues that representations that "GCU is a nonprofit institution and transitioned back to its prior manner of operating as a nonprofit institution" are "not actionable because" they are "true and unlikely to mislead prospective students." (Doc. 30-1 at 5, cleaned up.) GCE emphasizes that "[d]uring the time period in which GCE allegedly made representations that GCU was a nonprofit entity, every federal, state, and quasi-regulatory agency to opine on the issue recognized GCU as a nonprofit entity." (*Id.*) GCE argues that the DOE's refusal "to recognize GCU as a nonprofit for purposes of its participation in programs under Title IV of the Higher Education Act . . . does not alter the fact that GCU is a nonprofit, 501(c)(3) organization under the law" and that "it was patently reasonable for Defendants to identify GCU as a nonprofit given [the DOE's] historical deference to the IRS in determining whether an institution is a nonprofit." (*Id.* 5-6.) GCE also asks the Court to take judicial notice of documents demonstrating its nonprofit classification by the IRS, the Arizona Corporation Commission, and the Higher Learning

---

[9]    GCU and Mueller, as well as GCE and the FTC, also make arguments regarding whether the challenged statements regarding nonprofit status were material and whether Rule 9 applies to those statements, but it is unnecessary to summarize or resolve those arguments in light of the conclusion reached below.

Commission.  (Doc. 30-2.)

The FTC responds that it has pleaded sufficient facts to make it plausible that the challenged statements were "false," as GCU was not a nonprofit and "the July 2018 restructuring by GCE did not return the school to its 2004 structure." (Doc. 44 at 9, cleaned up.)  The FTC also maintains that "Defendants' arguments that the allegedly deceptive statements are truthful because GCU was (and is), in fact a nonprofit, tax-exempt entity, and claims that material outside the complaint vindicate Defendants' position, provide no basis for disregarding the complaint's allegations that Defendants' marketing is misleading."  (*Id.* at 9-10, cleaned up.)   The FTC further contends that "courts have repeatedly rejected arguments that state filings or IRS categorizations are determinative of whether an entity is a nonprofit" and argues that the IRS and Arizona Corporation Commission documents suggesting GCU is a nonprofit merely reflect documents Defendants provided to these regulators.  (*Id.* at 11.)  The FTC also asserts that, in any case, the Court may only take judicial notice to "establish[] the existence of such documents . . . not . . . the truth of the statements therein or facts that may reasonably be disputed." (*Id.* at 10 n.4.)  The FTC also rejects any argument that the DOE "regulations authorized [Defendants] to advertise GCU as a nonprofit from July 2018 to November 2019," both because the regulations do not speak to false advertising and because "[d]uring this period, the [DOE] was actively questioning GCU's claims, an inquiry that resulted in its conclusion that advertising that refers to GCU's 'nonprofit status' was confusing to students and the public." (*Id.* at 12.)

In reply, GCU and Mueller contend that "courts may take judicial notice of facts that are not subject to reasonable dispute" and that "it is beyond dispute that Arizona and the IRS recognized GCU as a nonprofit at the time of the statements at issue (and still do)." (Doc. 45 at 3, cleaned up.)  GCU and Mueller also contend that "[a]n organization does not lose its non-profit status (and thus does not engage in impermissible siphoning) simply because it enters into an arm's length contract, even a favorable one, with a for-profit firm for essential inputs, [a]nd here, the complaint never alleges that the MSA is not an arm's

1   length contract or that it does not reflect market value for the concededly essential services

2   GCE performs for GCU." (*Id.* at 4, cleaned up.)

3         In reply, GCE derides as "conclusory" the FTC's allegation that GCU is a for-profit

4   institution and asserts that it would be "unreasonable" to construe statements that GCU

5   returned to its nonprofit roots as claiming that GCU returned to its exact 2004 structure.

6   (Doc. 46 at 2-3.) GCE further contends that the Court may take judicial notice of "contents

7   of the IRS, Arizona Corporation Commission, and HLC records submitted with GCE's

8   Motion" because "it is undisputed that GCU is recognized as a nonprofit corporation by

9   the IRS, State of Arizona, and HLC." (*Id.* at 3.) Further, GCE argues that "[r]ather than

10  acknowledge" that DOE regulations treat "501(c)(3) recognition" as "proof of nonprofit

11  status," "the FTC makes up facts that are not in the Complaint, arguing that the [DOE] was

12  actively questioning GCU's claims during the period the nonprofit representations were

13  made." (*Id.* at 4, cleaned up.)

14                          2.      Request For Judicial Notice

15        As noted, some of Defendants' dismissal arguments are premised on documents that

16  are the subject of requests for judicial notice. GCU and Mueller ask the Court to take

17  judicial notice of the IRS's November 9, 2015 letter (Doc. 27-2) informing GCU that the

18  IRS had classified it as a § 501(c)(3) public charity. (Doc. 28.) GCE also asks the Court

19  to take judicial notice of the IRS letter (Doc. 30-3) and additionally seeks judicial notice

20  of GCU's characterization as a "Domestic Nonprofit Corporation" in the records of the

21  Arizona Corporation Commission (Doc. 30-4) [10] and of the "statement of accreditation"

22  issued by the Higher Learning Commission (Doc. 30-5). (Doc. 30-2.) The FTC does not

23  oppose these requests but contends that judicial notice "only establishes the existence of

24  such documents and does not extend to the truth of the statements therein or facts that may

25  reasonably be disputed." (Doc. 44 at 10-11 n.4.)

26        Both sets of judicial notice requests are granted, but with caveats. Courts "may take

27  

28  _____

[10]    Although GCE appears to have attached the wrong document in place of the webpage from the Arizona Corporation Commission (Doc. 30-4), it provided an accurate hyperlink: https://ecorp.azcc.gov/BusinessSearch/BusinessInfo?entityNumber=19665600.

1   judicial notice of matters of public record without converting a motion to dismiss into a

2   motion for summary judgment," but "may not take judicial notice of a fact that is subject

3   to reasonable dispute." *Lee v. City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001)

4   (cleaned up).  Accordingly, the Court may take judicial notice of the fact that the IRS has

5   classified GCU as a § 501(c)(3) public charity, of the fact that GCU is characterized as a

6   "Domestic Nonprofit Corporation" in the records of the Arizona Corporation Commission,

7   and of the fact that GCU is accredited by the Higher Learning Commission, but these acts

8   of judicial notice do not establish that GCU is a nonprofit entity, because that proposition

9   is disputed in this litigation.

