1
2
3
4
5
6 **IN THE UNITED STATES DISTRICT COURT**
7 **FOR THE DISTRICT OF ARIZONA**
8

| | |
|---|---|
| Federal Trade Commission, | No. CV-23-02711-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Grand Canyon Education Incorporated, et al., | |
| Defendants. | |

In advance of the motion hearing on February 19, 2025, the Court wishes to provide the parties with its tentative ruling. The point of providing it beforehand is to streamline oral argument and enhance the parties' ability to address any perceived errors in the Court's tentative analysis. This is not an invitation to submit additional evidence or briefing. Also, if the parties jointly agree, after reviewing the tentative ruling, that oral argument is unnecessary, they may file a stipulation to vacate oral argument and issue a final order based on the tentative ruling.

Dated this 13th day of February, 2025.

Dominic W. Lanza
United States District Judge

<u>TENTATIVE RULING</u>

There are three fully briefed motions pending before the Court: (1) a motion to dismiss filed by Defendant Grand Canyon University ("GCU") (Doc. 71); (2) a motion to quash and/or for protective order filed by GCU (Doc. 117); and (3) a motion to strike affirmative defenses filed by Plaintiff Federal Trade Commission ("FTC") (Doc. 124). Each motion is addressed below.

## DISCUSSION

I.  GCU's Motion To Dismiss

A.  **Relevant Background**

In its original complaint in this action, the FTC sued three defendants: (1) GCU; (2) Grand Canyon Education, Inc. ("GCE"); and (3) Brian E. Mueller ("Mueller"), who is GCU's president and GCE's CEO and chairman of the board. (Doc. 25.)  The complaint asserted five causes of action: (1) making deceptive representations concerning GCU's status as a non-profit institution, in violation of § 5 of the FTC Act; (2) making deceptive representations concerning GCU's doctoral programs, in violation of § 5 of the FTC Act; (3) making both sets of deceptive representations in connection with the telemarketing of educational services, in violation of the FTC's Telemarketing Sales Rule ("TSR"); (4) initiating telemarketing calls to persons who requested that GCU not contact them, in violation of the TSR; and (5) initiating telemarketing calls to persons registered on the national Do-Not-Call Registry, in violation of the TSR. (*Id.*)

On February 9, 2024, GCU moved to dismiss. (Doc. 27.)  Among other things, GCU argued that the FTC only possesses authority under the FTC Act and the TSR to pursue claims against "persons, partnerships, or corporations," yet GCU is not a "person" or "partnership" and does not fall within the FTC Act's definition of a "corporation," which is limited to a company "organized to carry on business for its own profit or that of its members." (*Id.* at 6-8.)

On August 15, 2024, after full briefing on GCU's motion to dismiss (as well as on GCE's and Mueller's motions to dismiss) and oral argument, the Court issued a lengthy order that, among other things, dismissed GCU as a defendant. (Doc. 56)  As an initial

matter, the Court agreed with GCU that, to fall within the FTC Act's definition of a "corporation," an entity must either be (1) organized to carry on business for the profit of its "members"; or (2) organized to carry on business for its "own" profit.  (*Id.* at 16, 22-23.)  The Court concluded that the FTC could not prevail under the former theory because "during oral argument, the FTC abandoned any claim that GCU is organized to profit its members."  (*Id.* at 22.)  Thus, the analysis turned on whether the allegations in the complaint were sufficient to establish that GCU was organized for its "own" profit.

As to that issue, "the FTC's theory as clarified during oral argument [was] that if an ostensible nonprofit entity is being operated to benefit 'insiders,' 'related . . . businesses,' or 'officers' that are not members, it qualifies as a company 'organized to carry on business for its own profit' within the meaning of" the FTC Act.  (*Id.* at 22-23.)  Although the Court acknowledged that the issue presented a debatable call, it rejected the FTC's position, both because "no federal appellate court has ever, in a published opinion, allowed the FTC to pursue claims against an ostensible nonprofit under this theory" and because "the FTC's theory cannot be squared with the plain language of the statute."  (*Id.* at 23.)  The Court elaborated:

> If Congress had intended for [the statutory definition] to encompass nonprofit entities organized to carry on business for the profit of non-member "insiders," "related businesses," and "officers," it could have said so.  Indeed, other statutes addressing nonprofit status expressly call for such an inquiry. For example, the inurement clause of section 501(c)(3) of the Internal Revenue Code requires an evaluation of whether any "part of the net earnings" of an asserted nonprofit charity "inures to the benefit of any private shareholder or individual."  Similarly, under the DOE regulations, one part of the definition of the term "Nonprofit institution" is that "the Secretary determines that no part of the net earnings of the institution benefits any private entity or natural person."  But there is no textual basis for engaging in such an inquiry when determining whether an entity falls within [the FTC Act's] definition of a "corporation."  Instead, for whatever reason, Congress chose only to vest the FTC with authority to pursue claims against an entity organized to carry on business for its "own" profit or the profit of its "members."  Although there may be persuasive policy reasons why the FTC should be allowed to pursue claims against nonprofits that operate for the benefit of non-member insiders, related businesses, and officers, the Court

must take the statute as written.

(*Id.* at 23-24, cleaned up.)  The Court also observed that the FTC's proposed "interpretation effectively deletes the words 'its own' from the statute. . . .  Even if GCU is somehow organized for Mueller's and/or GCE's profit, no facts have been pleaded suggesting it is organized for its 'own' profit."  (*Id.* at 24-25, cleaned up).  Finally, the Court disagreed with the FTC's assertion "that the only way to give meaning to the phrase 'for its own profit' the second time it appears in [the statutory] definition of 'corporation' is to treat a company that uses any portion of its revenue to perpetuate or expand itself as a company that is organized 'for its own profit,'" concluding that this was nothing more than a restated version of the FTC's "original argument that because GCU is allegedly operating to generate profits for GCE and Mueller, it is operating 'for its own profit.'"  (*Id.* at 25.)

In the final portion of the August 15, 2024 order, the Court addressed whether the FTC should be granted leave to amend as to GCU.  (*Id.* at 51.)  The Court concluded that leave should be granted because "[t]he FTC has not previously amended the Complaint, the policy of extreme liberality underlying Rule 15(a) counsels in favor of granting the FTC's amendment request, and it is at least theoretically possible that the deficiencies identified in . . . this order could be cured based on the pleading of additional facts."  (*Id.*)

On September 5, 2024, the FTC filed its operative pleading, the First Amended Complaint ("FAC").  (Doc. 62.)  The FAC again names GCU as a defendant and reasserts the same five causes of action that appeared in the original complaint.  (*Id.*)  The FAC also includes, in paragraphs 13, 14, and 20, the following new allegations intended to establish that GCU is organized for its "own" profit:

- Paragraph 13:  "Gazelle University/GCU was organized to carry on the business of selling educational services and related activities for its own profit and for the profit of GCE.  Gazelle University/GCU was organized to acquire, own, and operate portions of the University owned by GCE, and use at least some of its earnings from this business to acquire property, secure loans, accumulate capital, and otherwise perpetuate and expand its business,

- 5 -

and to increase the assets of the corporation and their value.  Accordingly, Defendant Gazelle University/GCU was organized and has been operated to carry on business for its own profit or that of its members, within the meaning of Section 4 of the FTC Act.  15 U.S.C. § 44."  (Doc. 62-1 ¶ 13.)

