**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Federal Trade Commission, | No. CV-23-02711-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Grand Canyon Education Incorporated, et al., | |
| Defendants. | |

There are four fully briefed motions pending before the Court: (1) a motion to dismiss filed by Defendant Grand Canyon University ("GCU") (Doc. 71); (2) a motion to quash and/or for protective order filed by GCU (Doc. 117); (3) a motion to strike affirmative defenses filed by Plaintiff Federal Trade Commission ("FTC") (Doc. 124); and (4) a motion for a stay of discovery filed by Defendants Grand Canyon Education, Inc. ("GCE") and Brian E. Mueller ("Mueller") (Doc. 136). Each motion is addressed below.

## DISCUSSION

I.    GCU's Motion To Dismiss

A.    **Relevant Background**

In its original complaint in this action, the FTC sued GCU, GCE, and Mueller, who is GCU's president and GCE's CEO and chairman of the board. (Doc. 25.) The complaint asserted five causes of action: (1) making deceptive representations concerning GCU's status as a nonprofit institution, in violation of § 5 of the FTC Act; (2) making deceptive representations concerning GCU's doctoral programs, in violation of § 5 of the FTC Act;

(3) making both sets of deceptive representations in connection with the telemarketing of educational services, in violation of the FTC's Telemarketing Sales Rule ("TSR"); (4) initiating telemarketing calls to persons who requested that GCU not contact them, in violation of the TSR; and (5) initiating telemarketing calls to persons registered on the national Do-Not-Call Registry, in violation of the TSR. (*Id.*)

On February 9, 2024, GCU moved to dismiss. (Doc. 27.) Among other things, GCU argued that the FTC only possesses authority under the FTC Act and the TSR to pursue claims against "persons, partnerships, or corporations," yet GCU is not a "person" or "partnership" and does not fall within the FTC Act's definition of a "corporation," which is limited to a company "organized to carry on business for its own profit or that of its members." (*Id.* at 6-8.)

On July 30, 2024, the Court heard oral argument on GCU's motion to dismiss (as well as on motions to dismiss by GCE and Mueller). (Doc. 57 [transcript].)

On August 15, 2024, the Court issued a lengthy order that, among other things, dismissed GCU as a defendant. (Doc. 56) As an initial matter, the Court agreed with GCU that, to fall within the FTC Act's definition of a "corporation," an entity must either be (1) organized to carry on business for the profit of its "members"; or (2) organized to carry on business for its "own" profit. (*Id.* at 16, 22-23.) The Court concluded that the FTC could not prevail under the former theory because "during oral argument, the FTC abandoned any claim that GCU is organized to profit its members." (*Id.* at 22.) Thus, the analysis turned on whether the allegations in the complaint were sufficient to establish that GCU was organized to carry on business for its "own" profit.

As to that issue, "the FTC's theory as clarified during oral argument [was] that if an ostensible nonprofit entity is being operated to benefit 'insiders,' 'related . . . businesses,' or 'officers' that are not members, it qualifies as a company 'organized to carry on business for its own profit' within the meaning of" the FTC Act. (*Id.* at 22-23.) Although the Court acknowledged that the issue presented a debatable call, it rejected the FTC's position, both because "no federal appellate court has ever, in a published opinion, allowed the FTC to

pursue claims against an ostensible nonprofit under this theory" and because "the FTC's theory cannot be squared with the plain language of the statute." (*Id.* at 23.) The Court elaborated:

> If Congress had intended for [the statutory definition] to encompass nonprofit entities organized to carry on business for the profit of non-member "insiders," "related businesses," and "officers," it could have said so. Indeed, other statutes addressing nonprofit status expressly call for such an inquiry. For example, the inurement clause of section 501(c)(3) of the Internal Revenue Code requires an evaluation of whether any "part of the net earnings" of an asserted nonprofit charity "inures to the benefit of any private shareholder or individual." Similarly, under the DOE regulations, one part of the definition of the term "Nonprofit institution" is that "the Secretary determines that no part of the net earnings of the institution benefits any private entity or natural person." But there is no textual basis for engaging in such an inquiry when determining whether an entity falls within [the FTC Act's] definition of a "corporation." Instead, for whatever reason, Congress chose only to vest the FTC with authority to pursue claims against an entity organized to carry on business for its "own" profit or the profit of its "members." Although there may be persuasive policy reasons why the FTC should be allowed to pursue claims against nonprofits that operate for the benefit of non-member insiders, related businesses, and officers, the Court must take the statute as written.

(*Id.* at 23-24, cleaned up.) The Court also observed that the FTC's proposed "interpretation effectively deletes the words 'its own' from the statute. . . . Even if GCU is somehow organized for Mueller's and/or GCE's profit, no facts have been pleaded suggesting it is organized for its 'own' profit." (*Id.* at 24-25, cleaned up.)

In the final portion of the August 15, 2024 order, the Court addressed whether the FTC should be granted leave to amend as to GCU. (*Id.* at 51.) The Court concluded that leave should be granted because "[t]he FTC has not previously amended the Complaint, the policy of extreme liberality underlying Rule 15(a) counsels in favor of granting the FTC's amendment request, and it is at least theoretically possible that the deficiencies identified in . . . this order could be cured based on the pleading of additional facts." (*Id.*)

On September 5, 2024, the FTC filed its operative pleading, the First Amended Complaint ("FAC"). (Doc. 62.) The FAC again names GCU as a defendant and reasserts

the same five causes of action that appeared in the original complaint. (*Id.*) The FAC also includes, in paragraphs 13, 14, and 20, the following new allegations intended to establish that GCU is organized for its "own" profit:

- Paragraph 13: "Gazelle University/GCU was organized to carry on the business of selling educational services and related activities for its own profit and for the profit of GCE. Gazelle University/GCU was organized to acquire, own, and operate portions of the University owned by GCE, and use at least some of its earnings from this business to acquire property, secure loans, accumulate capital, and otherwise perpetuate and expand its business, and to increase the assets of the corporation and their value. Accordingly, Defendant Gazelle University/GCU was organized and has been operated to carry on business for its own profit or that of its members, within the meaning of Section 4 of the FTC Act. 15 U.S.C. § 44." (Doc. 62-1 ¶ 13.)

- Paragraph 14: "The articles of incorporation of Gazelle University/GCU represent that it is organized and operated exclusively for charitable, religious, and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code. Notwithstanding these articles of incorporation, Gazelle University/GCU was not organized exclusively for these purposes or exclusively for its own profit. In fact, it was organized by GCE and Defendant Mueller for Gazelle University/GCU's own profit, and to advance GCE's for-profit business and advance Defendant Mueller's interests as officer, chairman, director, stockholder and promoter of investment in GCE." (*Id.* ¶ 14.)

- Paragraph 20: "Since July 1, 2018, GCU's revenue has generated profit for itself, for GCE, and for GCE's investors. Since the July 1, 2018 reorganization of the University's assets, GCU has also generated revenue and profit. GCU has used its earnings to acquire property, accumulate reserves and enhance the value of its assets, and has reportedly increased the

- 4 -

net value of its assets by more than $125 million." (*Id.* ¶ 20.)

On September 26, 2024, GCU again moved to dismiss. (Doc. 71.) The motion is now fully briefed. (Docs. 83, 85.)

On February 13, 2025, the Court issued a tentative ruling on GCU's motion (as well as on two of the other motions being resolved in this order). (Doc. 137.)

On February 19, 2025, the Court heard oral argument. (Doc. 138.)

## B. **The Parties' Arguments**

GCU argues that the new factual allegations in the FAC do not cure the deficiencies that led to the dismissal of the original complaint. (Doc. 71.) First, GCU argues that any new allegations regarding how it has been "operated" are irrelevant because the statutory definition only addresses how an entity is "organized." (*Id.* at 4-5.) Second, GCU argues that the FAC's allegation that it was "organized . . . to perpetuate and expand its business" is unavailing because "nonprofits may grow their revenue and acquire new assets without undermining their nonprofit status." (*Id.* at 5.) GCU also contends the FTC conceded this point during oral argument on the previous motion to dismiss. (*Id.* at 5-6.) Third, GCU argues that the FAC's allegations regarding its efforts to acquire property, secure loans, and accumulate capital are unavailing because "the FTC does not allege that any of the perpetuation and expansion of GCU's operations . . . was not in furtherance of GCU's educational mission." (*Id.* at 6.)

In response, the FTC argues that the new factual allegations in the FAC should be deemed sufficient to cure the deficiencies that led to the dismissal of the original complaint. (Doc. 83.) More specifically, the FTC contends that the new allegations in paragraphs 13, 14, and 20 establish the following narrative:

> [GCE], which owned and operated the University as a for-profit beginning in 2004, devised a plan to re-brand the University as a nonprofit by transferring some of its assets and operations to a new entity, created and headed by . . . Mueller. The purported nonprofit formed to implement this plan, initially named Gazelle University, was created so that it would acquire portions of the University from GCE. GCE would retain other portions of the University's operations, continue to be the exclusive provider of

marketing for the business, and receive most of its income.  Gazelle University/GCU was organized, the amended complaint alleges, so that both it and GCE could profit from this division of assets and operations.  Gazelle University/GCU could use earnings from operating the University to 'acquire property, secure loans, accumulate capital, and otherwise perpetuate and expand its business, and to increase the assets of the corporation and their value.'  At the same time, it also would advance GCE's business, the interest of GCE's investors, and the interests of Defendant Mueller as GCE's CEO, Chairman, and stockholder.