10             3.   <u>Analysis</u>

11             a.   **Nonprofit Status**

12         The FTC's overarching argument is that Defendants' representations concerning

13   GCU's nonprofit status were deceptive, and thus actionable under the FTC Act and the

14   Telemarketing Sales Rules, because they were "false."   (Doc. 44 at 9 ["GCU's

15   representation that it was a nonprofit is false."].)  But this framing of the issue presumes

16   that a claim of "nonprofit" status is a factual assertion capable of verification.  *See, e.g.,*

17   *Pantron I Corp.*, 33 F.3d at 1096 (explaining that when the FTC chooses to "assert a so-

18   called 'falsity' theory," it "must carry the burden of proving that the express or implied

19   message conveyed by the ad is false") (cleaned up); *FTC v. Direct Mktg. Concepts, Inc.*,

20   624 F.3d 1, 11-12 (1st Cir. 2010) (explaining that "'specific and measurable' claims and

21   claims that may be literally true or false are not puffery, and may be the subject of deceptive

22   advertising claims" under the FTC Act) (citation omitted).  *Cf. Ariix, LLC v. NutriSearch*

23   *Corp.*, 985 F.3d 1107, 1121 (9th Cir. 2021) (explaining that, under the Lanham Act, "[a]n

24   actionable statement is a specific and measurable claim, capable of being proved false or

25   of being reasonably interpreted as a statement of objective fact" but "[s]tatements of

26   opinion and puffery . . . are not actionable") (citations omitted).

27         Unfortunately, the parties have not cited (and the Court has not identified) any

28   remotely analogous case arising under the FTC Act or the Telemarketing Sales Rule.

Given this vacuum, and because the Ninth Circuit (and other courts) have addressed analogous false advertising claims arising under the Lanham Act, the Court finds it helpful to look to those cases for guidance. *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 40 n.2 (D.C. Cir. 1985) (explaining that although "the Lanham Act [and] the FTC Act . . . have divergent purposes," "[b]oth statutes . . . attack false advertising" and "we look to Lanham Act cases for guidance as to evidentiary requirements to establish 'tendency to deceive'") (citations omitted); *FTC v. Am. Future Sys., Inc.*, 2024 WL 1376026, *21 n.76 (E.D. Pa. 2024) ("courts have looked to the Lanham Act for guidance on the FTC Act").

In *Coastal Abstract Service, Inc. v. First American Title Ins. Co.*, 173 F.3d 725 (9th Cir. 1999), the defendant published an advertisement asserting that the plaintiff, a competitor, lacked an escrow license that it was required to possess under California law. *Id.* at 731. The plaintiff contended this advertisement was false, in violation of the Lanham Act, because it wasn't required by California law to have an escrow license. *Id.* at 731-32. The jury returned a verdict in the plaintiff's favor but the Ninth Circuit reversed, holding that because the challenged statement was effectively an "opinion statement[]" about "the meaning of a statute or regulation," yet there was no "clear and unambiguous ruling from a court or agency of competent jurisdiction" establishing that the defendant's interpretation of the statute or regulation was false, "the licensure statement as a matter of law could not give rise to a Lanham Act claim." *Id.*[11]

In reaching this conclusion, the Ninth Circuit cited, with approval, *Dial A Car, Inc. v. Transportation, Inc.*, 82 F.3d 484 (D.C. Cir. 1996). That case involved a Lanham Act challenge to an advertisement in which the defendant asserted that its taxicabs could legally provide certain forms of transportation under D.C. law. *Id.* at 488. "The key question

---

[11] The Ninth Circuit has subsequently applied the same principle in cases arising under other provisions of the Lanham Act. *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 904 (9th Cir. 2007) ("Oey's statements were not 'false.' At worst, Oey offered an erroneous legal opinion (by a layperson) that TFN lacked trademark rights in the term 'freecycle.' Statements of opinion are not generally actionable under the Lanham Act. To this day, there has been no formal determination that TFN has trademark rights in the term 'freecycle.' . . . Until it is definitively established that TFN holds a trademark in the term 'freecycle,' it cannot be false to contend that it does not.").

[was] whether appellees' representations that they are permitted to provide the taxi service at issue qualifies as a false or misleading statement of fact for Lanham Act purposes." *Id.* The D.C. Circuit concluded that the Lanham Act claim failed as a matter of law because the agency with jurisdiction over the regulatory issue had not yet "addressed, in an adjudication or any other formal ruling, whether" the defendant's interpretation was correct and "there must be a clear and unambiguous statement from the [relevant agency] regarding [the defendants'] status before a Lanham Act claim can be entertained." *Id.* at 488-89 (emphasis omitted).  The court also criticized the plaintiff for engaging in the "gambit" of "using the Lanham Act to try to enforce its preferred interpretation of [the law in question] instead of adjudicating the issue before the [agency]." *Id.* at 488.

These cases are not, of course, perfect analogues to the situation here, but the Court finds them instructive.  Although "the fact or opinion question can be a difficult one," *Koch v. Goldway*, 817 F.2d 507, 509 (9th Cir. 1987), the Court concludes that Defendants' characterization of GCU as a "nonprofit" was effectively an opinion statement concerning a disputed legal or regulatory issue, as there are several different agencies empowered to decide, based on their own understanding of the relevant statutes and regulations, whether a particular entity qualifies as a nonprofit.[12]  Notably, at the time of the challenged statements here, every relevant agency—the IRS, the Arizona Corporation Commission, and the Higher Learning Commission—had accepted GCU's characterization of itself as a nonprofit under that agency's definition of the term.  Of course, the DOE had not yet weighed in, but once the DOE determined in 2019 that GCU did not qualify as a nonprofit under its definition of that term, Defendants stopped characterizing GCU as a nonprofit in their advertisements.  Under the logic of *Coastal Abstract Service* and *Dial A Car*, a claim for false or deceptive advertising will not lie under these circumstances.  *Coastal Abstract Serv.*, 173 F.3d at 731-32 ("Absent a clear and unambiguous ruling from a court or agency of competent jurisdiction, statements by laypersons that purport to interpret the meaning

---

[12]   It is permissible to make this determination at the motion-to-dismiss stage.  *Cf. Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 245 (9th Cir. 1990).

of a statute or regulation are opinion statements . . . [that] are not generally actionable under the Lanham Act. . . . [E]ven if a California court ultimately concludes that [the law] does not require that a company in Coastal's position obtain an escrow license, the licensure statement as a matter of law could not give rise to a Lanham Act claim."); *Dial A Car*, 82 F.3d at 489 ("[Plaintiff] cannot pursue this lawsuit with a simple assertion that current . . . law is seen to be clear and unambiguous, based on an interpretation by the [relevant agency] that was issued subsequent to [the challenged] statements. Rather, the proper inquiry is whether the law was unambiguous at the time [the] alleged misstatements were made.") (emphasis omitted).[13]

### b.   **Return To Nonprofit Roots**

The FTC also contends that Defendants' representations about GCU's return to its nonprofit roots are actionable under the FTC Act and the Telemarketing Sales Rules because those representations were "false." (Doc. 44 at 9 ["[T]he representation that GCU had returned to its nonprofit 'roots' is false; the July 2018 restructuring by GCE did not return the school to its 2004 structure."].)