- Paragraph 14:  "The articles of incorporation of Gazelle University/GCU represent that it is organized and operated exclusively for charitable, religious, and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.  Notwithstanding these articles of incorporation, Gazelle University/GCU was, in not organized exclusively for these purposes or exclusively for its own profit.  In fact, it was organized by GCE and Defendant Mueller for Gazelle University/GCU's own profit, and to advance GCE's for-profit business and advance Defendant Mueller's interests as officer, chairman, director, stockholder and promoter of investment in GCE."  (*Id.* ¶ 14.)

- Paragraph 20:  "Since July 1, 2018, GCU's revenue has generated profit for itself, for GCE, and for GCE's investors.  Since the July 1, 2018 reorganization of the University's assets, GCU has also generated revenue and profit.  GCU has used its earnings to acquire property, accumulate reserves and enhance the value of its assets, and has reportedly increased the net value of its assets by more than $125 million."  (*Id.* ¶ 20.)

B.  **The Parties' Arguments**

GCU again moves to dismiss, arguing that the new factual allegations in the FAC do not cure the deficiencies that led to the dismissal of the original complaint.  (Doc. 71.) First, GCU argues that any new allegations regarding how it has been "operated" are immaterial because the statutory definition only addresses how an entity is "organized." (*Id.* at 4-5.)  Second, GCU argues that the FAC's allegation that it was "organized to perpetuate and expand its business" is unavailing because "nonprofits may grow their revenue and acquire new assets without undermining their nonprofit status."  (*Id.* at 5.)

GCU also contends the FTC conceded this point during oral argument on the previous motion to dismiss. (*Id.* at 5-6.) Third, GCU argues that the FAC's allegations regarding its efforts to acquire property, secure loans, and accumulate capital are unavailing because "the FTC does not allege that any of the perpetuation and expansion of GCU's operations . . . was not in furtherance of GCU's educational mission." (*Id.* at 6.)

In response, the FTC argues that the new factual allegations in the FAC should be deemed sufficient to cure the deficiencies that led to the dismissal of the original complaint. (Doc. 83.) More specifically, the FTC contends that the new allegations in paragraphs 13, 14, and 20 establish the following narrative:

> [GCE], which owned and operated the University as a for-profit beginning in 2004, devised a plan to re-brand the University as a nonprofit by transferring some of its assets and operations to a new entity, created and headed by . . . Mueller. The purported nonprofit formed to implement this plan, initially named Gazelle University, was created so that it would acquire portions of the University from GCE. GCE would retain other portions of the University's operations, continue to be the exclusive provider of marketing for the business, and receive most of its income. Gazelle University/GCU was organized, the amended complaint alleges, so that both it and GCE could profit from this division of assets and operations. Gazelle University/GCU could use earnings from operating the University to 'acquire property, secure loans, accumulate capital, and otherwise perpetuate and expand its business, and to increase the assets of the corporation and their value.' At the same time, it also would advance GCE's business, the interest of GCE's investors, and the interests of Defendant Mueller as GCE's CEO, Chairman, and stockholder.

(*Id.* at 1-2.) According to the FTC, these new allegations are not conclusory and establish "that Gazelle University/GCU was organized for its own profit, that it was not organized exclusively for charitable purposes, and that it has reportedly increased the net value of its assets by more than $125 million." (*Id.* at 3-4.) The FTC also contends that GCU's arguments regarding "organized" versus "operated" amount to "a straw man" because the FAC specifically alleges that "GCU was operated *and* organized for its own profit." (*Id.* at 4-5.) Finally, the FTC argues that GCU's other arguments—including that it is permissible for a nonprofit to generate excess revenue to be used to support its mission—

effectively amount to requests to "insert requirements that have no basis in the FTC Act's text." (*Id.* at 5-6.)

In reply, GCU argues that "the FTC's conclusory statement that GCU was 'organized for its own profit' is not a factual allegation entitled to the presumption of truth. The only new facts that the [FAC] alleges are that GCU has used its revenue to retire debt, acquire property, accumulate capital, build its reserves, increase the value of its assets, and expand or perpetuate the University. But those kinds of commonplace activities, which are undertaken by nonprofits throughout the country, in no way suggest that GCU has used its revenue to enrich itself, its member, or (non-existent) shareholders, as they are the kind entirely consistent with the nonprofit mission for which GCU was organized." (Doc. 85 at 1.) Next, in a related vein, GCU clarifies that it is not arguing that the improper use of revenues is part of the statutory test for whether an entity qualifies as a "corporation"—rather, it simply argues that "a nonprofit does not meet the statutory requirement . . . just because it perpetuates or expands itself as part of its nonprofit mission." (*Id.* at 1-2, cleaned up.) Next, GCU reiterates that the FTC's current position is inconsistent with the position the FTC took during the last oral argument. (*Id.* at 2.) GCU concludes: "[T]he FTC now abandons any discernable limiting principle, taking a stance that would give it authority over virtually every thriving nonprofit. To be sure, what the FTC alleges in the First Amended Complaint's new paragraphs are sound financial principles for nonprofit universities. But the mere fact that a non-profit is earning revenue and expanding does not transform it into a for-profit. No federal court has ever adopted such a broad reading of the FTC Act's definition of a corporation, which would eviscerate §4's limiting language and give the FTC authority over all manner of nonprofit entities." (*Id.* at 2-4, citations omitted.)

C.    **Analysis**

The new factual allegations in the FAC do not cure the deficiencies that led to the dismissal of GCU from the original complaint and do not plausibly establish that GCU is "organized to carry on business for its own profit" within the meaning of the FTC Act. As

an initial matter, some of the new allegations in the FAC are intended to establish that GCU is organized and is being operated to generate profit for GCE, GCE's investors, and/or Mueller. But as discussed in the August 15, 2024 order, such allegations do not speak to whether GCU is organized and is being operated for its "own" profit. Nor does the FAC allege that GCE, GCE's investors, or Mueller are "members" of GCU.