(*Id.* at 1-2.)  According to the FTC, these new allegations are not conclusory and establish "that Gazelle University/GCU was organized for its own profit, that it was not organized exclusively for charitable purposes, and that it has reportedly increased the net value of its assets by more than $125 million."  (*Id.* at 3-4.)  The FTC also contends that GCU's arguments regarding "organized" versus "operated" amount to a straw man because the FAC specifically alleges that "GCU was operated *and* organized for its own profit."  (*Id.* at 4-5.)  Finally, the FTC argues that GCU's other arguments—including that it is permissible for a nonprofit to generate surplus earnings to be used to support its mission—effectively amount to requests to "insert requirements that have no basis in the FTC Act's text."  (*Id.* at 5-6.)

In reply, GCU argues that "the FTC's conclusory statement that GCU was 'organized for its own profit' is not a factual allegation entitled to the presumption of truth.  The only new facts that the [FAC] alleges are that GCU has used its revenue to retire debt, acquire property, accumulate capital, build its reserves, increase the value of its assets, and expand or perpetuate the University.  But those kinds of commonplace activities, which are undertaken by nonprofits throughout the country, in no way suggest that GCU has used its revenue to enrich itself, its member, or (non-existent) shareholders, as they are the kind entirely consistent with the nonprofit mission for which GCU was organized."  (Doc. 85 at 1.)  GCU also clarifies that it is not arguing that the improper use of revenues, in violation of a nonprofit's articles of organization, is part of the statutory test for whether an entity qualifies as a "corporation"—rather, its position is that "a nonprofit does not meet the

statutory requirement . . . just because it perpetuates or expands itself as part of its nonprofit mission." (*Id.* at 1-2, cleaned up.)  Next, GCU reiterates that the FTC's current position is inconsistent with the position the FTC took during the last oral argument.  (*Id.* at 2.)  GCU concludes: "[T]he FTC now abandons any discernable limiting principle, taking a stance that would give it authority over virtually every thriving nonprofit.  To be sure, what the FTC alleges in the First Amended Complaint's new paragraphs are sound financial principles for nonprofit universities.  But the mere fact that a non-profit is earning revenue and expanding does not transform it into a for-profit.  No federal court has ever adopted such a broad reading of the FTC Act's definition of a corporation, which would eviscerate § 4's limiting language and give the FTC authority over all manner of nonprofit entities." (*Id.* at 2-4, citations omitted.)

C.    **Analysis**

During oral argument, the FTC clarified that the new allegations in the FAC are intended to establish that GCU was organized for two, and only two, purposes: (1) to carry on business to generate profit for GCE, GCE's investors, and Mueller (none of whom are members of GCU); and (2) to carry on business for GCU's "own" profit.[1]  But as discussed in the August 15, 2024 order, the first alleged purpose is insufficient to satisfy the definition of "corporation" established in § 4 of the FTC Act.  (Doc. 56 at 24 ["Congress chose only to vest the FTC with authority to pursue claims against an entity organized to carry on business for its 'own' profit or the profit of its 'members.'  Although there may be persuasive policy reasons why the FTC should be allowed to pursue claims against nonprofits that operate for the benefit of non-member insiders, related businesses, and officers, the Court must take the statute as written."].)

---

[1]    In the tentative ruling issued before oral argument, the Court construed the FAC as alleging that one of GCU's organizational purposes—albeit not the sole purpose—was to advance GCU's stated charitable mission of providing educational services.  (Doc. 137 at 9-10.)  During oral argument, the FTC disagreed with this interpretation, which it attributed to the improper application of a heightened pleading standard, and clarified that the FAC should be construed as alleging that "GCU was organized for the two purposes identified in paragraph 13, namely, for the profit of GCU and for the profit of GCE and Mueller." The analysis here has been significantly revised to reflect that clarified position.

As for the second alleged purpose, the FAC does, indeed, assert that "GCU was organized to carry on the business of selling educational services and related activities for its own profit" (Doc. 62 ¶ 13) and then repeats the phrase "for its own profit" several more times (*id.* ¶¶ 13, 14). However, these assertions simply amount to the repetition of a legal conclusion. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Instead, the Court must (1) identify the actual *facts* alleged in the FAC; and (2) determine whether those facts, accepted as true, make it plausible that GCU was organized to carry on business for its "own" profit. *Id.* at 679 ("[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").

The first part of the analysis is straightforward. The relevant factual allegations in the FAC are that GCU was organized to "carry on the business of selling educational services and related activities"; that those business activities generate "earnings"; and that those earnings are used in part to "otherwise perpetuate and expand [GCU's] business" by acquiring property, securing loans, and accumulating assets that have "reportedly increased [in value] by more than $125 million." (Doc. 62 ¶¶ 13-14, 20.)

The second part of the analysis is more complicated. To assess the sufficiency of those factual allegations, it is necessary to identify what, exactly, it means for an entity to operate for its "own profit." The FTC's theory as to that issue, as clarified during oral argument, is that the meaning of the phrase "own profit" in § 4 of the FTC Act is not "limited to a context where there are dividends paid or there are earnings paid to another owner" and instead more broadly encompasses any situation in which an entity is able to

"thrive" through the reinvestment of surplus earnings: "The allegations in the complaint are that this [structure] was created so that both [GCU and GCE] could thrive, both would receive surplus, and both would profit in that sense."  During a different portion of oral argument, the FTC restated its theory as follows: "[A]s a general matter, if a nonstock corporation is permitted to use its net surplus revenues to grow the business, to grow its balance sheet, to grow its activities, that entity is operating for its own profit."

As an initial matter, it is difficult to reconcile the FTC's theory with the position it took during the oral argument on GCU's earlier motion to dismiss.  There, the FTC stated that if GCU was generating "surplus earnings" and then using all of that money "for legitimate educational purposes" such as "expansion," this would *not* qualify as proof that GCU was operating for its "own" profit:

> Q:   [I]s it your theory that anytime that a university uses its revenues to expand, it's no longer a nonprofit because it's operating for its own profit through its expansion?
>
> A:   No, Your Honor.  It is that if those activities are in advancement of its educational mission, then that is not for profit.  It has to be faithful to the commitment to use the surplus earnings exclusively for the charitable purposes.
>
> Q:   So . . . where in the complaint does it allege that the subset of the revenue that GCU keeps for itself GCU uses for some purpose other than legitimate educational purposes?
>
> A:   Your Honor, that is not the test.  So let me go back.  The point is that if GCU is using the subset of what it retains for legitimate educational purposes, that's fine, but it needs to be 100 percent.

(Doc. 57 at 33-34.)

This colloquy is notable because the new allegations in the FAC resemble the scenario addressed during the last oral argument.  In both cases, GCU generates surplus earnings through the same conduct—the sale of educational services and related activities.  Additionally, in both cases, GCU uses at least some of those surplus earnings to pay for its own expansion and self-perpetuation.  Nevertheless, although the FTC previously stated

that GCU's use of all of its surplus earnings to pay for its expansion and self-perpetuation would be "not for profit," the FTC now seeks to characterize GCU's use of a portion of its surplus earnings to pay for its expansion and self-perpetuation as activity for GCU's "own profit." (*See also* Doc. 83 at 2 ["The amended complaint alleges that both GCU and GCE have profited from the restructuring, as GCU has used earnings to acquire property and improve its balance sheet, while also directing revenue to GCE and its investors."].)

Although the FTC is not precluded from seemingly changing its position in this fashion—the Ninth Circuit "has restricted the application of judicial estoppel to cases where the court relied on, or 'accepted,' the party's previous inconsistent position," *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783 (9th Cir. 2001)—the FTC's current theory is still untenable.[2]  During follow-up questioning, the FTC acknowledged that its theory would place no limit on its ability to pursue claims against ostensible nonprofit entities that generate surplus earnings.  For example, when asked "what would stop the FTC from bringing a suit against any educational institution, even one that doesn't have an arrangement like this with GCE where some of the profits flow to GCE?", the FTC answered: "[U]nder your analysis, there is no backstop to that."  The absence of such a backstop is a strong indication that the FTC's theory is flawed.  Indeed, at least one court has expressly rejected that theory.  *Community Blood Bank of Kansas City Area, Inc. v. FTC*, 405 F.2d 1011, 1016 (8th Cir. 1969) ("The interpretation of the Commission means, of course, that any corporation engaged in business only for charitable purposes and which is forbidden by law to carry on business for profit, that receives income in excess of expenses, is in fact carrying on business for its own profit if it is capable of self-perpetuation or expansion.  Neither the legislative history of the Act nor the language of § 4 supports the Commission's theory that Congress intended that 'profit' is to be given

_____

[2]    During the most recent oral argument, the FTC stated that it had not changed its position and argued that its representations during the earlier oral argument were only offered "in the context of explaining the earlier complaint."  Although the Court does not find this purported distinction persuasive, it ultimately does not matter whether there was a change in position.  As discussed, the outcome here is not based on principles of estoppel—the Court has considered the FTC's new/clarified theory on the merits.