This theory fails because it is premised on a strawman. The specific challenged statements on this topic in the Complaint are: (1) "GCU had gone 'Back to Non-Profit Roots'"; and (2) "In 2018, GCU transitioned back to a non-profit institution." (Doc. 25 ¶ 21.) In neither statement did Defendants represent that GCU had returned to the *same* structure it had occupied in 2004. Instead, Defendants more generically stated that GCU had once again become a nonprofit. As explained in Part IV.A.3.a above, it was not false for Defendants to characterize GCU as a nonprofit at the time of the challenged statements.

### B.   **Doctoral Degree Misrepresentation Claims**

#### 1.   The Parties' Arguments

GCU and Mueller assert that "the FTC alleges that GCU makes two supposedly

---

[13]   The analysis would be different if Defendants had, for example, stated in advertisements that GCU was considered a nonprofit in the eyes of the DOE, but there is no allegation that Defendants made such a specific (and verifiable) factual representation. Instead, the challenged representations were simply that GCU was "a private 'nonprofit' university" and/or "a non-profit institution." (Doc. 25 ¶ 21.)

'deceptive' representations about its doctoral programs: (1) that students 'typically' complete GCU's doctoral programs in twenty courses or 60 credits, and (2) that the total charge for doctoral degrees is 'the tuition and fees for twenty courses.'" (Doc. 27 at 11.) GCU and Mueller contend that any claim premised on those theories must be dismissed because the Complaint does not actually allege that Defendants made either representation, and in fact, the FTC acknowledges GCU tells students the doctoral programs usually require additional coursework. (*Id.* at 11-13.)

Similarly, GCE contends that "the FTC does not identify a single representation that GCU doctoral degrees that include a dissertation are typically completed in twenty courses or 60 credits." (Doc. 30-1 at 8, cleaned up.) Next, GCE contends that although "[t]he FTC appears to base its claims on documents describing GCU doctoral programs as requiring a total of 60 credits and enrollment agreements listing twenty Core Courses," these documents refer to these credits as minimum requirements and do not say they are all that is typically required. (*Id.* at 8-9.) Similarly, GCE argues that the challenged representations are accurate because they say a doctoral degree could be completed in fewer than seven years, which does not mean it typically is. (*Id.* at 9-10.) Likewise, GCE contends that representations of program costs based on 60 credits are "estimate[s] . . . based on a published cost per credit value that is centrally displayed on the enrollment agreement" and "prospective students are provided with the information they need to calculate the cost of additional coursework beyond the minimum 60-credit requirement." (*Id.* at 11, cleaned up.)

The FTC responds that "[t]he complaint alleges that GCU markets doctoral programs as requiring only twenty courses (60 credits), despite the fact that more than half of the students that graduate must complete thirty courses . . . that substantially increase the cost of pursuing the degree." (Doc. 44 at 13.) The FTC specifically highlights (1) "Course lists that state: 'Total Degree Requirements: 60 credits'"; (2) "Enrollment agreements that list twenty courses, state 'Total Program Credits 60,' and 'Total Tuition Program and Fees:' followed by a dollar figure based on the tuition and fees for twenty

courses"; and (3) "Telemarketing pitches in which the doctoral program is described as '20 courses, which is 60 credits.'"  (*Id.* at 13-14.)  The FTC also notes that the Complaint alleges that although "Defendants sometimes communicate to prospective students that the twenty courses are not the complete program . . . , such communications appear in buried disclaimers, are themselves misleading statements, or distort the program requirements." (*Id.*)  Because "[a] representation that is literally true may still be misleading," the FTC contends that "terms such as 'Total Program Credits' and 'Total Tuition and Fees'" are deceptive when they fail to account for additional costs and credits that apply to the vast majority of students.  (*Id.* at 15.)  The FTC further contends that Defendants wrongly argue "that false representations are not actionable if contradicting statements appear later," because "[d]isclaimers do not alter liability for deceptive statements unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression."  (*Id.* at 16, cleaned up.)

In reply, GCU and Mueller reiterate that "the sample enrollment agreement excerpted in the agency's own complaint . . . belie[s] . . . [t]he agency's basic premise" that GCU's marketing of doctoral programs is deceptive.  (Doc. 45 at 7.)  GCU and Mueller argue that "[t]he Court need only take judicial notice of the entire referenced enrollment agreement to see that these are not buried disclaimers . . . , and that no reasonable doctoral student would have believed that doctoral programs are typically completed in twenty courses or that continuation courses would be free."  (*Id.*, cleaned up.)

In reply, GCE argues that the FTC's argument that "GCU markets doctoral programs as requiring only twenty courses (60 credits) . . . is nowhere to be found in the Complaint."  (Doc. 46 at 6, cleaned up.)  GCE accuses the FTC of drawing "the implausible inference that doctoral students would not understand that the dissertation process is necessarily dependent upon the individual student's ability and aptitude and the scope of the chosen dissertation."  (*Id.*).  Finally, GCE contends that its disclosures were not buried and "make clear that the advertisements about the length and cost of the doctoral programs are not misleading."  (*Id.* at 7.)

2.      Judicial Notice

As noted, some of Defendants' dismissal arguments related to the doctoral degree misrepresentation claims are premised on documents that are not attached to the complaint. More specifically, GCU and Mueller ask the Court to take judicial notice of (1) GCU's standard doctoral degree program application for the degree of "Doctor of Business Administration: Marketing" (Doc. 27-3); (2) GCU's standard doctoral degree program application for the degree of "Doctor of Health Administration" (Doc. 27-4); and (3) the "degree-price calculator" that "GCU has provided with alterations over the years to doctoral students" (Doc. 27-5). (Doc. 28.) GCU's and Mueller's theory as to all three documents is that they are properly before the Court because they are referenced in the Complaint. (*Id.* at 3.)

The FTC responds that the Court should not "take judicial notice of three GCU marketing documents" because GCU and Mueller "provide[d] no authentication or context for these materials" and otherwise failed to "articulate a justification for affording them judicial notice. These marketing materials do not contradict the complaint, much less warrant not treating the complaint's allegations as true." (Doc. 44 at 11 n.4.)