This leaves the FAC's new allegations that GCU is organized and is being operated to generate "earnings" that are then used to "otherwise perpetuate and expand its business," such as by acquiring property, securing loans, and accumulating assets. (Doc. 62 ¶¶ 13-14, 20.) These allegations also fail to establish that GCU is organized and is being operated for its "own" profit. During oral argument on GCU's earlier motion to dismiss, the FTC conceded that if GCU was generating "surplus earnings" and then using them "for legitimate educational purposes," such activity would not qualify as proof that GCU was operating for its "own" profit:

> Q:    [I]s it your theory that anytime that a university uses its revenues to expand, it's no longer a nonprofit because it's operating for its own profit through expansion?
>
> A:    No, Your Honor. It is that if those activities are in advancement of its educational mission, then that is not for profit. It has to be faithful to the commitment to use the surplus earnings exclusively for the charitable purposes.
>
> Q:    So . . . where in the complaint does it allege that the subset of the revenue that GCU keeps for itself GCU uses for some purpose other than legitimate educational purposes?
>
> A.    Your Honor, that is not the test. So let me go back. The point is that if GCU is using the subset of what it retains for legitimate educational purposes, that's fine, but it needs to be 100 percent.

(Doc. 57 at 33-34.)

This colloquy is significant because the FAC seems to acknowledge—and, at any rate, the FTC does not dispute—that one of GCU's purposes when earning surplus revenues for use in acquiring property, securing loans, and accumulating assets was to

fulfill its stated charitable mission of providing educational services.  (Doc. 62 ¶ 14, emphasis added ["The articles of incorporation of Gazelle University/GCU represent that it is organized and operated exclusively for charitable, religious, and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.  Notwithstanding these articles of incorporation, Gazelle University/GCU was not organized *exclusively* for these purposes . . . ."]; Doc. 83 at 5-6 [not disputing GCU's assertion that GCU "devotes a portion of its earnings to further an educational mission"].)  If GCU used all of its surplus revenues for that purpose, then GCU would not—per the FTC's earlier concession— qualify as an entity that is organized and being operated for its "own" profit.

Effectively, then, the FTC's position is that because GCU's efforts to earn surplus revenues for use in acquiring property, securing loans, and accumulating assets are also intended to achieve a separate purpose—which the FAC identifies as generating profits for GCE, GCE's investors, and Mueller—the presence of this dual motive transforms GCU into an entity that is organized and being operated for its "own" profit.  (Doc. 83 at 6 ["As the amended complaint alleges, GCU was not organized exclusively for the educational purposes it has represented, but to advance the business of Defendants GCE and Mueller."].)  The problem with this approach is that neither alleged purpose qualifies as an effort to carry on business for GCU's "own" profit—the former purpose (*i.e.*, advancing GCU's stated charitable mission of providing educational services) would not qualify per the FTC's earlier concession while the latter purpose (*i.e.*, generating profits for GCE, GCE's investors, and Mueller) would not qualify for the reasons stated in the August 15, 2024 order.  The FTC does not explain why the presence of these two purposes, neither of which alone qualifies as an effort to carry on business for GCU's "own" profit, should be deemed to suffice when paired together.  *Cf. Henderson v. Kennedy*, 253 F.3d 12, 19 (D.C. Cir. 2001) ("For this argument to prevail, one would have to conclude that . . . the combination of two untenable claims equals a tenable one.  But in law as in mathematics zero plus zero equals zero.").

For these reasons, GCU is again dismissed.  This dismissal is without leave to

1    amend, as any further attempt at amendment would be futile.

2    II.    GCU's Motion To Quash And/Or For Protective Order

3        A.    **Relevant Background**

4        During the early stages of this case, all three Defendants requested a stay of

5    discovery until the Court resolved their respective motions to dismiss. (Doc. 47 at 10-12.)

6    On April 10, 2024, after hearing argument on that issue, the Court granted the stay request.

7    (Doc. 51.)

8        As noted, on August 15, 2024, the Court issued a lengthy order resolving the

9    motions to dismiss. (Doc. 56.) Although that order resulted in the dismissal of GCU as a

10    defendant, the Court did not wholly grant GCE's and Mueller's dismissal requests. (*Id.*)

11    As a result, the Court ordered that "[t]he stay on discovery . . . is lifted." (*Id.* at 52.)

12        As noted, on September 5, 2024, the FTC filed the FAC, which again named GCU

13    as a defendant. (Doc. 62.)

14        On September 23, 2024, the Court held a renewed case management conference.

15    (Doc. 69.) During that conference, GCU's counsel made an oral motion to stay discovery

16    as to GCU pending the resolution of GCU's forthcoming motion to dismiss the FAC. (*Id.*)

17    The Court granted that stay request. (*Id.*)

18        On December 12, 2024, the FTC served a Rule 45 subpoena on the law firm Cooley,

19    LLP ("Cooley"). (Doc. 117-1.) As background, Cooley "represented GCU as regulatory

20    counsel in connection with the July 1, 2018 acquisition of [GCU] from GCE and GCU's

21    change-in-ownership application with the Department of Education." (Doc. 117 at 3.) The

22    subpoena seeks to compel Cooley to produce three categories of documents associated with

23    those processes: "1. Documents sent to and received from the United States Department

24    of Education. 2. Documents sent to and received from the Higher Learning Commission,

25    or Arizona State Board for Private Postsecondary Education. 3. Documents sent to and

26    received from Deloitte Tax LLP, Barclays Capital Inc., or other entities that Jonathan Glass

27    did not represent as an attorney in connection with this matter and was not acting as agent

28    for an entity with whom Jonathan Glass had an attorney-client relationship." (Doc. 117-1

at 5.)

Between December 13-23, 2024, counsel for GCU and the FTC met and conferred regarding the Cooley subpoena.  (Doc. 117-2.)

On December 23, 2024, after GCU and the FTC were unable to resolve their dispute informally, GCU filed the pending motion to quash and/or for protective order.  (Doc. 117.)

On January 13, 2025, the FTC filed a response.  (Doc. 125.)

On January 24, 2025, GCU filed a reply.  (Doc. 131.)