1    different meanings depending upon the character of the corporation under consideration.

2    Additionally, the strained interpretation of the Commission runs counter to the principle

3    that Congress will be presumed to have used a word in its usual and well-settled sense.")

4    (cleaned up).  More broadly, courts have assumed—contrary to FTC's "no backstop"

5    theory—that § 4 places at least *some* limits on the FTC's authority under the FTC Act to

6    pursue claims against ostensible nonprofit entities, even if courts have not conclusively

7    identified the extent of those limits.  *See, e.g.*, *National Federation of the Blind v. FTC*,

8    420 F.3d 331, 334 (4th Cir. 2005) ("The FTCA gives the FTC jurisdiction over 'persons,

9    partnerships, or corporations,' with some exceptions not relevant here.  An entity is only a

10   'corporation,' for FTCA purposes, if it is 'organized to carry on business for its own profit

11   or that of its members.'  Thus, according to the FTC's organic statute, non-profit

12   organizations fall outside the scope of the agency's jurisdiction."); *FTC v. University

13   Health, Inc.*, 938 F.2d 1206, 1217 n.23 (11th Cir. 1991) (referring to "the fact that the FTC

14   has no jurisdiction under the FTCA to regulate nonprofit corporations"); *Community Blood

15   Bank*, 405 F.2d at 1017 ("Congress did not intend to provide a blanket exclusion of *all*

16   nonprofit corporations . . . .") (emphasis added).  On the other side of the ledger, the FTC

17   has tellingly failed to identify any judicial decision agreeing that it has authority under § 4

18   of the FTC Act to pursue claims against any ostensible nonprofit entity that happens to

19   generate surplus earnings that may be used for expansion or self-perpetuation.[3]

20        In addition to lacking a discernable limiting principle, the FTC's theory is also

21   flawed for other reasons.  For the FTC to prevail, the Court would need to find that GCU's

22   first alleged organizational purpose of generating surplus earnings for its own expansion

23   (which does not inherently qualify as activity for GCU's "own" profit for the reasons stated

24   above) becomes so when coupled with GCU's other alleged organizational purpose of

25   generating profits for GCE, GCE's investors, and Mueller (which does not qualify as

---

[3]       As noted in the August 15, 2024 order, the Supreme Court has expressly declined to reach this issue: "[W]e do not, and indeed, on the facts here, could not, decide today whether the Commission has [authority] over nonprofit organizations that do not confer profit on for-profit members but do, for example, show annual income surpluses . . . ." *Cal. Dental Association v. FTC*, 526 U.S. 756, 767 n.6 (1999).

activity for GCU's "own" profit for the reasons stated in the August 15, 2024 order). But such a conclusion would be logically incoherent. *Henderson v. Kennedy*, 253 F.3d 12, 19 (D.C. Cir. 2001) ("For this argument to prevail, one would have to conclude that . . . the combination of two untenable claims equals a tenable one. But in law as in mathematics zero plus zero equals zero."). The bottom line is that the only entities and individuals who stand to profit from GCU's expansion are GCE, GCE's investors, and Mueller. GCU's expansion simply enhances its ability to generate future surplus earnings, which may then be used for additional expansion or as further profit for GCE, GCE's investors, and Mueller. In other words, all roads eventually lead to profit for GCE, GCE's investors, and Mueller. Thus, the FAC's allegation that GCU was organized in part for its "own" profit is just a roundabout way of alleging that GCU was organized to generate profit for those entities and individuals—an allegation that fails to state a claim for the reasons stated in the August 15, 2024 order.[4]

For these reasons, GCU is again dismissed. This dismissal is without leave to amend, as any further attempt at amendment would be futile.

II.    GCU's Motion To Quash And/Or For Protective Order

A.    **Relevant Background**

During the early stages of this case, all Defendants sought a stay of discovery until the Court resolved their respective motions to dismiss. (Doc. 47 at 10-12.) On April 10, 2024, after hearing argument on that issue, the Court granted the stay request. (Doc. 51.)

As noted, on August 15, 2024, the Court issued a lengthy order resolving the motions to dismiss. (Doc. 56.) Although that order resulted in the dismissal of GCU, the Court did not wholly grant GCE's and Mueller's dismissal requests. (*Id.*) As a result, the

---

[4]    In a related vein, although the FTC emphasizes that generating profit for GCE, GCE's investors, and Mueller is inconsistent with being "organized exclusively for the educational purposes [GCU] has represented" (Doc. 83 at 6, citing Doc. 62 ¶ 13), the analysis under § 4 of the FTC Act doesn't turn on whether an entity has misstated its true organizational purpose in its articles of incorporation. Instead, as both sides previously agreed (Doc. 56 at 18), the analysis turns on whether the entity is, in fact, "organized to carry on business for its own profit or that of its members." For all the reasons stated above, the FTC has failed to allege facts that make such a claim plausible.

1    Court ordered that "[t]he stay on discovery . . . is lifted."  (*Id.* at 52.)

2         As noted, on September 5, 2024, the FTC filed the FAC, which again named GCU

3    as a defendant.  (Doc. 62.)

4         On September 23, 2024, the Court held a renewed case management conference.

5    (Doc. 69.)  During that conference, GCU's counsel made an oral motion to stay discovery

6    as to GCU pending the resolution of GCU's forthcoming motion to dismiss the FAC.  (*Id.*)

7    The Court granted that stay request.  (*Id.*)

8         On December 2, 2024, the FTC issued a Rule 45 subpoena directed to the law firm

9    Cooley, LLP ("Cooley").  (Doc. 117-1.)  As background, Cooley "represented GCU as

10   regulatory counsel in connection with the July 1, 2018 acquisition of [GCU] from GCE

11   and GCU's change-in-ownership application with the Department of Education."  (Doc.

12   117 at 2.)  The subpoena seeks to compel Cooley to produce three categories of documents

13   associated with those processes: "1.  Documents sent to and received from the United States

14   Department of Education.  2.  Documents sent to and received from the Higher Learning

15   Commission, or Arizona State Board for Private Postsecondary Education.  3.  Documents

16   sent to and received from Deloitte Tax LLP, Barclays Capital Inc., or other entities that

17   Jonathan Glass did not represent as an attorney in connection with this matter and was not

18   acting as agent for an entity with whom Jonathan Glass had an attorney-client relationship."

19   (Doc. 117-1 at 5.)

20        Between December 13-23, 2024, counsel for GCU and the FTC met and conferred

21   regarding the Cooley subpoena.  (Doc. 117-2.)

22        On December 23, 2024, after GCU and the FTC were unable to resolve their dispute

23   informally, GCU filed the pending motion to quash and/or for protective order.  (Doc. 117.)

24        On January 13, 2025, the FTC filed a response.  (Doc. 125.)

25        On January 24, 2025, GCU filed a reply.  (Doc. 131.)

26   B.    **The Parties' Arguments**

27        GCU moves to quash the Cooley subpoena or for a protective order to block

28   enforcement of the Cooley subpoena.  (Doc. 117.)  First, GCU argues that the Cooley

subpoena constitutes an impermissible attempt "to circumvent this Court's order staying discovery against GCU." (*Id.* at 4.)  More specifically, GCU contends that because "documents related to a law firm's representation of a client are within the client's possession, custody, and control, *i.e.*, Cooley's potentially responsive documents are GCU's documents for purposes of discovery," it follows that the subpoena will force GCU "to incur the burden and cost of responding to the subpoena, just as if it were issued to GCU directly." (*Id.* at 4-5.) Second, GCU argues that the documents sought by the Cooley subpoena are irrelevant because Count One of the FAC turns on whether "students may have been misled by Defendants' characterization of GCU as a non-profit" and the requested documents will shed no light on that issue. (*Id.* at 5-6.)  GCU further contends that the Cooley subpoena represents a backdoor attempt by the FTC to obtain information that could be used to "collaterally attack[]" the regulatory decisions of certain agencies and is particularly misplaced in light of the Ninth Circuit's recent decision in *Grand Canyon Univ. v. Cardona*, 121 F.4th 717 (9th Cir. 2024), which ordered the Department of Education to set aside its denials of GCU's applications to be recognized as a nonprofit institution under the Higher Education Act of 1965. (*Id.* at 6-7.)  GCU also contends that at least some of the requested documents "are largely available in public filings in" the *Cardona* lawsuit. (*Id.* at 7.)  Third, GCU argues that complying with the Cooley subpoena would place an undue burden on GCU because the FTC already possesses most of the documents covered by the first two categories of the subpoena and the third category encompasses documents "that will require significant review for privilege and confidentiality." (*Id.* at 7-9.)