The request for judicial notice as to these materials is granted in part and denied in part. On the one hand, the Court agrees with GCU and Mueller that GCU's standard doctoral degree program application for the degree of "Doctor of Business Administration: Marketing" (Doc. 27-3) may be considered because that document is specifically referenced in ¶ 52 of the Complaint. *Ritchie*, 342 F.3d at 908 (discussing incorporation-by-reference doctrine). Additionally, although GCU and Mueller could have done a better job of authenticating that document—they provided only an unsworn assertion from their attorney that this document is a "true and correct exemplar" (Doc. 28 ¶ 9)—the FTC does not actually dispute its accuracy or authenticity. *Cf. Espinoza v. Trans Union LLC*, 2023 WL 6216550, *4 (D. Ariz. 2023) (considering document pursuant to incorporation-by-reference doctrine where opponent made a bare reference to authenticity but did not "affirmatively question the authenticity of" the document at issue, and citing other cases

- 36 -

following the same approach).

On the other hand, the Court will not consider the other two documents at this stage of the case.  The Complaint does not specifically reference GCU's doctoral degree program application for the degree of "Doctor of Health Administration" or GCU's degree-price calculator, so the incorporation-by-reference doctrine is inapplicable.  GCU's and Mueller's assertion that the latter is referenced in ¶ 63 of the Complaint is inaccurate— although that paragraph refers to unspecified "disclaimers, misleading statements, or presentations," it is anyone's guess as to whether those references are meant to be a reference to the degree-price calculator.  Also, GCU and Mueller acknowledge that the degree-price calculator has undergone "alterations over the years" (Doc. 28 at 3), so it is unclear if the document attached to their request for judicial notice is the same version that the Complaint may have indirectly referenced.

### 3.   Analysis

Although the issue (like many of the issues addressed in this order) presents a fairly close call, the Court agrees with the FTC that the Complaint adequately alleges that Defendants' representations concerning GCU's doctoral degree requirements were deceptive in a manner that is actionable under the FTC Act and the Telemarketing Sales Rule.

In part, this is a close call because the some of the allegations in the Complaint address instances of non-actionable puffery and others omit important details.  For example, the FTC's first allegation regarding the doctoral degree requirements is that, since 2018, GCU has published advertisements that contain the following:

> The College of Doctoral Studies at Grand Canyon University places doctoral learners on an accelerated path from the first day.

> From day one, you are on an accelerated path with the support needed to grow & thrive.  Concerned about your dissertation?  Don't be.  At GCU, dissertations are built into your coursework so you move forward to graduation step by step.

> At Grand Canyon University, the doctoral journey is truly unique.  From day

1
2

> one, you are placed on an accelerated path that will prepare you to succeed
> in your academic journey and career.

3

(Doc. 25 ¶ 50.)  But statements characterizing GCU's doctoral program as "accelerated"

4

are not, alone, actionable deceptive practices, particularly where the Complaint fails to

5

allege that GCU's doctoral students do not earn their degrees more quickly than students

6

at other institutions.   At most, the "accelerated" claim amounts to puffery—"general

7

assertions" by a salesperson that "are either vague or highly subjective."  *Cook, Perkiss &*

8

*Liehe, Inc. v. N. California Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990).  *See*

9

*also Fitzer v. Security Dynamics Technologies, Inc.*, 119 F. Supp. 2d 12, 30 (D. Mass.

10

2000) (concluding that "statements indicat[ing] that the integration 'accelerated' Security

11

Dynamics' efforts and abilities" were "no more than corporate 'puffery'").

12

The Complaint also alleges that GCU's promotional materials "describe the GCU

13

programs as twenty course programs that require a total of 60 credits" and then purports to

14

provide an example by providing a screenshot of a "Course List" taken from GCU's

15

website.  (Doc. 25 ¶ 51.)  However, this screenshot does not fairly represent the substance

16

of the cross-referenced website.  The Complaint provides a hyperlink to the Course List—

17

https://www.gcu.edu/degree-programs/edd-organizational-leadership-development-

18

qualitative—which reveals that immediately below this Course List, in equally large font,

19

is a section providing information on "Continuation Courses."   Immediately below that

20

heading, the webpage explains: "The course[s] identified above represent the minimum

21

academic course requirements only.  Most students will also need to take one or more of

22

the following Research Continuation Courses to complete a dissertation.   Research

23

Continuation Courses are 3-credit courses charged at the standard doctoral per credit rate."

24

*Id*.  The website then lists up to nine additional research continuation courses.  *Id*.[14]  The

25
26
27
28

---

[14]      The Court may properly consider the webpage under the incorporation-by-reference doctrine for several reasons.  First, paragraph ¶ 51 of the Complaint provides the hyperlink for this webpage.  *Battle v. Tylor James, LLC*, 607 F.Supp.3d 1025, 1039 (C.D. Cal. 2022) ("Under the incorporation by reference doctrine, the court may consider Exhibit 1 because the FAC cites, discusses, and hyperlinks it.").   Second, the FTC explicitly relies on the Course List as a basis for the asserted violations (Doc. 25 ¶¶ 65, 71-73), so it forms a "basis of the plaintiff's claim."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th

- 38 -

FTC did not enhance its credibility by omitting these details from the Complaint.

But despite these flaws, the Complaint still alleges sufficient facts to clear the low bar of avoiding dismissal at the pleading stage. The Complaint identifies an array of marketing materials that contain assertions that can reasonably be viewed, at least in isolation, as suggesting that only 20 courses and 60 credits would be required to obtain a doctoral degree. For example, as discussed above, paragraph 51 alleges (albeit while omitting potentially important clarifying comments and context) that GCU's website identifies the "Total Degree Requirements" as "60 credits" and then identifies 20 "Core Courses." (*Id.* ¶ 51.) Similarly, paragraph 52 alleges that GCU's "enrollment agreements . . . include a list of twenty courses, and an itemized list of per credit costs and fees, and then state a specific amount as the 'Total Program Tuition and Fees,' for the doctoral program covered by the agreement." (*Id.* ¶ 52.)[15] And again, in paragraph 54, the FTC alleges that Defendants train telemarketers to make statements such as the following to prospective students:

> The doctorate goes for 20 courses, which is 60 credits. And what you're doing a little differently is you're working towards your dissertation at the same time you're doing your courses. So rather than a typical seven year doctorate, it could be completed a lot faster than that. . . . The ultimate goal is that you finish your coursework in about three years and then pretty soon after you have the opportunity to finish your dissertation and therefore graduate. So it's a very unique system.

(*Id.* ¶ 54.) If, as the Complaint alleges, "GCU very rarely awards doctoral degrees to students upon completion of 60 credits, representing twenty courses" and "GCU required continuation courses for 98.5% of the doctoral students to whom it awarded degrees" (*id.* ¶ 60), such challenged statements could, when all reasonable inferences are resolved in the FTC's favor, qualify as deceptive representations. *See, e.g., FTC v. Medicor LLC*, 217 F.