B.    **The Parties' Arguments**

GCU moves to quash the Cooley subpoena or for a protective order to block enforcement of the Cooley subpoena.  (Doc. 117.)  First, GCU argues that the Cooley subpoena constitutes an impermissible attempt "to circumvent this Court's order staying discovery against GCU."  (*Id.* at 4.)  More specifically, GCU contends that because "documents related to a law firm's representation of a client are within the client's possession, custody, and control, *i.e.*, Cooley's potentially responsive documents are GCU's documents for purposes of discovery," it follows that the subpoena will force GCU "to incur the burden and cost of responding to the subpoena, just as if it were issued to GCU directly." (*Id.* at 4-5.)  Second, GCU argues that the documents sought by the Cooley subpoena are irrelevant because Count One of the FAC turns on whether "students may have been misled by Defendants' characterization of GCU as a non-profit" and the requested documents will shed no light on that issue.  (*Id.* at 5-6.)  GCU further contends that the Cooley subpoena represents a backdoor attempt by the FTC to obtain information that could be used to "collaterally attack[]" the regulatory decisions of the agencies at issue and is particularly misplaced in light of the recent Ninth Circuit decision ordering the Department of Education "to set aside the Department's denials" of GCU's applications to be recognized as a nonprofit institution under the Higher Education Act of 1965.  *Grand Canyon Univ. v. Cardona*, 121 F.4th 717, 727 (9th Cir. 2024).  Additionally, GCU contends that at least some of the requested documents "are largely available in public filings in" the *Cardona* lawsuit.  (Doc. 117 at 7.)  Third, GCU argues that complying with the Cooley

subpoena would place an undue burden on GCU because the FTC already possesses most of the documents covered by the first two categories of the subpoena and the third category encompasses documents "that will require significant review for privilege and confidentiality." (*Id.* at 7-9.)

The FTC opposes GCU's motion. (Doc. 125.) In response to GCU's contention that the Cooley subpoena represents an attempt to circumvent the stay, the FTC argues that the stay "does not bar discovery from others pursuant to Rule 45 or other means as the FTC prepares to litigate the claims for which this Court has already rejected motions to dismiss. The records covered by the subpoena are discoverable, regardless of whether GCU remains a party to this suit, as they are relevant to whether Defendants GCE and Mueller are liable for marketing GCU as a nonprofit. Indeed, even if GCU was not a party, its non-party status would not allow it to block discovery because it claimed an interest in the records." (*Id.* at 4-5.) The FTC also disputes the notion that the subpoena is effectively directed to GCU, arguing that "a subpoena for these documents is not transformed into discovery 'against GCU' because counsel for GCU also possesses copy of these records. The subpoena seeks Cooley's communications; records for which Cooley is the original source—not merely a custodian. As counsel in GCU's dealings with the Department of Education, HLC, and State of Arizona, Cooley was the author and original recipient of many of the documents exchanged. The fact that GCU also happens to have a copy of the documents does not invalidate an otherwise valid subpoena." (*Id.* at 5-6.) In response to GCU's relevance arguments, the FTC argues that "[d]ocuments describing the terms, plans and goals of the creation of 'New GCU' are relevant to the FTC's claims that the terms, plans and goals show it is deceptive to represent that the University is a nonprofit. Thus, relevance does not turn on whether the records may confirm allegations that false representations were made." (*Id.* at 11.) The FTC also argues that "this Court has already rejected arguments that IRS and other agency characterizations are dispositive of the nonprofit claims in this case" and that "nothing in the recent Ninth Circuit decision undermines this Court's prior ruling on the motion to dismiss. To the contrary, the Ninth

Circuit's remand underscores that whether GCU is a genuine nonprofit is an open question to be litigated, and is not governed by prior actions of the IRS or any other agency." (*Id.* at 9-11.)  In response to GCU's undue burden arguments, the FTC contends it is "questionable" whether GCU, as a non-recipient, has standing to raise such arguments.  (*Id.* at 6 n.4.)  Regardless, the FTC contends that those arguments fail on the merits because Cooley only possesses approximately 3,800 documents (so the scope of review will be limited), the subpoena only seeks third-party communications, and even if some subset of those documents might theoretically be covered by some privilege or the work-product doctrine, "GCU makes no showing that the volume of such records is significant or that privilege or work product protections apply." (*Id.* at 6-7.)  In a later section of its brief, the FTC elaborates on why it believes GCU's references to privilege doctrines are too vague and conclusory.  (*Id.* at 11-13.)  Finally, the FTC also contends that, for various reasons, the requested documents are not duplicative of documents already in its possession and are not included in the publicly available portions of the *Cardona* docket.  (*Id.* at 7-9.)

In reply, GCU begins by reiterating its contention that, particularly in light of *Cardona*, none of the materials sought in the Cooley subpoena are relevant.  (Doc. 131 at 1-4.)  GCU also reiterates its contention that the Cooley subpoena represents an attempt to circumvent the stay because "[f]unctionally, the Cooley subpoena is no different than if the FTC served discovery requests directly on GCU." (*Id.* at 4-5.)  GCU does not directly respond to most of the FTC's undue burden arguments, which it characterizes as distractions intended "to shift this Court's focus away from the larger, preceding point" concerning relevance.  (*Id.* at 5.)

C.    **Analysis**

GCU has not established an entitlement to the relief sought in its motion.  As an initial matter, the Cooley subpoena does not represent an impermissible attempt to circumvent the September 23, 2024 order staying discovery as to GCU.  The purpose of that order was simply to protect GCU from the potential burdens of *party* discovery pending resolution of the parties' dispute over whether GCU is a proper party to this action.

It was not intended to forever preclude the FTC from pursuing discovery from any source bearing on the accuracy of Defendants' characterization of GCU as a nonprofit, which is relevant to the FTC's claim in Count One of the FAC.

Indeed, there is a certain irony to GCU's position now that it has been dismissed as a party. *See* Part I *supra*. Although that dismissal frees GCU from the burdens of party discovery, GCU (now a non-party) is nevertheless seeking to insert itself into a dispute concerning a subpoena the FTC issued to Cooley (another non-party) in an effort to raise relevance and undue burden objections. There is a strong argument that GCU lacks standing to raise such objections under these circumstances. After all, "the prevailing view is that . . . a *non-recipient party* cannot move to quash or modify a subpoena on relevance, cost, or proportionality grounds." 1 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 45 (2022) (emphasis added). *See also Anstead v. Va. Mason Med. Ctr.*, 2023 WL 34505, *2 (W.D. Wash. 2023) ("This Court agrees with other district courts in the Ninth Circuit that a party generally lacks standing to object to a subpoena served on a third party on grounds of relevance or undue burden."); *Thao v. Lynch*, 2023 WL 2480860, *2 (E.D. Cal. 2023) (the "general rule" is that a party "lacks standing to object to [third-party] subpoenas on grounds of relevance or undue burden"); *Jiae Lee v. Dong Yeoun Lee*, 2020 WL 7890868, *5 (C.D. Cal. 2020) ("[O]nly the party to which the subpoena is directed has standing to object to the requests on the grounds that they are irrelevant, vague, overbroad, duplicative, unduly burdensome, etc."). That rule would seem to apply with particular force if, as here, it is a *non-recipient non-party* that seeks to raise relevance and undue burden objections to a subpoena.