The FTC opposes GCU's motion. (Doc. 125.)  In response to GCU's contention that the Cooley subpoena represents an attempt to circumvent the stay, the FTC argues that the stay "does not bar discovery from others pursuant to Rule 45 or other means as the FTC prepares to litigate the claims for which this Court has already rejected motions to dismiss. The records covered by the subpoena are discoverable, regardless of whether GCU remains a party to this suit, as they are relevant to whether Defendants GCE and Mueller are liable

for marketing GCU as a nonprofit. Indeed, even if GCU was not a party, its non-party status would not allow it to block discovery because it claimed an interest in the records." (*Id.* at 4-5.) The FTC also disputes the notion that the subpoena is effectively directed to GCU, arguing that "a subpoena for these documents is not transformed into discovery 'against GCU' because counsel for GCU also possesses copy of these records. The subpoena seeks Cooley's communications; records for which Cooley is the original source—not merely a custodian. As counsel in GCU's dealings with the Department of Education, HLC, and State of Arizona, Cooley was the author and original recipient of many of the documents exchanged. The fact that GCU also happens to have a copy of the documents does not invalidate an otherwise valid subpoena." (*Id.* at 5-6.) In response to GCU's relevance arguments, the FTC argues that "[d]ocuments describing the terms, plans and goals of the creation of 'New GCU' are relevant to the FTC's claims that the terms, plans and goals show it is deceptive to represent that the University is a nonprofit. Thus, relevance does not turn on whether the records may confirm allegations that false representations were made." (*Id.* at 11.) The FTC also argues that "this Court has already rejected arguments that IRS and other agency characterizations are dispositive of the nonprofit claims in this case" and that "nothing in the recent Ninth Circuit decision undermines this Court's prior ruling on the motion to dismiss. To the contrary, the Ninth Circuit's remand underscores that whether GCU is a genuine nonprofit is an open question to be litigated, and is not governed by prior actions of the IRS or any other agency." (*Id.* at 9-11.) In response to GCU's undue burden arguments, the FTC contends it is "questionable" whether GCU, as a non-recipient, has standing to raise such arguments. (*Id.* at 6 n.4.) Regardless, the FTC contends those arguments fail on the merits because Cooley only possesses approximately 3,800 documents (so the scope of review will be limited), the subpoena only seeks third-party communications, and even if some subset of those documents might theoretically be covered by some privilege or the work-product doctrine, "GCU makes no showing that the volume of such records is significant or that privilege or work product protections apply." (*Id.* at 6-7.) In a later section of its brief, the FTC

elaborates on why it believes GCU's references to privilege doctrines are too vague and conclusory. (*Id.* at 11-13.) Finally, the FTC also contends that, for various reasons, the requested documents are not duplicative of documents already in its possession and are not included in the publicly available portions of the *Cardona* docket. (*Id.* at 7-9.)

In reply, GCU begins by reiterating its contention that, particularly in light of *Cardona*, none of the materials sought in the Cooley subpoena are relevant. (Doc. 131 at 1-4.) GCU also reiterates its contention that the Cooley subpoena represents an attempt to circumvent the stay because "[f]unctionally, the Cooley subpoena is no different than if the FTC served discovery requests directly on GCU." (*Id.* at 4-5.) GCU does not directly respond to most of the FTC's undue burden arguments, which it characterizes as distractions intended "to shift this Court's focus away from the larger, preceding point" concerning relevance. (*Id.* at 5.)

C.    **Analysis**

GCU has not established an entitlement to the relief sought in its motion. As an initial matter, the Cooley subpoena does not represent an impermissible attempt to circumvent the September 23, 2024 order staying discovery as to GCU. The purpose of that order was simply to protect GCU from the potential burdens of *party* discovery pending resolution of the parties' dispute over whether GCU is a proper party to this action. It was not intended to forever preclude the FTC from pursuing discovery from any source bearing on the accuracy of Defendants' characterization of GCU as a nonprofit, which is relevant to the FTC's claim in Count One of the FAC.

In fact, there is a certain irony to GCU's position now that it has been dismissed as a party. *See* Part I *supra*. Although that dismissal frees GCU from the burdens of party discovery, GCU (now a non-party) is nevertheless seeking to insert itself into a dispute concerning a subpoena issued to Cooley (another non-party) in an effort to raise relevance and undue burden objections. There is a strong argument that GCU lacks standing to raise such objections under these circumstances. For example, under Rule 26(c), "[a] party or any person from whom discovery is sought may move for a protective order," but GCU is

no longer a party and is not the person from whom discovery is being sought. *See also* 1 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 26 (2024) ("A motion for a protective order may be filed by (1) any party; or (2) the person from whom discovery is sought. . . . When discovery threatens the interests of nonparties who are not the targets of the discovery, those nonparties do not fall within the scope of Rule 26(c) because they are neither parties nor persons from whom discovery is sought.") (emphasis omitted). Meanwhile, under Rule 45, "the prevailing view is that . . . a *non-recipient party* cannot move to quash or modify a subpoena on relevance, cost, or proportionality grounds." Gensler, *supra*, Rule 45 (emphasis added). *See also Anstead v. Va. Mason Med. Ctr.*, 2023 WL 34505, *2 (W.D. Wash. 2023) ("This Court agrees with other district courts in the Ninth Circuit that a party generally lacks standing to object to a subpoena served on a third party on grounds of relevance or undue burden."); *Thao v. Lynch*, 2023 WL 2480860, *2 (E.D. Cal. 2023) (the "general rule" is that a party "lacks standing to object to [third-party] subpoenas on grounds of relevance or undue burden"); *Jiae Lee v. Dong Yeoun Lee*, 2020 WL 7890868, *5 (C.D. Cal. 2020) ("[O]nly the party to which the subpoena is directed has standing to object to the requests on the grounds that they are irrelevant, vague, overbroad, duplicative, unduly burdensome, etc."). That rule would seem to apply with particular force where, as here, it is a *non-recipient non-party* that seeks to raise relevance and undue burden objections to a subpoena.[5]

Nevertheless, even assuming GCU possesses standing to raise those objections, they fail on the merits. Starting with relevance, "[r]elevancy in civil litigation is a relatively

---

[5]    GCU's current status as a non-recipient non-party also distinguishes this case from *Blotzer v. L-3 Communications Corp.*, 287 F.R.D. 507 (D. Ariz. 2012), which GCU cited during oral argument. There, the court granted a motion to quash/motion for protective order sought by one of the existing parties. To be clear, to the extent GCU has privilege claims related to the documents sought in the Cooley subpoena, it has standing to raise such claims notwithstanding its status as a non-party non-recipient. Gensler, *supra*, Rule 45 ("[S]ome other person or party may have standing to challenge a subpoena directed at a nonparty if the challenging person or party is seeking to protect a personal privilege or right. For example, when a subpoena seeks documents that contain information protected by a privacy right or a privilege, the person whose right or privilege is in jeopardy may file a motion to quash even though the subpoena is directed to the custodian of those records."). The point is simply that the right to assert a claim of privilege is not the same thing as the right to assert objections based on relevance or undue burden.

low bar." *Continental Circuits LLC v. Intel Corp.*, 435 F. Supp. 3d 1014, 1018 (D. Ariz. 2020).[6]  Under Rule 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  *See also* Gensler, *supra*, Rule 26 ("For discovery purposes, courts define relevance broadly, stating that information is relevant if it bears on or might reasonably lead to information that bears on any material fact or issue in the action. . . .  [C]ourts are quick to point out that discovery is concerned with relevant information—not relevant evidence—and that as a result the scope of relevance for discovery purposes is necessarily broader than trial relevance.").

As explained in the August 15, 2024 order, the merits of Count One will ultimately turn on whether the "characterization of GCU as a nonprofit was confusing to students and the public." (Doc. 56 at 32.)  "Although the parties may dispute what it means to meet the legal definition of a 'nonprofit' in various contexts . . . what the parties, agencies, or this Court understand that term to mean does not necessarily determine how consumers would interpret Defendants' marketing."  (*Id.*)  Thus, one way the FTC may attempt to establish consumer confusion in this case is by showing that consumers' understanding of the term "nonprofit" differs from the reality of how GCU was structured.  Even though the documents sought in the Cooley subpoena do not directly address the first part of this inquiry (consumer perception),[7] they are still relevant to the second part of the inquiry

---

[6]    During oral argument, GCU's counsel asked the Court to confine its analysis to the issue of standing if inclined to rule against GCU on that basis.  The Court respectfully disagrees with this request—because the issue of standing is debatable, the most efficient course of action is to also reach the parties' other arguments bearing on the enforceability of the Cooley subpoena.

[7]    During oral argument, GCU's counsel accused the FTC of "essentially stonewall[ing]" as to the first part of this inquiry, by refusing to disclose its theory of how consumers understand the term "nonprofit," and suggested that these stonewalling tactics provide another reason for disallowing the Cooley subpoena.  However, based on subsequent questioning, it appears that the FTC's discovery responses on this topic are either not yet due or are the subject of ongoing meet-and-confer efforts.  Regardless, the

(GCU's structure).  In particular, the representations that GCU's counsel made to various regulatory agencies and third-party consultants concerning GCU's nonprofit status and structure are relevant in assessing GCU's actual structure.