---

Cir. 2018). Third, the incorporation-by-reference doctrine exists specifically to "prevent[] plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Id.*

[15] Unlike in paragraph 51, the FTC provides the entirety of the relevant portion of the challenged document in paragraph 52, including the clarifying language that, in Defendants' view, undermines the FTC's position. (*Id.* [bolded language that "[a] minimum of 60 credits are required for completion of this program of study"].)

Supp. 2d 1048, 1053-54 (C.D. Cal. 2002) (advertisements claiming that purchasers could achieve certain income levels, although "results may vary," were deceptive where "the vast majority of consumers did not earn the amount represented as the earning potential"); *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000) (marketing materials were deceptive where reasonable consumer could conclude that results were achieved by typical participants).

Defendants contend the challenged assertions were not misleading because the documents in which they appeared contained prominent disclaimers explaining that the references to 20 courses and 60 credits were not guarantees as to how a doctoral degree could be obtained or even expressions of the typical path to obtain a doctoral degree. (Doc. 45 at 7 ["The Court need only take judicial notice of the entire referenced enrollment agreement to see that these are not 'buried disclaimers' (a conclusory label obviously not 'to be taken as true'), and that no reasonable doctoral student would have believed that doctoral programs 'are typically completed 'in twenty courses'' or that continuation courses would be free."].)[16] Although this argument has some force, it is not an argument the Court may resolve in Defendants' favor, as a matter of law, at this stage of this case. Evaluating the "net impression" of an advertisement, and more specifically how the meaning of a factual assertion appearing within an advertisement (which, alone, could be reasonably viewed as deceptive) may be altered by a disclaimer within the advertisement, is an intensely factual inquiry ill-suited for resolution at the pleading stage. *See, e.g., FTC v. Am. Fin. Benefits Ctr.*, 324 F. Supp. 3d 1067, 1078 (N.D. Cal. 2018) ("As rightly argued by the FTC, Defendants' reliance on the mailers' '[f]ine-print disclosures' is unavailing, *particularly at the pleading stage*.") (emphasis added); *FTC v. DeVry Educ. Grp.*, 2016 WL 6821112, *4-5 (C.D. Cal. 2016) (denying motion to dismiss, where the FTC alleged that educational institution's employment-rate statistics were misleading and the institution argued that it added "clarifying language" on certain websites that addressed the FTC's

---

[16]     The Court notes that although Defendants point to disclaimers appearing in written documents, they do not argue—let alone come forward with judicially noticeable evidence of—any disclaimers that appeared in the telemarketing script described in paragraph 54.

1 concerns, because "[g]iven that context, whether Defendants' advertisements make

2 implicit misleading representations is an issue for the trier of fact").[17]    Accordingly,

3 Defendants' request to dismiss the doctoral degree-related misrepresentation claims on the

4 ground that the challenged representations "are not 'deceptive,' as a matter of law" (Doc.

5 27 at 12) is denied.[18]

6 V.    Rule 9(b)

7        A.    **The Parties' Arguments**

8        GCU and Mueller contend that "Rule 9(b)'s heightened pleading standard . . .

9 applies here because the FTC's claims sound in fraud" and that the FTC failed to satisfy

10 this standard because it "fails to allege the who, what, when, where, and how of GCU and

11 Mr. Mueller's supposedly misleading representations, their materiality, and the asserted

12 consumer injury."  (Doc. 27 at 9-10, cleaned up.)

13        Similarly, GCE contends that "[c]laims for violation of Section 5(a) of the FTC

14 Act—and by extension the [Telemarketing Sales Rule]—'sound in fraud' and are,

15 therefore, subject to a heightened pleading standard under Rule 9(b)."  (Doc. 30-1 at 11.)

16 GCE argues that "the FTC has alleged that Defendants have made misleading

17 representations about . . . GCU's educational services—in connection with the advertising,

18 marketing, or promotion of those services" and that "the FTC's omission of the magic

19 word—fraud—from its Complaint does not detract from the apparently fraudulent nature

20 of the allegations."  (*Id.* at 12, cleaned up).  GCE contends the Complaint is insufficient

---

21

22 [17]        This outcome is not inconsistent with *Young v. Grand Canyon University, Inc.*, 57
F.4th 861 (11th Cir. 2023), on which Defendants rely.  Although *Young* concluded that the
23 plaintiff failed to allege a plausible "claim for *breach of contract* on his 60-hour theory"
because he "fail[ed] to point to any provision in any of the relevant documents promising
24 that a student will complete his doctoral degree program in 60 (and no more than 60) credit
hours" and "the documents belie any such promise," *id.* at 871 (emphasis added), a
25 deceptive-practices claim under § 5 of the FTC Act is governed by different standards.

26 [18]        The Court does not construe Defendants' motions as separately challenging the
materiality of the doctoral degree-related misrepresentations, which is an argument they
27 raised with respect to the nonprofit-related misrepresentations.  (Doc. 27 at 9; Doc. 30-1 at
7-8.)  At any rate, any such challenge would be unavailing.  *Novartis Corp. v. FTC*, 223
28 F.3d 783, 786 (D.C. Cir. 2000) (materiality is "historically presumed" for "certain
categories of claims," including "a claim that concerns the . . . cost of the product or
service") (cleaned up).

- 41 -

under Rule 9(b) because it does not "identify which Defendant engaged in which conduct" and does not identify "the time, place, or context in which the alleged statement was made." (*Id.* at 13.)

In response, the FTC contends that "Rule 9(b)'s exception does not apply to actions enforcing the FTC Act and the [Telemarketing Sales Rule] because they are distinguishable from fraud and mistake." (Doc. 44 at 18.)  Alternatively, the FTC contends that even if Rule 9(b) does apply, the Complaint "provides sufficient detail to satisfy this Circuit's test for particularity; namely, do the allegations identify the misconduct so that defendant can prepare an adequate answer?" (*Id.* at 19.)  The FTC also contends that "statements of the time, place and nature of the alleged fraudulent activities are sufficient," as the Complaint "specifies a timeframe, identifies the challenged representations, and describes how they were used by GCE in marketing on behalf of GCU that GCE conducted online and through telemarketing." (*Id.* at 20.)  The FTC also contends that "the complaint describes the role of each defendant in the deceptive practices." (*Id.*)  Finally, the FTC argues that Rule 9(b) "plainly does not . . . require[] particularized pleading of materiality and consumer injury" because it only "requires particularity regarding the circumstances constituting the fraud." (*Id.* at 22, cleaned up.)

In reply, GCU and Mueller contend that the "out-of-circuit cases" the FTC cites "contravene well-established Ninth Circuit law." (Doc. 45 at 5, cleaned up.)  GCU and Mueller also reiterate that Rule 9(b) requires a plaintiff plead "the who, what, when, where, and how of the misconduct charged" and argue that "the FTC cannot avoid its burden by baldly asserting that all three Defendants are well aware of the conduct described in the complaint." (*Id.* at 6, cleaned up.)  Finally, GCU and Mueller contend that Rule 9(b) requires a plaintiff to "plead each of the elements of an FTC Act claim with particularity except for conditions of a person's mind." (*Id.*, cleaned up.)