Nevertheless, even assuming GCU possesses standing to raise those objections, they fail on the merits. Starting with relevance, "[r]elevancy in civil litigation is a relatively low bar." *Continental Circuits LLC v. Intel Corp.*, 435 F. Supp. 3d 1014, 1018 (D. Ariz. 2020). Under Rule 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in

controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *See also* Gensler, *supra*, Rule 26 ("For discovery purposes, courts define relevance broadly, stating that information is relevant if it bears on or might reasonably lead to information that bears on any material fact or issue in the action. . . . [C]ourts are quick to point out that discovery is concerned with relevant information—not relevant evidence—and that as a result the scope of relevance for discovery purposes is necessarily broader than trial relevance."). As explained in the August 15, 2024 order, the merits of Count One will ultimately turn on whether the "characterization of GCU as a nonprofit was confusing to students and the public, who may interpret such statements to mean that the DOE considers GCU a nonprofit under its regulations." (Doc. 56 at 32, cleaned up.) Although the documents sought in the Cooley subpoena do not directly address this question of consumer confusion—instead, they will shed light on the representations that GCU's counsel made to various regulatory agencies and third-party consultants concerning GCU's nonprofit status—they still bear a close enough relation to this topic to fall within the broad scope of relevance for discovery purposes. As the FTC correctly argues in its response: "Documents describing the terms, plans and goals of the creation of 'New GCU' are relevant to the FTC's claims that the terms, plans and goals show it is deceptive to represent that the University is a nonprofit." (Doc. 125 at 11.)

Turning to undue burden, although GCU suggests it would be required to engage in a "significant" and "substantial" privilege-review process if Cooley were required to comply with the subpoena (Doc. 117 at 8), GCU does not actually identify the number of documents at issue or attempt to substantiate, in anything other than conclusory terms, the nature of the privileges that could be implicated by a subpoena that only seeks communications between Cooley and various third parties: "While the request seeks communications with third parties, those communications *could* nonetheless be subject to attorney client, work-product, and common interest privileges." (*Id.*, emphasis added.)

Moreover, after the FTC argued in its response that the subpoena only encompasses 3,800 documents, most of which could not possibly raise any privilege or work-product issues, GCU did not dispute these points in its reply and simply fell back on its relevance objection (which lacks merit, for the reasons discussed above). Under these circumstances, even assuming GCU has standing to raise an undue burden objection to the subpoena or otherwise raise objections based on privilege and confidentiality, it has not adequately substantiated those objections in a manner that would justify quashing the subpoena under Rule 45 or otherwise blocking the subpoena through the issuance of a Rule 26(c) protective order. *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002) ("For good cause to exist, the party seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is granted.").[1]

### III.   The FTC's Motion To Strike Affirmative Defenses

#### A.   **Relevant Background**

On September 26, 2024, GCE filed its answer to the FAC. (Doc. 73.) GCE's answer also raises various affirmative defenses, two of which are discussed in more detail below.

On November 25, 2024, Mueller filed his amended answer to the FAC. (Doc. 100.) Mueller's amended answer also raises various affirmative defenses, two of which are discussed in more detail below.

On January 10, 2025, the FTC filed a motion to strike the challenged affirmative defenses. (Doc. 124.)

On January 24, 2025, GCE (Doc. 130) and Mueller (Doc. 132) each filed a response.

On February 1, 2025, the FTC filed a reply. (Doc. 134.)

#### B.   **Legal Standard**

Although the Ninth Circuit has not directly addressed the issue, many courts have concluded—and the Court agrees—that "[t]he standard for striking an affirmative defense

---

[1]     The Court clarifies that nothing in this order precludes Cooley or GCU from attempting to withhold otherwise responsive documents based on the good-faith assertion of a claim of privilege—GCU has simply not established an entitlement to the relief sought in its motion, which is to quash or otherwise categorically block enforcement of the subpoena.

1  . . . is effectively the same as for granting a motion under Rule 12(b)(6)."  Gensler, *supra*,

2  Rule 12.  *See also GEOMC Co., Ltd. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 98 (2d

3  Cir. 2019) ("We conclude that the plausibility standard . . . applies to determining the

4  sufficiency of all pleadings, including the pleading of an affirmative defense, but with

5  recognition that . . . applying the plausibility standard to any pleading is a 'context-specific'

6  task.") (citations omitted).[2]

7          Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege sufficient

8  factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *In re*

9  *Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (internal quotation marks

10  omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that

11  allows the court to draw the reasonable inference that the defendant is liable for the

12  misconduct alleged."  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "[A]ll

13  well-pleaded allegations of material fact in the complaint are accepted as true and are

14  construed in the light most favorable to the non-moving party."  *Id.* at 1444-45 (citation

15  omitted).  However, the court need not accept legal conclusions couched as factual

16  allegations.  *Iqbal*, 556 U.S. at 678-80.  Moreover, "[t]hreadbare recitals of the elements of

17  a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 678.

18  The court also may dismiss due to "a lack of a cognizable legal theory."  *Mollett v. Netflix,*

19  *Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

20          C.      **GCE's Sixth Affirmative Defense (Offset)**

21                  1.      The Parties' Arguments

22          GCE's sixth affirmative defense provides as follows: "Any monetary relief to which

23  the FTC may be entitled, in whatever form, is subject to offset by amounts previously paid

24  to regulatory agencies related to the same conduct."  (Doc. 73 at 31.)

25  _____

26  [2]       Given this standard, the FTC need not establish prejudice in order to prevail on its
   motion to strike.  *See, e.g., G & G Closed Cir. Events, LLC v. Alfaro*, 2023 WL 1803399,
27  *3 (E.D. Cal. 2023) ("[N]o published Ninth Circuit authority requires a showing of
   prejudice to strike affirmative defenses . . . [so] the Court declines to require Plaintiff to
   show prejudice where such a requirement is not found in Rule 12(f)."); *FTC v. AMG Servs.,*
28  *Inc.*, 2014 WL 5454170, *9 (D. Nev. 2014) ("Prejudice considerations are not relevant
   under Rule 12(f).").

The FTC argues this affirmative defense should be stricken because it "is too vague to provide fair notice and lacks legal basis.  When previously challenged to explain this defense, GCE did not identify any previous payments and, instead, argued that *future* payments arising from a proposed Department of Education fine of GCU might give rise to a defense.  GCE's description of a single example of a potential payment that is not consistent with the defense it has pled underscores that the defense fails to provide adequate notice and should be stricken."  (Doc. 124 at 6.)  The FTC adds: "Neither the statute nor case law provide that FTC Act remedies are subject to offset for fees or other amounts that are not refunds."  (*Id.* at 7.)  Finally, the FTC also contends that "a defense predicated on conjecture that a future event in another proceeding may have a collateral impact is not a current defense."  (*Id.* at 8.)