Turning to undue burden, although GCU suggests it would be required to engage in a "significant" and "substantial" privilege-review process if Cooley were required to comply with the subpoena (Doc. 117 at 8), GCU does not actually identify the number of documents at issue or attempt to substantiate, in anything other than conclusory and conditional terms, the nature of the privileges that could be implicated by a subpoena that only seeks communications between Cooley and various third parties: "While the request seeks communications with third parties, those communications *could* nonetheless be subject to attorney client, work-product, and common interest privileges."  (*Id.*, emphasis added.)  Moreover, after the FTC argued in its response that the subpoena only encompasses 3,800 documents, most of which could not possibly raise any privilege or work-product issues, GCU did not dispute these points in its reply and simply fell back on its relevance objection (which lacks merit, for the reasons discussed above).  Under these circumstances, even assuming GCU has standing to raise an undue burden objection to the subpoena or otherwise raise objections based on privilege and confidentiality, it has not adequately substantiated those objections in a manner that would justify quashing the subpoena under Rule 45 or otherwise blocking the subpoena through the issuance of a Rule 26(c) protective order.  *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002) ("For good cause to exist, the party seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is granted.").[8]

---

remedy for any alleged stonewalling would be to move to compel as to the missing discovery, not to withhold related discovery.

[8]    The Court clarifies that nothing in this order precludes Cooley or GCU from attempting to withhold otherwise responsive documents based on the good-faith assertion of a claim of privilege—GCU has simply not established an entitlement to the relief sought in its motion, which is to quash or otherwise categorically block enforcement of the subpoena.  *Cf. Louisiana Corral Mgmt., LLC v. Axis Surplus Ins. Co.*, 650 F. Supp. 3d 491, 502 (E.D. La. 2023) ("Axis lacks standing to object on behalf of the non-parties based on insufficient compliance time.  Axis does, however, have standing to object based on its

III.    <u>The FTC's Motion To Strike Affirmative Defenses</u>

    A.    **Relevant Background**

On September 26, 2024, GCE filed its answer to the FAC.  (Doc. 73.)  GCE's answer also raises various affirmative defenses, two of which are discussed in more detail below.

On November 25, 2024, Mueller filed his amended answer to the FAC.  (Doc. 100.) Mueller's amended answer also raises various affirmative defenses, two of which are discussed in more detail below.

On January 10, 2025, the FTC filed a motion to strike the challenged affirmative defenses.  (Doc. 124.)

On January 24, 2025, GCE (Doc. 130) and Mueller (Doc. 132) each filed a response.

On February 1, 2025, the FTC filed a reply.  (Doc. 134.)

    B.    **Legal Standard**

"In the past few years, . . . the district courts have wrestled with whether the pleading standards that apply to claims under Rule 8(a)(2), as set out in *Twombly* and *Iqbal*, also apply to the pleading of affirmative defenses under Rule 8(c)."  Gensler, *supra*, Rule 8. "The Supreme Court has not addressed this question, and the lower courts are divided." Gensler, *supra*, Rule 12.  "[O]nly the Second Circuit has explicitly addressed this issue at the appellate level, holding that 'the plausibility standard of *Twombly* applies to determining the sufficiency of all pleadings, including the pleading of an affirmative defense, but with recognition that, as the Supreme Court explained in *Iqbal*, applying the plausibility standard to any pleading is a 'context-specific' task.'"  Gensler, *supra*, Rule 8 (quoting *GEOMC Co., Ltd. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 98 (2d Cir. 2019)). Acknowledging the unsettled nature of this issue,[9] the Court agrees with the Second

_____

personal interest in documents protected by attorney-client privilege and/or work product. Not every communication with counsel, however, falls within the attorney-client privilege, nor is every document created after litigation is anticipated protected by the work-product doctrine, particularly when prepared in the ordinary course of business.  Although Axis has failed to provide the required affidavit or other evidence necessary to establish work product protection in this motion, Axis will be allowed to review the subpoenaed materials and provide a proper privilege log with regard to any document withheld on the basis of privilege or work product.").

[9]    As Mueller's counsel correctly noted during oral argument, this Court previously

Circuit's approach.  Thus, "[t]he standard for striking an affirmative defense . . . is effectively the same as for granting a motion under Rule 12(b)(6)."  Gensler, *supra*, Rule 12.[10]

Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party."  *Id.* at 1444-45 (citation omitted).  However, the court need not accept legal conclusions couched as factual allegations.  *Iqbal*, 556 U.S. at 678-80.  Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 678.  The court also may dismiss due to "a lack of a cognizable legal theory."  *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

## C.    GCE's Sixth Affirmative Defense (Offset)

### 1.    The Parties' Arguments

GCE's sixth affirmative defense provides as follows: "Any monetary relief to which the FTC may be entitled, in whatever form, is subject to offset by amounts previously paid to regulatory agencies related to the same conduct."  (Doc. 73 at 31.)

---

observed that "whether *Twombly* and *Iqbal* apply to affirmative defenses is an open question" and that "[t]he 'strong trend' is that *Twombly* and *Iqbal* do not apply."  *Guanzon v. Vixxo Corp.*, 2020 WL 619695 (D. Ariz. 2020).  Nevertheless, having now more fully considered the issue (as well as the intervening legal developments since *Guanzon* was issued), the Court concludes that the plausibility standard applies in this context.

[10]  Given this standard, the FTC need not establish prejudice in order to prevail on its motion to strike.  *See, e.g.*, *G & G Closed Cir. Events, LLC v. Alfaro*, 2023 WL 1803399, *3 (E.D. Cal. 2023) ("[N]o published Ninth Circuit authority requires a showing of prejudice to strike affirmative defenses . . . [so] the Court declines to require Plaintiff to show prejudice where such a requirement is not found in Rule 12(f)."); *FTC v. AMG Servs., Inc.*, 2014 WL 5454170, *9 (D. Nev. 2014) ("Prejudice considerations are not relevant under Rule 12(f).").

- 21 -

The FTC argues this affirmative defense should be stricken because it "is too vague to provide fair notice and lacks legal basis.  When previously challenged to explain this defense, GCE did not identify any previous payments and, instead, argued that *future* payments arising from a proposed Department of Education fine of GCU might give rise to a defense.  GCE's description of a single example of a potential payment that is not consistent with the defense it has pled underscores that the defense fails to provide adequate notice and should be stricken."  (Doc. 124 at 6.)  The FTC adds: "Neither the statute nor case law provide that FTC Act remedies are subject to offset for fees or other amounts that are not refunds."  (*Id.* at 7.)  Finally, the FTC also contends that "a defense predicated on conjecture that a future event in another proceeding may have a collateral impact is not a current defense."  (*Id.* at 8.)

In response, GCE defends the sufficiency of its offset-related affirmative defense.  (Doc. 130 at 3-11.)  First, GCE argues that the affirmative defense, as pleaded, provides adequate notice and that the FTC's arguments to the contrary are "disingenuous" in light of GCE's further elaboration of the nature of this affirmative defense during the parties' meet-and-confer discussions.  (*Id.* at 3-5.)  Second, GCE argues that "it is no basis to strike an affirmative defense simply because facts not known or present today may develop through the pendency of the litigation and bear on the merits of the defense."  (*Id.* at 5-6.)  Third, GCE argues that maintaining its offset-related affirmative defense would not result in "wasteful and distracting inquiries" because the FTC's theory of liability here and the Department of Education's threatened fine are both based on "similar conduct."  (*Id.* at 8-11.)  Additionally, GCE contends, "any damages awarded in this case may necessarily result in prohibited duplicative redress for injured students" because the Department of Education has indicated that its proposed fine is intended to "protect[] students and taxpayers" and calculated the proposed fine by multiplying the number of affected doctoral students by $5,000.  (*Id.* at 10-11.)

In reply, the FTC contends that GCE has "effectively concede[d] that the defense pled in its Answer is not a defense it intends to pursue.  To wit, GCE has yet to identify

any *previous* payment made to an agency that purportedly bears on the FTC's recovery. Rather, GCE intends to argue that it is entitled to an offset if there are *future redress* payments to the Department of Education arising from claims that Defendants misrepresented their doctoral program. . . .  [S]uch a claim is not encompassed by the defense actually pled in GCE's Answer and thus fails to provide the FTC fair notice." (Doc. 134 at 5-6.)  Next, the FTC argues that "GCE's argument confuses defenses resting on extant facts that have yet to be developed with defenses lacking extant facts altogether" and that "no development of the facts on past or present events . . . would sustain GCE's offset defense as it is undisputed that GCU has paid no fine to the Department of Education. GCE's other cited cases similarly deal with defenses that could be developed during discovery, and not on the hypothetical outcome of a collateral matter." (*Id.* at 6-7.)  Finally, as for whether a fine paid to the Department of Education could ever provide the basis for an offset in an FTC enforcement action, the FTC argues that the Department of Education's proposed fine "is a civil fine payable to the United States, not redress to injured students. Thus, even if GCU paid a civil fine to the Department of Education, that would not be a basis for reducing the redress to consumers under Section 19 of the FTC Act." (*Id.* at 7 n.2.)