GCE replies that "District Courts in the Ninth Circuit routinely hold that claims for violation of Section 5(a) of the FTC Act—and by extension the [Telemarketing Sales Rule]—sound in fraud and are, therefore, subject to a heightened pleading standard under

. . . Rule 9(b)" and that "the weight of authority in the Ninth Circuit undeniably supports applying Rule 9(b) heightened pleading requirements here."  (Doc. 46 at 6-8, cleaned up.)  GCE also contends that "[t]he FTC does not credibly dispute that it fails to allege specific representations as to specific Defendants but instead attempts to recast its improper group pleading as categorizing of defendants based on their function in the alleged scheme," even though "the only category the FTC alleges in its Complaint is the category of all Defendants generally."  (*Id.* at 8-9, cleaned up.)

### B.   **Analysis**

"Rule 9(b) applies when (1) a complaint specifically alleges fraud as an essential element of a claim, (2) when the claim 'sounds in fraud' by alleging that the defendant engaged in fraudulent conduct . . . and (3) to any allegations of fraudulent conduct, even when none of the claims in the complaint 'sound in fraud.'"  *Davis v. Chase Bank U.S.A., N.A.*, 650 F. Supp. 2d 1073, 1089-90 (C.D. Cal. 2009) (citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1102-06 (9th Cir. 2003)).  "To ascertain whether a complaint sounds in fraud, we must normally determine, after a close examination of the language and structure of the complaint, whether the complaint alleges a unified course of fraudulent conduct and 'relies entirely on that course of conduct as the basis of a claim.'"  *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009) (cleaned up).

The Ninth Circuit has not yet decided "whether Rule 8 or Rule 9(b) applies to claims brought under Section 5 of the FTC Act" and "[c]ourts within the Ninth Circuit and elsewhere are split" on that issue.  *DeVry*, 2016 WL 6821112 at *3.  After careful consideration, and acknowledging the split of authority, the Court concludes that the FTC has the better of this argument.  As noted, the essential consideration under Ninth Circuit law when evaluating the applicability of Rule 9(b) is whether a claim is premised on allegations of "fraudulent conduct."  Thus, Rule 9(b) can apply even if "fraud is not an essential element" of a claim, so long as the plaintiff "choose[s] nonetheless to allege in the complaint that the defendant has engaged in fraudulent conduct."  *Vess*, 317 F.3d at 1103.  "[W]here fraud is not an essential element of a claim, only allegations ('averments')

of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b). Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)." *Id.* at 1105.

What, exactly, is "fraudulent conduct"?  In *Vess*, the Ninth Circuit noted that, at least under California law, some of the "indispensable elements of a fraud claim" include "knowledge of . . . falsity" and "intent to defraud."  *Id.* (citation omitted).  Having made that clarification, the court concluded that Rule 9(b) did not apply to the plaintiff's claims that the defendant "negligently" made certain misrepresentations, because such claims were "not 'grounded in fraud.'"  *Id.* at 1106.

The FTC's claims in this action resemble the claims in *Vess* that were deemed not to implicate Rule 9(b).  As in *Vess*, the FTC's claims—except, perhaps, the claim for individual monetary liability against Mueller under the Telemarketing Sales Rule, which is discussed in further detail in the next section—do not require a showing that Defendants knew the challenged representations were false or deceptive or that Defendants acted with the intent to defraud.  *Chrysler Corp. v. FTC*, 561 F.2d 357, 363 n.5 (D.C. Cir.1977) ("An advertiser's good faith does not immunize it from responsibility for its misrepresentations; intent to deceive is not a required element for a section 5 violation."); *FTC v. OMICS Grp. Inc.*, 374 F. Supp. 3d 994, 1010 (D. Nev. 2019) ("The FTC need not prove that Defendants' misrepresentations were made with an intent to defraud or deceive or in bad faith.").  For these reasons, many courts have concluded that Rule 9(b) does not apply to claims brought by the FTC under § 5 of the FTC Act and the Telemarketing Sales Rule, and the Court finds those decisions persuasive.  *See, e.g., FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1203 n. 7 (10th Cir. 2005) ("A § 5 claim simply is not a claim of fraud as that term is commonly understood or as contemplated by Rule 9(b), and the district's court's inclination to treat it as such unduly hindered the FTC's ability to present its case.  Unlike the elements of common law fraud, the FTC need not prove scienter, reliance, or injury to establish a § 5 violation."); *FTC v. Sterling Precious Metals, LLC*, 2013 WL 595713, *3 (S.D. Fla. 2013) (acknowledging split in authority before concluding that "the rationale of

the Tenth Circuit in *Freecom Communications* [is] persuasive"); *FTC v. Nat'l Testing Servs., LLC*, 2005 WL 2000634, *2 (M.D. Tenn. 2005) ("[T]he particularity required by Fed.R.Civ.P. 9(b) does not apply in this case . . . ."); *FTC v. Skybiz.com, Inc.*, 2001 WL 1673649, *4 (N.D. Okla. 2001) ("Defendants contend that the FTC was required under Rule 9(b) . . . to plead with particularity its factual allegations that NCI and Nanci Masso participated in deceptive trade practices against consumers.  The Court disagrees."); *FTC v. Communidyne, Inc.*, 1993 WL 558754, *2 (N.D. Ill. 1993) ("A claim under section 5(a) of the FTC Act is not a claim of fraud or mistake, so Rule 9(b) does not apply. . . .  There is no scienter or reliance requirement, as would be required to prove fraud.").