In response, GCE defends the sufficiency of its offset-related affirmative defense.  (Doc. 130 at 3-11.)  First, GCE argues that the affirmative defense, as pleaded, provides adequate notice and that the FTC's arguments to the contrary are "disingenuous" in light of GCE's further elaboration of the nature of this affirmative defense during the parties' meet-and-confer discussions.  (*Id.* at 3-5.)  Second, GCE argues that "it is no basis to strike an affirmative defense simply because facts not known or present today may develop through the pendency of the litigation and bear on the merits of the defense."  (*Id.* at 5-6.)  In support, GCE cites *G & G Closed Circuit Events LLC v. Mayer*, 2024 WL 4534470 (D. Ariz. 2024).  (*Id.* at 6-7.)  Third, GCE argues that maintaining its offset-related affirmative defense would not result in "wasteful and distracting inquiries" because the FTC's theory of liability here and the Department of Education's threatened fine are both based on "similar conduct."  (*Id.* at 8-10.)  Additionally, GCE contends, "any damages awarded in this case may necessarily result in prohibited duplicative redress for injured students" because the Department of Education has indicated that its proposed fine is intended to "protect[] students and taxpayers" and calculated that proposed fine by multiplying the number of affected doctoral students by $5,000.  (*Id.* at 10-11.)

In reply, the FTC contends that GCE has "effectively concede[d] that the defense

pled in its Answer is not a defense it intends to pursue.  To wit, GCE has yet to identify any *previous* payment made to an agency that purportedly bears on the FTC's recovery. Rather, GCE intends to argue that it is entitled to an offset if there are *future redress* payments to the Department of Education arising from claims that Defendants misrepresented their doctoral program. . . .  [S]uch a claim is not encompassed by the defense actually pled in GCE's Answer and thus fails to provide the FTC fair notice." (Doc. 134 at 5-6.)  Next, the FTC argues that "GCE's argument confuses defenses resting on extant facts that have yet to be developed with defenses lacking extant facts altogether" and that "no development of the facts on past or present events . . . would sustain GCE's offset defense as it is undisputed that GCU has paid no fine to the Department of Education. GCE's other cited cases similarly deal with defenses that could be developed during discovery, and not on the hypothetical outcome of a collateral matter." (*Id.* at 6-7.)  Finally, as for whether a fine paid to the Department of Education could ever provide the basis for an offset in an FTC enforcement action, the FTC argues that the Department of Education's proposed fine "is a civil fine payable to the United States, not redress to injured students. Thus, even if GCU paid a civil fine to the Department of Education, that would not be a basis for reducing the redress to consumers under Section 19 of the FTC Act." (*Id.* at 7 n.2.)

### 2.   Analysis

The Court agrees with the FTC that GCE's sixth affirmative defense should be stricken.  Although the challenged defense alleges that GCE is entitled to an offset for "amounts previously paid to regulatory agencies related to the same conduct" (Doc. 73 at 31), GCE has now clarified that it is not seeking an offset based on any previous payment to a regulatory agency—instead, GCE seeks to preserve its ability to seek an offset based on a threatened future fine by the Department of Education.  The sixth affirmative defense, as presently worded, would not apply to such a fine.  Nor does GCE plead (or identify in its motion papers) any past payments to regulatory agencies that might fall within the scope of the sixth affirmative defense as presently worded.

The next question is whether GCE should be granted leave to amend. That question is governed by Rule 15(a) of the Federal Rules of Civil Procedure, which "advises the court that 'leave [to amend] shall be freely given when justice so requires.'" *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). "This policy is 'to be applied with extreme liberality.'" *Id.* Thus, leave to amend should be granted unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).

Applying those standards, GCE is entitled to leave to amend as to its offset-related affirmative defense. Amendment would not be futile because GCE can easily cure the deficiency identified above by changing the wording of its affirmative defense to encompass the contemplated future fine by the Department of Education. Changing the wording in this fashion will also eliminate the fair notice and vagueness concerns raised by the FTC.

The FTC also appears to contend that amendment would be futile for a different reason—because an affirmative defense can never be based on a specific collateral development, known to the parties, that is currently unfolding but not yet finalized. The Court disagrees but also notes that even if the FTC were correct on this point, the remedy would simply be to strike the sixth affirmative defense without leave to amend for the time being, with the understanding that if the Department of Education fine later came to fruition, GCE would have good cause under Rules 15 and 16 to seek leave to amend at that point in order to reassert its offset-based affirmative defense. *Macias v. Cleaver*, 2016 WL 8730687, *2 (E.D. Cal. 2016) ("Good cause may be demonstrated by a change in circumstance or newly discovered facts."). It would not advance Rule 1's aim of promoting the "just, speedy, and inexpensive" determination of this action to require the parties to go through such unnecessary and inefficient hoops.

Finally, to the extent the FTC contends that amendment would be futile because an offset in an FTC enforcement action can never be based on a fine paid to a different

regulatory agency, the Court is unprepared to categorically reject the possibility of such an offset at this early stage of the case where the issue has not been fully briefed and where the details of the contemplated fine are undeveloped.

### D. **GCE's Ninth Affirmative Defense (Agent Liability)**

#### 1. The Parties' Arguments

GCE's ninth affirmative defense provides as follows: "GCE cannot be held liable as an agent for acts upon which the principal is not held liable." (Doc. 73 at 32.)

The FTC contends this affirmative defense should be stricken because it "misstate[s] the law." (Doc. 124 at 9.) The FTC continues: "There is no requirement that the FTC obtain judgment against all possible defendants, nor does a settlement with some possible defendants without an admission of liability preclude the FTC from obtaining relief against other defendants participating in the same misconduct." (*Id.* at 9-11, citing cases.) The FTC also contends that this affirmative defense should be stricken "because discovery and motions practice elaborating on [it] would unnecessarily delay resolution of this case." (*Id.* at 11.)

In response, GCE does not dispute any of the FTC's legal arguments—instead, it simply argues that "courts in the Ninth Circuit routinely decline to strike affirmative defenses" on the ground that they misstate the law. (Doc. 130 at 11.) In other words, GCE argues that "the question of whether to strike an affirmative defense turns on the issue of fair notice and does not wade into the likelihood of success on the merits." (*Id.* at 12.) GCE also argues that the FTC would not be prejudiced by allowing this affirmative defense to remain part of the case. (*Id.* at 13-14.)

In reply, the FTC argues that GCE's position "conflate[s] fair notice and legal validity. An affirmative defense may be insufficient under Rule 12(f) as a matter of pleading (*i.e.*, because it fails to provide proper notice) *or* as a matter of law." (Doc. 134 at 7-8.)