### 2.  Analysis

The Court agrees with the FTC that GCE's sixth affirmative defense should be stricken.  Although the challenged defense alleges that GCE is entitled to an offset for "amounts previously paid to regulatory agencies related to the same conduct" (Doc. 73 at 31), GCE has now clarified that it is not seeking an offset based on any previous payment to a regulatory agency—instead, GCE seeks to preserve its ability to seek an offset based on a threatened future fine by the Department of Education.  The sixth affirmative defense, as presently worded, would not apply to such a fine.  Nor does GCE plead (or identify in its motion papers) any past payments to regulatory agencies that might fall within the scope of the sixth affirmative defense as presently worded.

The next question is whether GCE should be granted leave to amend.  That question

is governed by Rule 15(a) of the Federal Rules of Civil Procedure, which "advises the court that 'leave [to amend] shall be freely given when justice so requires.'" *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). "This policy is 'to be applied with extreme liberality.'" *Id.* Thus, leave to amend should be granted unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).

Applying those standards, GCE is entitled to leave to amend as to its offset-related affirmative defense. Amendment would not be futile because GCE can cure the deficiency identified above by changing the wording of its affirmative defense to encompass the contemplated future fine by the Department of Education. Changing the wording in this fashion will also eliminate the fair notice and vagueness concerns raised by the FTC.

The FTC also appears to contend that amendment would be futile for a different reason—because an affirmative defense can never be based on a specific collateral development, known to the parties, that is currently unfolding but not yet finalized. The Court disagrees but also notes that even if the FTC were correct on this point, the remedy would simply be to strike the sixth affirmative defense without leave to amend for the time being, with the understanding that if the Department of Education fine later came to fruition, GCE would have good cause under Rules 15 and 16 to seek leave to amend at that point in order to reassert its offset-based affirmative defense. *Macias v. Cleaver*, 2016 WL 8730687, *2 (E.D. Cal. 2016) ("Good cause may be demonstrated by a change in circumstance or newly discovered facts."). It would not advance Rule 1's aim of promoting the "just, speedy, and inexpensive" determination of this action to require the parties to go through such unnecessary and inefficient hoops.

Finally, to the extent the FTC contends that amendment would be futile because an offset in this action cannot be based on a fine paid to a different regulatory agency that is not subsequently distributed to consumers, the Court is unprepared to categorically reject the possibility of such an offset at this early stage of the case where the issue has not been

1    fully briefed and where the details of the contemplated fine are undeveloped.

2        D.    **GCE's Ninth Affirmative Defense (Agent Liability)**

3            1.    <u>The Parties' Arguments</u>

4        GCE's ninth affirmative defense provides as follows: "GCE cannot be held liable

5    as an agent for acts upon which the principal is not held liable."  (Doc. 73 at 32.)

6        The FTC contends this affirmative defense should be stricken because it "misstate[s]

7    the law."  (Doc. 124 at 9.)  The FTC continues: "There is no requirement that the FTC

8    obtain judgment against all possible defendants, nor does a settlement with some possible

9    defendants without an admission of liability preclude the FTC from obtaining relief against

10   other defendants participating in the same misconduct."  (*Id.* at 9-11, citing cases.)  The

11   FTC also contends this defense should be stricken "because discovery and motions practice

12   elaborating on [it] would unnecessarily delay resolution of this case."  (*Id.* at 11.)

13       In response, GCE does not dispute any of the FTC's legal arguments—instead, it

14   simply argues that "courts in the Ninth Circuit routinely decline to strike affirmative

15   defenses" on the ground that they misstate the law.  (Doc. 130 at 11.)  In other words, GCE

16   argues that "the question of whether to strike an affirmative defense turns on the issue of

17   fair notice and does not wade into the likelihood of success on the merits."  (*Id.* at 12.)

18   GCE also argues that the FTC would not be prejudiced by allowing this affirmative defense

19   to remain part of the case.  (*Id.* at 13-14.)

20       In reply, the FTC argues that GCE's position "conflate[s] fair notice and legal

21   validity.  An affirmative defense may be insufficient under Rule 12(f) as a matter of

22   pleading (*i.e.*, because it fails to provide proper notice) *or* as a matter of law."  (Doc. 134

23   at 7-8.)

24            2.    <u>Analysis</u>

25       The Court agrees with the FTC that GCE's ninth affirmative defense should be

26   stricken.  GCE makes no effort to dispute the FTC's showing that this affirmative defense

27   fails as a matter of law.  It would serve no purpose—and potentially cause mischief—to

28   allow such a facially invalid affirmative defense to remain part of the case.  *See, e.g., Torres*

1    *v. Goddard*, 2008 WL 1817994, *1 (D. Ariz. 2008) ("Motions to strike are generally

2    regarded with disfavor, but are proper when a defense is insufficient as a matter of law.");

3    *Sec. People, Inc. v. Classic Woodworking, LLC*, 2005 WL 645592, *3 (N.D. Cal. 2005)

4    ("Although Rule 12(f) motions are generally viewed with disfavor because striking a

5    portion of a pleading is often sought by a movant simply as a dilatory tactic, an affirmative

6    defense that would not, under the facts alleged, constitute a valid defense to the action can

7    and should be deleted.") (cleaned up).  This dismissal is without leave to amend because

8    amendment would be futile.

9          **E.**      **Mueller's Ninth Affirmative Defense (Officer Liability)**

10                **1.**      <u>The Parties' Arguments</u>

11         Mueller's ninth affirmative defense provides: "Defendant Mueller cannot be held

12   liable for acts upon which the other Defendants are not held liable."  (Doc. 100 at 12.)

13         The FTC's arguments regarding Mueller's officer-liability affirmative defense

14   mirror its arguments concerning GCE's agent-liability affirmative defense—the FTC

15   argues that Mueller's version should be stricken because it misstates the law and would

16   lead to unnecessary discovery and motions practice.  (Doc. 124 at 8-12.)

17         Unlike GCE, Mueller seeks to defend the legal basis for his challenged affirmative

18   defense.  According to Mueller, "[u]nder the FTC Act, an individual may be liable for

19   corporate practices in violation of the Act once corporate liability is established."  (Doc.

20   132 at 4.)  Thus, Mueller contends that "the FTC must establish GCE's liability before it

21   can hold Mr. Mueller individually liable for corporate violations."  (*Id.* at 4-5.)

22   Alternatively, Mueller argues—as did GCE—that legal insufficiency is not a basis for

23   striking an affirmative defense.  (*Id.* at 5.)

24         In reply, the FTC reiterates its argument that legal insufficiency is a valid basis for

25   striking an affirmative defense.  (Doc. 134 at 7-8.)  The FTC's only response to Mueller's

26   merits-based argument is that "proof of the alleged misconduct is sufficient to hold

27   participants in a deceptive practice liable" and that Mueller's brief does "not identify any

28   basis in statute or case law for [his] contention that the absence of a judgment against a

1    codefendant is a defense." (*Id.* at 8.)

2            2.    <u>Analysis</u>

3        The FTC's request to strike Mueller's ninth affirmative defense is denied. In

4 response to Mueller's earlier motion to dismiss, the FTC stated that it intends "to hold

5 Defendant Mueller liable for the misconduct by GCE and GCU." (Doc. 44 at 24.) The

6 FTC added: "[E]ven if GCU were not a defendant, all five counts state claims against

7 Mueller for the misconduct of GCE. . . . [Dismissing GCU] would not shield Mueller from

8 liability for GCE's misconduct in deceptively marketing on behalf of GCU and making

9 abusive telemarketing calls." (*Id.*)

10        In the August 15, 2024 order, the Court accepted the FTC's arguments on these

11 points, explaining that "under Ninth Circuit law, individual monetary liability for a

12 corporation's violations of § 5 of the FTC Act requires proof of both (1) authority to control

13 the challenged representations and (2) some degree of awareness of, or reckless disregard

14 concerning, the challenged representations." (Doc. 56 at 47.) The Court further noted that

15 "the Ninth Circuit has held that when the FTC seeks injunctive relief against an individual

16 based on corporate-entity violations, the only required showing is that the individual

17 participated directly in the violations or had authority to control the entity." (*Id.* at 49,

18 emphasis omitted.)

19        As this backdrop shows, at least some of the FTC's claims against Mueller appear

20 to be derivative-liability claims that must be predicated on a finding that GCE violated the

21 FTC Act or the TSR. At least as to that subset of claims, Mueller's ninth affirmative

22 defense appears to be correct—he cannot be held liable without a predicate finding of

23 corporate misconduct. *See generally F.T.C. v. Cyberspace.Com LLC*, 453 F.3d 1196, 1202

24 (9th Cir. 2006) ("An individual is personally liable *for a corporation's FTCA § 5 violations*

25 if he participated directly in the acts or practices or had authority to control them and had

26 actual knowledge of material misrepresentations, was recklessly indifferent to the truth or

27 falsity of a misrepresentation, or had an awareness of a high probability of fraud along with

28 an intentional avoidance of the truth.") (cleaned up) (emphasis added).