Alternatively, even if Rule 9(b) applied here, the Complaint would survive dismissal.  As discussed in the previous section, the Complaint identifies the specific websites and written materials that contained the challenged representations concerning GCU's doctoral degree requirements and also summarizes the telemarketing script that contained related representations.  (Doc. 25 ¶¶ 51-52, 54.)  This is sufficient, under the circumstances, to plead "the who, what, when, where, and how of the misconduct charged" and "set forth what is false or misleading about a statement, and why it is false."  *Vess*, 317 F.3d at 1106 (cleaned up).  *See also DeVry*, 2016 WL 6821112 at *6 (concluding that, even assuming Rule 9(b) applied, the complaint was sufficient because "the FTC has identified the 'who' (all three Defendants); the 'what' (misrepresentations regarding post-graduation employment rates in advertisements); the 'when' (between 2008 and 2015); the 'where' (throughout United States); and the 'how' (by miscounting three categories of graduates)" and "Rule 9(b) requires no more"); *FTC v. ELH Consulting, LLC*, 2013 WL 4759267, *1-2 (D. Ariz. 2013) (reaching similar conclusion while emphasizing that there "is no absolute requirement that, where several defendants are sued in connection with an alleged fraudulent scheme, the complaint must identify false statements made by each and every defendant") (citation omitted).  Nor is there any merit to Defendants' assertion that, under Rule 9(b), the complaint must provide such granular details as "who trained the unidentified telemarketers."  (Doc. 30-1 at 13.)  As the FTC correctly notes in its

1    response—and as discussed in more detail in the next section of this order—imposing such

2    a pleading requirement would make no sense in the context of claims under § 5 of the FTC

3    Act and the Telemarketing Sales Rules.

4    VI.    Remaining Claims Against Mueller

5          A.    **The Parties' Argument**

6          Mueller argues that "[t]he FTC . . . has failed to adequately allege [his] individual

7    liability" because it has not sufficiently pleaded that he "participated directly in or had

8    control over the acts alleged in the alleged misrepresentations." (Doc. 27 at 13-14.)

9    Mueller also argues that "the FTC has failed to allege that [he] had the requisite knowledge

10   of the allegedly deceptive acts or practices referenced in the Complaint." (*Id.* at 15.)

11         The FTC responds that "[a]n allegation that the individual has assumed the duties

12   and authority of chief executive alone demonstrates that it is plausible that the individual

13   had the requisite authority." (Doc. 44 at 23.) The FTC further contends that "the complaint

14   elaborates on Mueller's role" by alleging that he "directed GCE's efforts to re-brand the

15   university as a nonprofit and promoted representations that the July 2018 division of

16   operations between GCE and GCU resulted in the University returning to operation as a

17   traditional nonprofit university" and "boasted to investors that the re-branding boosted

18   recruiting." (*Id.* at 22-23.) The FTC contends it need not "allege personal involvement,

19   control, and knowledge or reckless indifference" because "[w]here a complaint states a

20   claim for corporate liability, the FTC may also bring an action against an individual if he

21   participated directly in the business entity's deceptive acts or practices, or had the authority

22   to control such acts or practices." (*Id.* at 23-24, cleaned up.) The FTC also rejects the

23   notion that claims against Mueller should be dismissed because "the complaint does not

24   adequately allege corporate violations of the FTC Act or the [Telemarketing Sales Rule]

25   for reasons stated [in GCU's motion to dismiss] and in GCE's motion to dismiss," in part

26   because even if the Court granted GCE's motion, some claims against Mueller would still

27   survive. (*Id.* at 24.)

28         Mueller contends in reply that "the FTC's submission confirms that the allegations

against [him] cannot survive on their own, as they hinge entirely on the erroneous premise that GCU or GCE violated the FTC Act" and that "the FTC cannot evade the fact that it lacks jurisdiction over GCU, by naming [him] as a Defendant based on his role as President of GCU." (Doc. 45 at 8, cleaned up.) Mueller further contends that "the FTC fails to plausibly allege that [he] participated directly in the alleged misrepresentations." (*Id.* at 8-9.) Mueller next contends that the FTC's theory that he had "authority to control . . . is not a winning theory either, as [the] FTC must also show that [he] had knowledge of the misrepresentations, was recklessly indifferent to the truth or falsity of the misrepresentation, or was aware of a high probability of fraud along with an intentional avoidance of the truth." (*Id.* at 9.)

> ### B.   **Analysis**

As discussed in the preceding sections of this order, the remaining claims in the Complaint—before consideration of Mueller's individual dismissal arguments—are (1) the § 5 claim in Count Two against GCE and Mueller (but not GCU) premised on misrepresentations related to GCU's doctoral programs; (2) the Telemarketing Sales Rule claim in Count Three against GCE and Mueller (but not GCU), but only to the extent it is premised on misrepresentations related to GCU's doctoral programs; (3) the Telemarketing Sales Rule claim in Count Four against GCE and Mueller (but not GCU) premised on calls to persons who had previously asked not to be called; and (4) the Telemarketing Sales Rule claim in Count Five against GCE and Mueller (but not GCU) premised on calls to persons on the National Do-Not-Call Registry.

As for Count Two, the analysis is complicated by the fact that although Mueller is alleged to be GCE's CEO (Doc. 25 ¶ 7), there are no allegations in the Complaint specifically addressing his role in crafting GCE's challenged representations concerning GCU's doctoral degree requirements or addressing his knowledge of the alleged inaccuracy of those representations.[19]  This omission is potentially significant because, under Ninth

---

[19]     Although the Complaint often fails to specify which Defendant made a particular representation, it is reasonable to infer that the challenged representations concerning GCU's doctoral degree requirements were made by GCE, given the Complaint's allegation that "GCE has been the exclusive provider of marketing services for Defendant GCU."

Circuit law, individual monetary liability for a corporation's violations of § 5 of the FTC Act requires proof of both (1) authority to control the challenged representations and (2) some degree of awareness of, or reckless disregard concerning, the challenged representations. *See, e.g., FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1202 (9th Cir. 2006) ("An individual is personally liable for a corporation's FTCA § 5 violations if he participated directly in the acts or practices or had authority to control them and had actual knowledge of material misrepresentations, was recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud along with an intentional avoidance of the truth.") (cleaned up).

The first element of this test is satisfied here by virtue of the Complaint's allegation that Mueller serves as the CEO of GCE. That is sufficient, at the pleading stage, to plausibly establish control. *Cf. FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170-71 (9th Cir. 1997) (defendant's role as president and "her authority to sign documents on behalf of the corporation demonstrate that she had the requisite control over the corporation"). The closer question is whether the Complaint also alleges sufficient facts to plausibly establish the requisite degree of knowledge. Mueller attempts to liken this case to *Swish Marketing*, 2010 WL 653486, where the district court dismissed individual claims against the CEO of a corporate defendant in an FTC enforcement action because "as currently constituted the complaint presents virtually no facts to tie [the CEO] to the debit card scheme or to suggest his knowledge moves from the conceivable to the plausible." *Id.* at *5-6. However, this case is distinguishable from *Swish Marketing* because here, unlike there, the Complaint provides extensive allegations regarding Mueller's role in structuring the operations of GCU and GCE and overseeing the operations of both entities in his roles as president (of GCU) and CEO and chairman of the board (of GCE). (Doc. 25 ¶¶ 7, 11, 12, 13, 23.) Courts have concluded that such allegations are sufficient to plausibly establish knowledge or recklessness—and, thus, support individual liability—at the pleading stage. *See, e.g., Am. Fin. Benefits Ctr.*, 324 F. Supp. 3d at 1080-

(Doc. 25 ¶ 5.)