…

…

1

2.    Analysis

2      The Court agrees with the FTC that GCE's ninth affirmative defense should be

3 stricken.  GCE makes no effort to dispute the FTC's showing that this affirmative defense

4 fails as a matter of law.  It would serve no purpose—and potentially cause mischief—to

5 allow such a facially invalid affirmative defense to remain part of the case.  *See, e.g., Torres*

6 *v. Goddard*, 2008 WL 1817994, *1 (D. Ariz. 2008) ("Motions to strike are generally

7 regarded with disfavor, but are proper when a defense is insufficient as a matter of law.");

8 *Sec. People, Inc. v. Classic Woodworking, LLC*, 2005 WL 645592, *3 (N.D. Cal. 2005)

9 ("Although Rule 12(f) motions are generally viewed with disfavor because striking a

10 portion of a pleading is often sought by a movant simply as a dilatory tactic, an affirmative

11 defense that would not, under the facts alleged, constitute a valid defense to the action can

12 and should be deleted.") (cleaned up).  This dismissal is without leave to amend because

13 amendment would be futile.

14    E.    **Mueller's Ninth Affirmative Defense (Officer Liability)**

15        1.    The Parties' Arguments

16      Mueller's ninth affirmative defense provides as follows: "Defendant Mueller cannot

17 be held liable for acts upon which the other Defendants are not held liable."  (Doc. 100 at

18 12.)

19      The FTC's arguments regarding Mueller's officer-liability affirmative defense

20 mirror its arguments concerning GCE's agent-liability affirmative defense—the FTC

21 argues that Mueller's version should be stricken because it misstates the law and would

22 lead to unnecessary discovery and motions practice.  (Doc. 124 at 8-12.)

23      Unlike GCE, Mueller seeks to defend the legal basis for his challenged affirmative

24 defense.  According to Mueller, "[u]nder the FTC Act, an individual may be liable for

25 corporate practices in violation of the Act once corporate liability is established."  (Doc.

26 132 at 4.)  Thus, Mueller contends that "the FTC must establish GCE's liability before it

27 can hold Mr. Mueller individually liable for corporate violations."  (*Id.* at 4-5.)

28 Alternatively, Mueller argues—as did GCE—that legal insufficiency is not a basis for

striking an affirmative defense. (*Id.* at 5.)

In reply, the FTC reiterates its argument that legal insufficiency is a valid basis for striking an affirmative defense. (Doc. 134 at 7-8.) The FTC's only response to Mueller's merits-based argument is that "proof of the alleged misconduct is sufficient to hold participants in a deceptive practice liable" and that Mueller's brief does "not identify any basis in statute or case law for [his] contention that the absence of a judgment against a codefendant is a defense." (*Id.* at 8.)

### 2.  Analysis

The FTC's request to strike Mueller's ninth affirmative defense is denied. In response to Mueller's earlier motion to dismiss, the FTC stated that it intends "to hold Defendant Mueller liable for the misconduct of GCE and GCU." (Doc. 44 at 24.) The FTC added: "[E]ven if GCU were not a defendant, all five counts state claims against Mueller for the misconduct of GCE. . . . [Dismissing GCU] would not shield Mueller from liability for GCE's misconduct in deceptively marketing on behalf of GCU and making abusive telemarketing calls." (*Id.*)

In the August 15, 2024 order, the Court accepted the FTC's arguments on these points, explaining that "under Ninth Circuit law, individual monetary liability for a corporation's violations of § 5 of the FTC Act requires proof of both (1) authority to control the challenged representations and (2) some degree of awareness of, or reckless disregard concerning, the challenged representations." (Doc. 56 at 47.) The Court further noted that "the Ninth Circuit has held that when the FTC seeks injunctive relief against an individual based on corporate-entity violations, the only required showing is that the individual participated directly in the violations or had authority to control the entity." (*Id.* at 49, emphasis omitted.)

As this backdrop shows, at least some of the FTC's claims against Mueller appear to be derivative-liability claims that must be predicated on findings that either GCE or GCU violated the FTC Act or the TSR. At least as to that subset of claims, Mueller's ninth affirmative defense appears to be correct—he cannot be held liable without a predicate

finding of corporate liability.  *See generally F.T.C. v. Cyberspace.Com LLC*, 453 F.3d 1196, 1202 (9th Cir. 2006) ("An individual is personally liable *for a corporation's FTCA § 5 violations* if he participated directly in the acts or practices or had authority to control them and had actual knowledge of material misrepresentations, was recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud along with an intentional avoidance of the truth.") (cleaned up) (emphasis added).

F.      **Mueller's Fifteenth Affirmative Defense (Estoppel)**

1.      The Parties' Arguments

Mueller's fifteenth affirmative defense begins as follows: "The FTC cannot seek or enforce equitable remedies under the doctrines of unclean hands, estoppel, or other equitable defenses." (Doc. 100 at 13.)  Mueller then alleges the following additional facts in support of those defenses:

> Plaintiff, in coordination with the Department of Education, unfairly and unreasonably singled out Defendants for investigation and litigation over the same or similar disclosure practices used by numerous doctoral degree granting institutions.  It is common practice among such institutions to describe doctoral programs in terms of the minimum academic course requirements, notwithstanding the fact that students may require several additional courses to complete the dissertation component.  Nonetheless, Plaintiff filed this action to force Defendant GCU to litigate the same issues against multiple agencies in multiple forums, to Defendants' detriment and expense.  The FTC's misrepresentation claims are nearly identical to those the United States Department of Education previously raised, which are simultaneously being litigated in the Department's administrative tribunal.  In addition, the FTC seeks to relitigate the Department's decision on GCU's nonprofit status, which was pending on appeal with the Ninth Circuit when the FTC filed its initial complaint.  On information and belief, both actions were taken in retaliation for Defendant Grand Canyon University filing a legal challenge to the Department's denial of GCU's nonprofit status.  Defendant forms this belief, in part, based on Plaintiff's coordination and communication with the Department throughout its investigation, including improperly sharing with the Department documents Defendant GCU produced in response to the FTC's civil investigative demand, in violation of GCU's confidentiality rights under the FTC Act.  The belief is further supported by the timing of the agencies' respective actions in pursuing overlapping claims.  By way of example, the Department issued a press

release on October 31, 2023, accusing Defendant GCU of harming doctoral students and, in statements to the press, encouraged students to file complaints and seek student loan discharges, despite eschewing any requirement to establish student harm and not having identified any affected doctoral students during its investigation. Nearly two months later, after the Department accused GCU (without evidence) of harming students and encouraged those students to file complaints seeking loan discharges, the FTC filed this action seeking restitution and other damages. Stated differently, Defendant alleges (among other things) that the FTC coordinated its investigation and litigation with the Department to manufacture student complaints in support of its claims here.

(*Id.* at 12-13.)