1

F.    **Mueller's Fifteenth Affirmative Defense (Estoppel)**

2

1.    The Parties' Arguments

3      Mueller's fifteenth affirmative defense begins as follows: "The FTC cannot seek or

4   enforce equitable remedies under the doctrines of unclean hands, estoppel, or other

5   equitable defenses." (Doc. 100 at 13.) Mueller then alleges the following additional facts

6   in support of those defenses:

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff, in coordination with the Department of Education, unfairly and
unreasonably singled out Defendants for investigation and litigation over the
same or similar disclosure practices used by numerous doctoral degree
granting institutions.  It is common practice among such institutions to
describe doctoral programs in terms of the minimum academic course
requirements, notwithstanding the fact that students may require several
additional courses to complete the dissertation component.  Nonetheless,
Plaintiff filed this action to force Defendant GCU to litigate the same issues
against multiple agencies in multiple forums, to Defendants' detriment and
expense.  The FTC's misrepresentation claims are nearly identical to those
the United States Department of Education previously raised, which are
simultaneously being litigated in the Department's administrative tribunal.
In addition, the FTC seeks to relitigate the Department's decision on GCU's
nonprofit status, which was pending on appeal with the Ninth Circuit when
the FTC filed its initial complaint.  On information and belief, both actions
were taken in retaliation for Defendant Grand Canyon University filing a
legal challenge to the Department's denial of GCU's nonprofit status.
Defendant forms this belief, in part, based on Plaintiff's coordination and
communication with the Department throughout its investigation, including
improperly sharing with the Department documents Defendant GCU
produced in response to the FTC's civil investigative demand, in violation of
GCU's confidentiality rights under the FTC Act.  The belief is further
supported by the timing of the agencies' respective actions in pursuing
overlapping claims.  By way of example, the Department issued a press
release on October 31, 2023, accusing Defendant GCU of harming doctoral
students and, in statements to the press, encouraged students to file
complaints and seek student loan discharges, despite eschewing any
requirement to establish student harm and not having identified any affected
doctoral students during its investigation.  Nearly two months later, after the
Department accused GCU (without evidence) of harming students and
encouraged those students to file complaints seeking loan discharges, the
FTC filed this action seeking restitution and other damages.  Stated
differently, Defendant alleges (among other things) that the FTC coordinated

its investigation and litigation with the Department to manufacture student complaints in support of its claims here.

(*Id.* at 13-14.)

The FTC contends the "estoppel" portion of this affirmative defense should be stricken because it is "conclusory" and "provides no meaningful notice" of the specific conduct that might support a claim of estoppel. (Doc. 124 at 4-5.) The FTC elaborates that "Mueller has not identified any material fact that the FTC affirmatively misrepresented or concealed" and has not "alleged detrimental reliance" on that unspecified representation. (*Id.* at 5.) The FTC cites several cases, including *FTC v. OMICS Grp.*, 2017 WL 6806802, *3 (D. Nev. 2017) ("[T]he defense fails as a matter of law when the defendant pleads nothing more than the word 'estoppel' and fails to allege its necessary elements."), in which courts struck conclusory estoppel-based affirmative defenses in FTC enforcement actions. (*Id.* at 5.)

In response, Mueller contends that "[c]ontrary to the FTC's motion, Mr. Mueller has done more than merely 'invoke the word estoppel.' Mr. Mueller's fifteenth affirmative defense alleges that the Department of Education and the FTC coordinated their efforts to manufacture student complaints for which the FTC now seeks a monetary award. When the Department issued its press release accusing GCU of harming its students and encouraging them to file complaints, the agencies knew that the Department had not established student harm but intended its statements to trigger student complaints with the prospect of loan forgiveness and sequenced their efforts such that GCU confined its response to the Department's investigation to its detriment. Indeed, the government then misrepresented the Department's findings in public statements (*i.e.,* by alleging as fact student harm occurred despite not identifying such harm in its findings) to manufacture complaints for which the FTC now seeks monetary damages. In short, Mr. Mueller's answer alleges that the government engaged in affirmative misconduct that violates notions of basic fairness for which estoppel is appropriate." (Doc. 132 at 2-3.)

In reply, the FTC contends that "estoppel is an equitable defense with specific

elements that are simply absent from Mueller's Answer and that the Opposition fails to address." (Doc. 134 at 4.) In particular, the FTC emphasizes Mueller's failure to identify any "representation or misconduct by the FTC (the agency Mueller asserts is estopped)" and failure to identify any "ignorance or detrimental reliance by Defendant Mueller." (*Id.* at 4-5.) The FTC concludes: "To plead a valid estoppel defense, an Answer must do more than assert that the government has been unfair." (*Id.* at 5.)

2.    Analysis

Mueller's fifteenth affirmative defense is unusual because it seeks to raise at least two distinct defenses, estoppel and unclean hands, and then alleges, without differentiation, a laundry list of facts in support of those defenses. Notably, the FTC has not moved to strike the "unclean hands" component of Mueller's fifteenth affirmative defense—its argument here is limited to the "estoppel" component.

The Court agrees with the FTC that the "estoppel" component of this affirmative defense should be stricken. Although Mueller contends that his underlying factual allegations show that "the Department of Education and the FTC coordinated their efforts to manufacture student complaints for which the FTC now seeks a monetary award" and otherwise "engaged in affirmative misconduct that violates basic notions of fairness" (Doc. 132 at 2), Mueller does not explain why these very serious allegations, if true, could support an estoppel-based defense (as opposed to an unclean hands-based defense). Among other things, estoppel claims against the government require a showing that the defendant "rel[ied] to its detriment on the conduct of the party to be estopped," *Vickars-Henry Corp. v. Bd. of Governors of Fed. Rsrv. Sys.*, 629 F.2d 629, 635 (9th Cir. 1980), but Mueller's amended answer does not allege—and Mueller does not contend in his response—that he detrimentally relied on any of the challenged conduct. Because the "estoppel" portion of Mueller's fifteenth affirmative defense "would not, under the facts alleged, constitute a valid defense to the action," it "can and should be deleted." *Sec. People, Inc.*, 2005 WL 645592 at *3. This dismissal is with leave to amend because it may be possible for Mueller to allege new facts sufficient to cure this deficiency.

1    G.    **Mueller's Fifteenth Affirmative Defense (Other Equitable Defenses)**

2         1.    <u>The Parties' Arguments</u>

3         As noted, Mueller's fifteenth affirmative defense begins as follows: "The FTC

4    cannot seek or enforce equitable remedies under the doctrines of unclean hands, estoppel,

5    or other equitable defenses."  (Doc. 100 at 13.)

6         The FTC contends the "other equitable defenses" portion of this affirmative defense

7    should be stricken because Mueller "fails to give the FTC fair notice of even the names of

8    these defenses, let alone their legal and factual predicates."  (Doc. 124 at 5-6.)

9         In response, Mueller merely asserts in a footnote that "the FTC has shown no

10   prejudice from [his] 'reservation' of 'other equitable defenses' . . . , which is a sufficient

11   basis to deny the motion to strike."  (Doc. 132 at 4 n.2.)  Mueller also cites cases stating

12   that "[t]here is nothing dumber than a motion to strike boilerplate affirmative defenses; it

13   wastes the client's money and the court's time."  (*Id.*, citation omitted.)

14        In reply, the FTC argues that "Mueller's 'other equitable defenses' affirmative

15   defense is an improper reservation of rights and should be stricken for that independent

16   reason.  The Opposition makes no attempt to identify the basis for these defenses or

17   otherwise provide fair notice to the FTC.  Rather, the only argument offered is that the FTC

18   would not be prejudiced by their inclusion . . . [but] courts routinely dismiss this improper

19   'defense' even without requiring a separate showing of prejudice."  (Doc. 134 at 5.)

20        2.    <u>Analysis</u>

21        The Court agrees with the FTC that the "other equitable defenses" portion of

22   Mueller's fifteenth affirmative defense should be stricken.  As noted elsewhere in this

23   order, the FTC does not need to establish prejudice to prevail on a motion to strike—

24   dismissal is warranted if, as here, the challenged affirmative defense would not constitute

25   a valid defense under the facts alleged.  *See also FTC v. N. Am. Mktg. & Assocs., LLC*,

26   2012 WL 5034967, *3 (D. Ariz. 2012) ("An attempt to reserve affirmative defenses for a

27   future date is not a proper affirmative defense in itself.  Instead, if at some later date

28   defendants seek to add affirmative defenses, they must comply with Rule 15 of the Federal

1    Rules of Civil Procedure. . . .  The Court will strike the Vigil and Lowry Defendants'

2    reservation of the right to allege additional affirmative defenses.") (cleaned up).  This

3    dismissal is without leave to amend because amendment would be futile.