81 (distinguishing *Swish Marketing* and concluding that the complaint plausibly alleged the necessary degree of knowledge or recklessness to support individual liability because it provided "robust" allegations regarding the individual's "founding, incorporation, and majority ownership of the Companies," as well as his service "as the CEO, Secretary, CFO, and sole Director of each entity since its incorporation," as such conduct "evidences his involvement in both their high-level and day-to-day management" and "support[s] the inference that he knew of or was recklessly indifferent to the purported misrepresentations"); *United States v. MyLife.com, Inc.*, 499 F. Supp. 3d 751, 756 (C.D. Cal. 2020) ("Tinsley relies almost exclusively on *Swish*.  But the comparison is inapt because the Complaint's allegations here are more robust. . . .  [T]he Complaint plausibly establishes Tinsley's authority to control MyLife's practices with specific factual allegations about his high-level leadership and day-to-day management that go beyond merely identifying his title.") (cleaned up).  It is also notable that after the FTC filed an amended complaint in *Swish Marketing* in response to the dismissal order, the district court concluded that the slightly beefed-up allegations regarding the CEO's knowledge were sufficient to support individual liability.  *FTC v. Benning*, 2010 WL 2605178, *5 (N.D. Cal. 2010).

Alternatively, even if the Complaint were insufficient to establish Mueller's individual *monetary* liability for the § 5 violations allegedly committed by GCE—and as discussed above, it is not—the Ninth Circuit has held that when the FTC seeks *injunctive* relief against an individual based on corporate-entity violations, the only required showing is that the individual participated directly in the violations or had authority to control the entity.  *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1101 (9th Cir. 2014) ("Individuals may be held liable for injunctive relief based on corporate entity violations of the FTC Act if (1) the corporation committed misrepresentations of a kind usually relied on by a reasonably prudent person and resulted in consumer injury, and (2) individuals participated directly in the violations or had authority to control the entities.  In order to hold an individual liable for restitution as a result of the misconduct of a corporation, the FTC must

also show that the individual had knowledge that the corporation or one of its agents engaged in dishonest or fraudulent conduct, that the misrepresentations were the type upon which a reasonable and prudent person would rely, and that consumer injury resulted.") (cleaned up).  As noted above, the necessary degree of control is alleged here, and the Complaint specifically seeks both monetary and injunctive relief against Mueller.  (Doc. 25 at 37.)  This provides an additional reason why Mueller's request for the outright dismissal of Count Two is denied.

The same analysis applies to Count Three.  Although the parties have not briefed the issue in any detail, it appears that the same or similar standards governing individual liability for corporate violations of § 5 of the FTC Act also govern individual liability for corporate violations of the Telemarketing Sales Rule.  *FTC v. Ivy Cap., Inc.*, 616 F. App'x. 360, 360-61 (9th Cir. 2015) (upholding, without differentiation, findings of individual liability for corporate violations of § 5 of the FTC Act and the Telemarketing Sales Rule).

This leaves Counts Four and Five, both of which relate to GCE's alleged practice of making unauthorized telemarketing calls in violation of the Telemarketing Sales Rule. (GCE has not moved for dismissal of those claims).  As with Count Three, the Court concludes that the Complaint is sufficient to establish Mueller's individual liability for those violations because it is plausible, based on the detailed factual allegations in the Complaint regarding Mueller's role, that Mueller had control over those telemarketing efforts and also had the requisite degree of knowledge or recklessness concerning them. At a minimum, the FTC's claim for injunctive relief against Mueller in relation to those claims is sufficient because, as noted, only control (and not knowledge) is required in the injunctive-relief context.  *Grant Connect,* 763 F.3d at 1101.[20]

…

…

---

[20]    Also, to the extent any party contends that Rule 9(b) applies to alleged violations of 16 C.F.R. § 310.4(b)(1)(iii)(A)-(B), the Court disagrees.  It is difficult to see how an allegation that GCE called consumers who had asked not to be called would "sound in fraud."  *Vess*, 317 F.3d at 1103-04.

VII.   Leave To Amend

A.   **The Parties' Arguments**

GCU and Mueller contend that "[l]eave to amend would be futile" because (1) "GCU's application for tax-exempt status, which has been filed on the public docket . . . since May 2022, disclosed Mr. Mueller's anticipated dual roles and the MSA (including the anticipated revenue share percentage)"; (2) "GCU and GCE were represented in the transaction by separate and independent boards with customary fiduciary duties owed to their respective entities"; and (3) "GCU obtained multiple appraisals and studies confirming the purchase price, interest rate, and MSA revenue split were at or below fair market value."  (Doc. 27 at 10-11 nn. 2, 4, 5.)  They ask the Court to "dismiss the FTC's complaint with prejudice."  (*Id.* at 17.)  GCE similarly contends that its partial motion to dismiss should be granted "with prejudice."  (Doc. 30 at 1.)

The FTC responds that "[i]f the Court were to conclude that further allegations are required in this complaint, leave to amend would be the proper remedy."  (Doc. 44 at 22 n.10.)   It contends that "GCU's assertion that leave to amend would be 'futile'—referencing arguments it made in *GCU v. Cardona*—ignores both the rule that the complaint allegations are to be taken as true, and the outcome of that proceeding."  (*Id.*)

Defendants offer no new arguments in reply, although GCU and Mueller reiterate that dismissal should be "with prejudice."  (Doc. 45 at 11.)

B.   **Analysis**

Rule 15(a) of the Federal Rules of Civil Procedure "advises the court that 'leave [to amend] shall be freely given when justice so requires.'"  *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (citation omitted).  "This policy is 'to be applied with extreme liberality.'"  *Id.* (citation omitted).  Thus, leave to amend should be granted unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile."  *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).

Applying these standards, the FTC's request for leave to amend is granted.  The

FTC has not previously amended the Complaint, the policy of extreme liberality underlying Rule 15(a) counsels in favor of granting the FTC's amendment request, and it is possible that at least some of the deficiencies identified in this order may be curable based on the pleading of additional facts (as the FTC contends).

Accordingly,

**IT IS ORDERED** that:

1.      GCU's and Mueller's motion to dismiss (Doc. 27) is **granted in part and denied in part**.

2.      GCE's partial motion to dismiss (Doc. 30) is **granted in part and denied in part**.

3.      GCU's and Mueller's request for judicial notice (Doc. 28) is **granted in part and denied in part**.

4.      GCE's request for judicial notice (Doc. 30-2) is **granted**.

5.      The FTC may file a First Amended Complaint within 21 days of the issuance of this order.  Any changes shall be limited to attempting to cure the deficiencies raised in this order, and the FTC shall, consistent with LRCiv 15.1(a), attach a redlined version of the pleading as an exhibit.