The FTC contends the "estoppel" portion of this affirmative defense should be stricken because it is "conclusory" and "provides no meaningful notice" of the specific conduct that might support a claim of estoppel. (Doc. 124 at 4-5.) The FTC elaborates that "Mueller has not identified any material fact that the FTC affirmatively misrepresented or concealed" and has not "alleged detrimental reliance" on that unspecified representation. (*Id.* at 5.) The FTC cites several cases, including *FTC v. OMICS Grp.*, 2017 WL 6806802, *3 (D. Nev. 2017) ("[T]he defense fails as a matter of law when the defendant pleads nothing more than the word 'estoppel' and fails to allege its necessary elements."), in which courts struck conclusory estoppel-based affirmative defenses in FTC enforcement actions. (*Id.* at 5.)

In response, Mueller contends that "[c]ontrary to the FTC's motion, Mr. Mueller has done more than merely 'invoke the word estoppel.' Mr. Mueller's fifteenth affirmative defense alleges that the Department of Education and the FTC coordinated their efforts to manufacture student complaints for which the FTC now seeks a monetary award. When the Department issued its press release accusing GCU of harming its students and encouraging them to file complaints, the agencies knew that the Department had not established student harm but intended its statements to trigger student complaints with the prospect of loan forgiveness and sequenced their efforts such that GCU confined its response to the Department's investigation to its detriment. Indeed, the government then

misrepresented the Department's findings in public statements (*i.e.,* by alleging as fact student harm occurred despite not identifying such harm in its findings) to manufacture complaints for which the FTC now seeks monetary damages.  In short, Mr. Mueller's answer alleges that the government engaged in affirmative misconduct that violates notions of basic fairness for which estoppel is appropriate."  (Doc. 132 at 2-3.)

In reply, the FTC contends that "estoppel is an equitable defense with specific elements that are simply absent from Mueller's Answer and that the Opposition fails to address."  (Doc. 134 at 4.)  In particular, the FTC emphasizes Mueller's failure to identify any "representation or misconduct by the FTC (the agency Mueller asserts is estopped)" and failure to identify any "ignorance or detrimental reliance by Defendant Mueller."  (*Id.* at 4-5.)  The FTC concludes: "To plead a valid estoppel defense, an Answer must do more than assert that the government has been unfair."  (*Id.* at 5.)

2.  Analysis

Mueller's fifteenth affirmative defense is unusual because it seeks to raise at least two distinct defenses, estoppel and unclean hands, and then alleges, without differentiation, a laundry list of facts in support of those defenses.  Notably, the FTC has not moved to strike the "unclean hands" component of Mueller's fifteenth affirmative defense—its argument here is limited to the "estoppel" component.

The Court agrees with the FTC that the "estoppel" component of this affirmative defense should be stricken.  Although Mueller contends that his underlying factual allegations show that "the Department of Education and the FTC coordinated their efforts to manufacture student complaints for which the FTC now seeks a monetary award" and otherwise "engaged in affirmative misconduct that violates basic notions of fairness" (Doc. 132 at 2), Mueller does not explain why these very serious allegations, if true, could support an estoppel-based defense (as opposed to an unclean hands-based defense).  Among other things, estoppel claims against the government require a showing that the defendant "rel[ied] to its detriment on the conduct of the party to be estopped," *Vickars-Henry Corp. v. Bd. of Governors of Fed. Rsrv. Sys.*, 629 F.2d 629, 635 (9th Cir. 1980), but Mueller's

amended answer does not allege—and Mueller does not contend in his response brief—that he detrimentally relied on any of the challenged governmental conduct. Because the "estoppel" portion of Mueller's fifteenth affirmative defense "would not, under the facts alleged, constitute a valid defense to the action," it "can and should be deleted." *Sec. People, Inc.*, 2005 WL 645592 at *3 (N.D. Cal. 2005). This dismissal is with leave to amend because it is at least theoretically possible that Mueller could allege new facts sufficient to cure this deficiency.

### G. Mueller's Fifteenth Affirmative Defense (Other Equitable Defenses)

#### 1. The Parties' Arguments

As noted, Mueller's fifteenth affirmative defense begins as follows: "The FTC cannot seek or enforce equitable remedies under the doctrines of unclean hands, estoppel, or other equitable defenses." (Doc. 100 at 13.)

The FTC contends the "other equitable defenses" portion of this affirmative defense should be stricken because Mueller "fails to give the FTC fair notice of even the names of these defenses, let alone their legal and factual predicates." (Doc. 124 at 5-6.)

In response, Mueller merely asserts in a footnote that "the FTC has shown no prejudice from [his] 'reservation' of 'other equitable defenses' . . . , which is a sufficient basis to deny the motion to strike." (Doc. 132 at 4 n.2.) Mueller also cites cases stating that "[t]here is nothing dumber than a motion to strike boilerplate affirmative defenses; it wastes the client's money and the court's time." (*Id.*, citation omitted.)

In reply, the FTC argues that "Mueller's 'other equitable defenses' affirmative defense is an improper reservation of rights and should be stricken for that independent reason. The Opposition makes no attempt to identify the basis for these defenses or otherwise provide fair notice to the FTC. Rather, the only argument offered is that the FTC would not be prejudiced by their inclusion . . . [but] courts routinely dismiss this improper 'defense' even without requiring a separate showing of prejudice." (Doc. 134 at 5.)

…

…

2.     Analysis

The Court agrees with the FTC that the "other equitable defenses" portion of Mueller's fifteenth affirmative defense should be stricken.  As noted elsewhere in this order, the FTC does not need to establish prejudice to prevail on a motion to strike—dismissal is warranted if, as here, the challenged affirmative defense would not constitute a valid defense under the facts alleged.  *See also FTC v. N. Am. Mktg. & Assocs., LLC*, 2012 WL 5034967, *3 (D. Ariz. 2012) ("An attempt to reserve affirmative defenses for a future date is not a proper affirmative defense in itself.  Instead, if at some later date defendants seek to add affirmative defenses, they must comply with Rule 15 of the Federal Rules of Civil Procedure. . . .  The Court will strike the Vigil and Lowry Defendants' reservation of the right to allege additional affirmative defenses.") (cleaned up).  This dismissal is without leave to amend because amendment would be futile.

Accordingly,

**IT IS ORDERED** that:

1.     GCU's motion to dismiss (Doc. 71) is **granted**.  GCU is **dismissed** as a party to this action.

2.     GCU's motion to quash and/or for protective order (Doc. 117) is **denied**.

3.     The FTC's motion to strike affirmative defenses (Doc. 124) is **granted in part and denied in part**.

4.     Within 14 days of the issuance of this order, GCE may file an amended answer and Mueller may file a second amended answer.  The changes shall be limited to attempting to cure the subset of deficiencies raised in this order as to which leave to amend was granted and GCE and/or Mueller shall, consistent with LRCiv 15.1(a), attach a redlined version of the pleading as an exhibit.