4    IV.    GCE's And Mueller's Motion For Stay Of Discovery

5          A.    **Relevant Background**

6          On February 10, 2025—that is, after the other three motions being addressed in this

7    order had become fully briefed, and just before the Court issued its tentative ruling

8    addressing the other three motions—GCE and Mueller filed the final motion being

9    addressed in this order, a "motion to stay discovery on nonprofit claims."  (Doc. 136.)[11]

10         On February 24, 2025, the FTC filed a response.  (Doc. 141.)

11         On March 3, 2025, GCE and Mueller filed a reply.  (Doc. 142.)

12         B.    **The Parties' Arguments**

13         In a nutshell, GCE and Mueller argue that because the Ninth Circuit's recent

14   *Cardona* decision has caused "the factual basis for the FTC's nonprofit claims [to be]

15   presently eliminated," the Court should stay discovery as to those claims until the

16   Department of Education completes its post-remand review of GCU's applications to be

17   recognized as a nonprofit under the Higher Education Act of 1965.  (Doc. 136 at 1.)

18         In response, the FTC argues the stay request "is predicated on three false assertions:

19   (I) the FTC's nonprofit claims are predicated upon [the] Department of Education's

20   classification of GCU under the HEA; (II) there is no factual basis for concluding that

21   marketing GCU as a nonprofit institution is deceptive; and (III) the equities favor not

22   allowing the FTC to complete discovery on these nonprofit issues."  (Doc. 141 at 7.)

23   Additionally, the FTC accuses GCE and Mueller of dragging their feet in responding to

24   certain discovery requests related to the nonprofit claims and "requests that the Court direct

25   Defendants to complete their production and provide final written responses to the

26

27   ───────────────
     [11]    GCE's and Mueller's request for oral argument on this motion is denied because the
     issues are fully briefed (and, indeed, were addressed in a roundabout way during the oral
28   argument on February 19, 2025) and because further argument would not aid the decisional
     process.  *See* LRCiv 7.2(f).

- 32 -

1    outstanding discovery within seven days of its order denying their motion for a stay." (*Id.*
2    at 17.)

3        In reply, GCE and Mueller accuse the FTC of engaging in "an extraordinary attempt
4    to backpedal on the factual basis for its nonprofit claims." (Doc. 142 at 1.) GCE and
5    Mueller also request, as an alterative to a stay, that the Court reverse its decision on an
6    earlier discovery dispute and hold that the FTC is "not . . . entitled to Defendants'
7    communications with or about the [Department of Education's] review and determination
8    (nor any communications with the IRS, the university's accreditor, etc.)." (*Id.* at 6-7 &
9    n.7.) Finally, GCE and Mueller oppose the FTC's request for an accelerated response
10   deadline to the outstanding discovery requests. (*Id.* at 8-9.)

11       C.    **Legal Standard**

12       District courts have "wide discretion in controlling discovery," which includes the
13   discretion to issue an order staying discovery until a collateral issue is resolved. *Little v.*
14   *City of Seattle*, 863 F.2d 681, 685 (9th Cir. 1988). *See also Wenger v. Monroe*, 282 F.3d
15   1068, 1077 (9th Cir. 2002) (affirming the district court's entry of a "protective order . . .
16   which barred Wenger from conducting additional discovery pending resolution of the
17   Guard's motion to dismiss"). This discretion arises both from Rule 26(c)—which, as
18   discussed in Part II above, authorizes the issuance of a protective order upon a showing of
19   "good cause"—and "as an incident to [the court's] power to control its own docket."
20   *Clinton v. Jones*, 520 U.S. 681, 706 (1997). With that said, "[t]he party seeking a stay of
21   discovery carries the heavy burden of making a strong showing why discovery should be
22   denied. The moving party must show a particular and specific need for the protective order,
23   as opposed to making stereotyped or conclusory statements." *DRK Photo v. McGraw-Hill*
24   *Companies, Inc.*, 2012 WL 5936681, *1 (D. Ariz. 2012) (cleaned up).

25       D.    **Analysis**

26       GCE and Mueller have not met their burden of establishing an entitlement to a stay
27   of discovery concerning the FTC's nonprofit-related claims. First, and most important, the
28   Court is not persuaded that *Cardona* eliminates the factual basis for those claims. As

discussed in Part II.C above, one way the FTC may attempt to establish consumer confusion in this case, as required to prevail on Count One, is by showing that consumers' understanding of the term "nonprofit" differs from the reality of how GCU was structured. Although the Department of Education's disposition of GCU's applications to be recognized as a nonprofit under the Higher Education Act of 1965 may be relevant in assessing consumers' understanding of that term—a point that the FTC seemingly acknowledges in the FAC (Doc. 62 ¶ 25) and that the Court accepted in the August 15, 2024 order (Doc. 56 at 32)—it is not necessarily dispositive.  To the contrary, "[a]lthough the parties may dispute what it means to meet the legal definition of a 'nonprofit' in various contexts . . . what the parties, *agencies*, or this Court understand that term to mean does not necessarily determine how consumers would interpret Defendants' marketing."  (Doc. 56 at 32, emphasis added.)

Second, the parties' debate over whether *Cardona* eliminates the factual basis for Count One also underscores the procedural irregularity of the pending stay request. Ordinarily, a request for a stay of discovery related to a particular claim is coupled with the filing of a dispositive motion directed toward that claim.  Even in that situation, the stay request is viewed "unfavorably," in part because "the Federal Rules of Civil Procedure does not provide for automatic or blanket stays of discovery when a potentially dispositive motion is pending."  *Mlejnecky v. Olympus Imaging Am., Inc.*, 2011 WL 489743, *6 (E.D. Cal. 2011).  Although "[t]he Ninth Circuit has not set forth a clear standard for district courts to apply in this situation . . . [m]ost federal district courts . . . apply a two-part test under which it is appropriate to stay discovery if (1) the pending motion must be potentially dispositive of the entire case, or at least dispositive on the issue at which discovery is aimed and (2) the pending, potentially dispositive motion can be decided absent additional discovery.  Discovery should proceed if either prong of the test is not met."  *Ferrell v. AppFolio, Inc.*, 2024 WL 132223, *1 (C.D. Cal. 2024) (cleaned up).  Here, there is not even a pending dispositive motion.  Instead, GCE and Mueller simply assert, as part of their stay request, that *Cardona* has effectively undermined the factual basis for Count One,

but the relief they seek as part of that disguised dispositive-motion argument is not the dismissal of Count One, but an indefinite stay of a portion of this action[12]—during which Count One will remain pending—until a separate administrative proceeding is completed. The Court is not persuaded that this unorthodox approach would promote the "just, speedy, and inexpensive" determination of this action, as contemplated by Rule 1. This is particularly true because, as discussed in Part II.A above, the Court previously granted Defendants' request for a stay of discovery pending the resolution of all their motions to dismiss. (Doc. 47 at 10-12; Doc. 51.) However, once the Court concluded that Count One should survive GCE's and Mueller's dismissal arguments, it lifted the stay and authorized discovery to proceed. (Doc. 56 at 52.) It would be anomalous to reinstitute the stay now, where Count One still survives and is no longer the subject of any pending dispositive motions.

Third, the requested stay would be highly inefficient. As the FTC correctly notes, GCE and Mueller are, in substance, seeking "an open-ended stay that would effectively bifurcate this case less than 90 days before the close of fact discovery." (Doc. 141 at 1.) The stay thus has the potential to result in duplicative depositions, as witnesses would be forced to be deposed once in relation to some of the FTC's claims (as to which no stay is being sought) and then potentially deposed again in relation to the nonprofit claims. Additionally, if the stay were granted, it is likely the parties would then engage in time-consuming, inefficient litigation over whether certain outstanding discovery requests are covered or partially covered by the stay.

For these reasons, the stay request is denied.

Finally, to the extent the parties have attempted to tuck affirmative requests for separate relief into their response and reply briefs—such as the FTC's request for an order requiring GCE and Mueller to provide certain discovery responses within seven days of

---

[12]    In their reply, GCE and Mueller "propose that the Court impose a predetermined 45-day stay and schedule a status conference at the end . . . to assess the Department's progress." (Doc. 142 at 8.) However, there is no reason to believe the anticipated administrative proceedings will be completed in 45 days or anything close to that timeframe.

the issuance of this order (Doc. 141 at 16-17) and GCE's and Mueller's request to limit the scope of certain pending discovery requests (Doc. 142 at 6)—those requests are both procedurally improper, *see* Fed. R. Civ. P. 7(b)(1) ("A request for a court order must be made by motion."), and denied on the merits.

Accordingly,

**IT IS ORDERED** that:

1.    GCU's motion to dismiss (Doc. 71) is **granted**.  GCU is **dismissed** as a party to this action.

2.    GCU's motion to quash and/or for protective order (Doc. 117) is **denied**.

3.    The FTC's motion to strike affirmative defenses (Doc. 124) is **granted in part and denied in part**.

4.    Within 14 days of the issuance of this order, GCE may file an amended answer and Mueller may file a second amended answer.  The changes shall be limited to attempting to cure the subset of deficiencies raised in this order as to which leave to amend was granted and GCE and/or Mueller shall, consistent with LRCiv 15.1(a), attach a redlined version of the pleading as an exhibit.

5.    GCE's and Mueller's motion for a stay of discovery (Doc. 136) is **denied**.

Dated this 6th day of March, 2025.

Dominic W. Lanza
United States District Judge