ALSTON & BIRD LLP
Derin B. Dickerson, GA Bar #220620 (*admitted pro hac vice*)
Caroline R. Strumph, GA Bar #250168 (*admitted pro hac vice*)
Shanique C. Campbell, GA Bar #346659 (*admitted pro hac vice*)
1201 West Peachtree Street
Atlanta, GA  30309-3424
Telephone:  404-881-7000
derin.dickerson@alston.com
caroline.strumph@alston.com
shanique.campbell@alston.com

Kathleen Benway, DC Bar #474356 (*admitted pro hac vice*)
Graham Gardner, DC Bar #1672612 (*admitted pro hac vice*)
950 F Street, NW
Washington, DC 20004
Telephone: 202-239-3034
kathleen.benway@alston.com
graham.gardner@alston.com

Lisa L. Garcia, CA Bar #301362 (*admitted pro hac vice*)
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Telephone: 213-576-1147
lisa.garcia@alston.com

*Attorneys for Defendant Grand Canyon
Education, Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Federal Trade Commission, | No.  2:23-cv-02711-PHX-DWL |
| Plaintiff, | |
| vs. | **DEFENDANT GRAND CANYON EDUCATION, INC.'S AMENDED ANSWER TO FIRST AMENDED COMPLAINT** |
| Grand Canyon Education, Inc. and Brian E. Mueller, | |
| Defendants. | **JURY TRIAL DEMANDED** |

Defendant Grand Canyon Education, Inc. ("GCE") hereby amends its answer to the Federal Trade Commission's ("FTC") First Amended Complaint (Dkt. 62). Any allegations that are not specifically admitted herein are denied, and GCE answers as follows:

1.    The FTC brings this action for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FTC's Telemarketing Sales Rule, as amended, 16 C.F.R. Part 310. For these violations, the FTC seeks relief, including monetary relief, a permanent injunction, and other relief pursuant to Sections 13(b), and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), 56(a), and 57b, and Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Telemarketing Act"), 15 U.S.C. § 6105.

**ANSWER:** Paragraph 1 is a characterization of the FTC's Amended Complaint to which no response is required. To the extent that Paragraph 1 asserts additional or other allegations, Defendants deny those allegations in Paragraph 1.

## JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

**ANSWER:** Paragraph 2 contains legal conclusions to which GCE is not required to respond.

3.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(1), and (c)(2), and 15 U.S.C. § 53(b). Defendants reside in and transact business in this District.

**ANSWER:** The first sentence of Paragraph 3 contains legal conclusions to which GCE is not required to respond. To the extent a response is required, GCE denies the allegations in the first sentence of Paragraph 3. GCE admits that it maintains a principal place of business and transacts business in the District of Arizona.

## PLAINTIFF

4.    The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC

also enforces the Telemarketing Sales Rule, 16 C.F.R. Part 310 (the "TSR" or "Rule"), which prohibits deceptive and abusive telemarketing practices.

**ANSWER:** GCE admits that the FTC is an agency of the United States Government and that the FTC can enforce Section 5(a) of the FTC Act and the Telemarketing Sales Rule. The remaining allegations contain legal conclusions to which GCE is not required to respond. To the extent a response is required, GCE denies the remaining allegations in Paragraph 4.

## DEFENDANTS

5.    Defendant GRAND CANYON EDUCATION, INC. ("GCE") is a Delaware corporation with its principal place of business at 2600 W. Camelback Road, Phoenix, AZ 85017. GCE stock is publicly traded under the trading symbol LOPE. GCE was previously named "Significant Education, LLC" and "Significant Education, Inc." and changed its name to GCE in 2008. Through June 30, 2018, GCE owned and operated the university known as "Grand Canyon University" as a for-profit institution. Since July 1, 2018, as a result of a series of transactions orchestrated by GCE and its officers, GCE has been the exclusive provider of marketing services for Defendant GCU and receives most of Grand Canyon University's revenue.

**ANSWER:** GCE admits the allegations in the first four sentences of Paragraph 5. GCE admits that on July 1, 2018, GCE sold the educational assets of Grand Canyon University ("GCU") to Grand Canyon University f/k/a Gazelle University and became a full service educational services provider for GCU, and that in return for performing those services, GCE receives 60% of GCU's revenue from tuition and fees. Except as stated herein, GCE denies any remaining allegations in Paragraph 5.

6.    Defendant GRAND CANYON UNIVERSITY ("GCU") is an Arizona corporation formerly known as Gazelle University. It acquired rights to the name "Grand Canyon University" and began using that name in July 2018. Its principal place of business is 3300 W. Camelback Road, Phoenix, AZ 85017.

**ANSWER:** Paragraph 6 contains allegations about another Defendant, GCU, and thus no response is required. To the extent a response is required, GCE admits the allegations in

Paragraph 6.

7.     Defendant BRIAN E. MUELLER is the President of GCU, and the Chief Executive Officer, Chairman of the Board and a director of Defendant GCE. He directed GCE's efforts to re-brand the University as a nonprofit, and promoted representations that the July 2018 division of operations between GCE and GCU resulted in the University returning to operation as a traditional nonprofit university. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of GCU and GCE, including the acts and practices described in this Complaint.

**ANSWER:** GCE admits that Brian E. Mueller is the President of GCU, and the Chief Executive Officer, Chairman of the Board, and a director of GCE. GCE denies any remaining allegations in Paragraph 7.

## COMMERCE

8.     At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**ANSWER:** Paragraph 8 contains legal conclusions to which GCE is not required to respond. To the extent a response is required, GCE denies the allegations in Paragraph 8.

## DEFENDANTS' BUSINESS ACTIVITIES

9.     Defendants market postsecondary educational services online and through telemarketing. Despite operating the school for the profit of GCE and its investors, Defendants have deceptively advertised Grand Canyon University as a nonprofit to prospective students. Defendants' marketing activities have also resulted in millions of abusive telemarketing calls to consumers who have specifically requested that Defendants not solicit them, and to individuals on the National Do Not Call Registry. In addition, Defendants have marketed "accelerated" doctoral programs requiring only twenty courses (or 60 credits) when, in fact, Grand Canyon University requires almost all doctoral students to take many more "continuation courses" that add thousands of dollars to the costs.

**ANSWER:** GCE admits that GCE markets GCU's postsecondary educational services online and through telemarketing.  Except as expressly admitted, GCE denies the allegations in Paragraph 9 as to GCE only.

### GCE's Creation of Gazelle University and Transfer of the GCU Name

10.    In 2004, GCE purchased the assets of a nonprofit college that had been operating in Phoenix, Arizona since 1951 under the names "Grand Canyon College" or "Grand Canyon University" and began operating the school as a for-profit educational institution. GCE became a publicly traded company in November 2008, published business plans for maximizing the financial performance of the institution, and solicited investment based on the reported and projected profit from GCE's operation of this institution.

**ANSWER:** GCE admits the allegations in the first sentence of Paragraph 10, as to GCE only. GCE admits that it became a publicly traded company in November 2008, published business plans for the institution, and solicited investment.  GCE denies the remaining allegations in Paragraph 10.

11.    Beginning on or about 2014, GCE and Defendant Mueller formulated a plan to transfer the name and some of the assets of Grand Canyon University to a new corporation with the goal of characterizing it as a nonprofit university. In furtherance of this plan, on November 18, 2014, Defendant Mueller, who was at the time the Chief Executive Officer ("CEO") of GCE, chartered a new corporation, named "Gazelle University" (later renamed Grand Canyon University, hereinafter "GCU" or "Gazelle University/GCU"), under the Arizona Nonprofit Corporation Act, A.R.S. §§ 10-3101 – 10-11702.

**ANSWER:** GCE admits that Defendant Mueller was Chief Executive Officer of GCE on November 18, 2014.  GCE admits that Defendant Mueller signed the Articles of Incorporation for Gazelle University in 2014. GCE denies the remaining allegations in Paragraph 11.

12.    Defendant Mueller also became the President of Gazelle University/GCU. In 2017, Defendant Mueller became Chairman of the Board of GCE. Since 2017, he has continuously held the offices of CEO of GCE, Chairman of the Board of GCE, and President of Gazelle University/GCU. Mueller receives salary, bonuses, and other compensation from

both Defendants GCU and GCE. His compensation includes cash and stock incentives that are linked to GCE's financial performance and are explicitly designed to align his interests with those of GCE stockholders. He holds GCE stock of significant value. As CEO and Chairman of the Board of GCE, Defendant Mueller is GCE's principal representative in dealings with stockholders and reporting to investors on GCE's financial results and prospects.

**ANSWER:** GCE admits that Defendant Mueller is the President of GCU and the Chairman of the Board and CEO of GCE. GCE also admits that Defendant Mueller is compensated by GCE for his work for GCE. Except as expressly admitted, GCE denies the allegations in Paragraph 12.

13. Gazelle University/GCU was organized to carry on the business of selling educational services and related activities for its own profit and for the profit of GCE. Gazelle University/GCU was organized to acquire, own, and operate portions of the University owned by GCE, and use at least some of its earnings from its business to acquire property, secure loans, accumulate capital, and otherwise perpetuate and expand its business, and to increase the assets of the corporation and their value. Accordingly, Defendant Gazelle University/GCU was organized and has been operated to carry on business for its own profit or that of its members, within the meaning of Section 4 of the FTC Act. 15 U.S.C. § 44.

**ANSWER:** Paragraph 13 contains allegations about another Defendant, GCU, and therefore, a response is not required.

14. The articles of incorporation of Gazelle University/GCU represent that it is organized and operated exclusively for charitable, religious, and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code. Notwithstanding these articles of incorporation, Gazelle University/GCU was not organized exclusively for these purposes or exclusively for its own profit. In fact, it was organized by GCE and Defendant Mueller for Gazelle University/GCU's own profit, and to advance GCE's for-profit business and advance Defendant Mueller's interests as officer, chairman, director, stockholder and promoter of investment in GCE.

1    **ANSWER:** The first sentence of Paragraph 14 contains allegations about articles of

2    incorporation which speak for themselves, and GCE denies any allegations inconsistent

3    therewith. GCE denies the remaining allegations in Paragraph 14 as to GCE only. Paragraph

4    14 also contains allegations about other Defendants, GCU and Brian Mueller, and therefore, a

5    response is not required.

6        15.    On July 1, 2018, GCE executed interrelated agreements that resulted in Gazelle

7    University assuming its current name, Grand Canyon University. As a result of these

8    agreements, GCE transferred the trademarks, campus, and certain assets and liabilities of the

9    institution that GCE had operated as "Grand Canyon University," to GCU in exchange for

10   GCU agreeing to pay GCE more than $870 million plus 6% annual interest. A "Master

11   Services Agreement" executed as part of this transaction makes GCE the service provider for

12   certain essential GCU operations in exchange for a bundled fee that is equal to 60% of GCU's

13   "Adjusted Gross Revenue."

14   **ANSWER:** Paragraph 15 contains allegations about written agreements which speak for

15   themselves, and GCE denies any allegations inconsistent therewith.

16       16.    Since July 1, 2018, pursuant to the Master Services Agreement, GCE has been

17   the exclusive provider of marketing for GCU and services related to communicating with

18   prospective GCU students regarding applications, program requirements, and financing

19   options. GCE, pursuant to the Master Services Agreement, is also the exclusive provider for

20   GCU of student support services and counseling, technology (including GCU's platform for

21   online education) and budget analysis services. GCU is not permitted to contract with any third

22   party for these services. Since July 1, 2018, GCE has also been the sole provider of GCU's

23   student records management, curriculum services, accounting services, technology services,

24   financial aid services, human resources services, procurement, and faculty payroll and training.

25   **ANSWER:** Paragraph 16 contains allegations about written agreements which speak for

26   themselves, and GCE denies any allegations inconsistent therewith.

27       17.    The fees GCE receives from GCU are not subject to any limit and are not

28   proportionate to GCE's costs for providing services to GCE. GCE receives 60% of GCU's

revenue from tuition and fees from students, including 60% of charitable contributions to GCU for payment of student tuition and fees. If GCU revenue from these sources increases at a rate faster than operating costs, GCE disproportionately benefits from the increased revenue. In addition, GCE does not provide services for student housing, food services, operation of the GCU hotel conference center, or athletic arena, but still receives 60% of the revenue from these operations. If GCU revenue from these activities increases, GCE disproportionately benefits.

**ANSWER:** GCE admits that it receives 60% of GCU's revenue from tuition and fees from students.  Except as expressly admitted, GCE denies the allegations in Paragraph 17.

18.    The Master Services Agreement makes it impractical for GCU to use any provider other than GCE for essential services. GCU must receive services designated as exclusive from GCE, and if GCU elects to use a third party to provide services that are not designated as exclusive to GCE, GCU is still obligated to pay GCE the entire bundled fee, equal to 60% of GCU's Adjusted Gross Revenue. As a result of the July 1, 2018 agreements, GCE also controls technology and licenses essential to GCU's online educational services.

**ANSWER:** Paragraph 18 contains allegations about written agreements which speak for themselves, and GCE denies any allegations inconsistent therewith.

19.    The transfer of assets and creation of obligations implemented in the July 1, 2018 agreements between GCE and GCU benefited the business interest of GCE and its stockholders. After the transaction was completed, GCE adjusted its bonus compensation standards to pay bonuses totaling more than one million dollars to the GCE executives responsible for the Master Services Agreement entitling GCE to 60% of GCU's revenue.

**ANSWER:** GCE denies the allegations in the first sentence of Paragraph 19 to the extent it implies that only GCE benefited from the transfer. Otherwise, GCE denies the allegations in the second sentence of Paragraph 19.

20.    Since July 1, 2018, GCU's revenue has generated profit for itself, for GCE, and for GCE's investors. Since the July 1, 2018 reorganization of the University's assets, GCU has already generated revenue and profit. GCU has used its earnings to acquire property,

accumulate reserves and enhance the value of its assets, and has reportedly increased the net value of its assets by more than $125 million. GCE reports to investors that it has profited, and projects that it will continue to profit, from GCU's obligations to GCE. GCU continues to be GCE's most significant source of revenue.

**ANSWER:** GCE admits that it earns revenue from GCU and that such revenue contributes to any profit earned. Otherwise, the first three sentences of Paragraph 20 contain allegations about another Defendant, GCU, and therefore, a response is not required. GCE admits the allegations in the last two sentences of Paragraph 20.

21.    GCU's operations since July 1, 2018, are not comparable to Grand Canyon University's operation as a nonprofit prior to 2004, as GCU is largely operated by, and most of its revenue is paid to, GCE – the for-profit corporation that owned and operated the University from 2004 until July 1, 2018.

**ANSWER:** Paragraph 21 contains a statement of opinion to which no response is required. Paragraph 21 also contains allegations about another Defendant, GCU, and therefore, no response is required. To the extent a response is required, GCE denies the allegations in Paragraph 21.

**Defendants Have Marketed GCU as a Nonprofit**

22.    Beginning shortly after transfer of the "Grand Canyon University" name to GCU on July 1, 2018, Defendants began promoting GCU in advertising and telemarketing as a private "nonprofit" university and disseminated digital and print advertising like the following, stating that GCU had gone "Back to Non-Profit Roots" and "transitioned back to a non- profit institution."

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**ANSWER:** GCE admits that GCE began referring to GCU as a nonprofit entity after July 1, 2018. GCE is without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 22, and on that basis denies them.

23. Defendants disseminated the advertisement above and similar statements representing that GCU had transitioned back to a nonprofit on websites, social media, press releases, video marketing and social media. Defendants used claims that GCU is a nonprofit to induce enrollment in GCU, and to induce consumers to provide their telephone numbers and other information for the use of GCE telemarketers. For example, the digital advertisement shown in Paragraph 22 appears adjacent to an online form urging consumers to "Let Us Know How To Contact You," with boxes for the consumer to submit their name, telephone number and information about their interest in educational services.

**ANSWER:** GCE denies the allegations in the second sentence of Paragraph 23, as to GCE only. GCE is without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 23, and on that basis denies them.

24. The representations that GCU was a nonprofit and had "transitioned back" to its non-profit roots were material to consumers and benefited GCE.

• In December 2018, Defendant Mueller, the Chief Executive Officer of GCE and President of GCU, stated in an interview that the characterization of GCU

as a non-profit educational institution "is a tremendous advantage . . . We can recruit in high schools that would not let us in the past . . . We're just 90 days into this, but we're experiencing, we believe, a tailwind already just because of how many students didn't pick up the phone because we were for- profit."

- On February 20, 2019, CEO Mueller stated during GCE's earnings call for the fourth quarter of 2018: "[N]ew student online growth [after the conversion of Gazelle to GCU] was more than we expected and I think it's evidence that being out there now a million times a day saying we're non-profit has had an impact."

**ANSWER:** GCE denies the allegations in the first sentence of Paragraph 24. The remaining sentences of Paragraph 24 contain allegations about interviews and calls which speak for themselves, and GCE denies any allegations inconsistent therewith.

25.    Defendants discontinued and removed most statements characterizing GCU as a nonprofit shortly after November 6, 2019. On that date, the Department of Education rejected GCU's request that it be recognized as a nonprofit institution under the Higher Education Act, and classified GCU as a *for-profit* participant in federal education programs. As part of the Department's action on GCU's application, the Department concluded that "GCU must cease any advertising or notices that refer to its 'nonprofit status.' Such statements are confusing to students and the public, who may interpret such statements to mean that the Department considers GCU a nonprofit under its regulations."

**ANSWER:** GCE admits the allegations in the first sentence of Paragraph 25, as to GCE only. The remaining sentences of Paragraph 25 contain allegations about Department of Education representations which speak for themselves, and GCE denies any allegations inconsistent therewith.

26.    The Department of Education determined that GCU does not meet the "operational test" for nonprofit status "that both the primary activities of the organization and its stream of revenue benefit the nonprofit itself." The Department concluded that materials GCU submitted to the Department concerning the July 1, 2018 transactions "demonstrate that

GCE and its stockholders – rather than Gazelle/GCU – are the primary beneficiaries of the operation of GCU under the terms of the Master Services Agreement. This violates the most basic tenet of nonprofit status – that the nonprofit be primarily operated for a tax-exempt purpose and not substantially for the benefit of any other person or entity."

**ANSWER:** Paragraph 26 contains allegations about Department of Education representations which speak for themselves, and GCE denies any allegations inconsistent therewith.

27.     GCU is challenging the Department of Education's November 6, 2019 decision. *See Grand Canyon University v. Cardona,* No. 2:21-cv- 00177, Order (D. Ariz., Dec. 1, 2022) (ruling the Department of Education lawfully concluded GCU is not nonprofit), *appeal pending,* No. 23-15124 (9th Cir.). GCU specifically seeks a declaration that GCU is entitled to refer to itself publicly as a nonprofit institution for all purposes.

**ANSWER:** Paragraph 27 contains allegations about legal action taken by GCU, which is a matter of public record and speaks for itself, and GCE denies any allegations inconsistent therewith.

### Defendants' Telemarketing

28.     GCU currently has approximately 118,000 students; over 90,000 of them are enrolled in online programs.

**ANSWER:** GCE admits the allegations in Paragraph 28.

29.     GCE, in the name of and on behalf of GCU, induces consumers to purchase educational services from GCU, including through nationwide marketing campaigns.

**ANSWER:** GCE denies the allegations in Paragraph 29.

30.     Defendants use online and social media advertisements, and in- person solicitations, to obtain information about consumers interested in educational services, including their name, contact information, and interests. Defendants use that information to conduct further marketing, including telemarketing.

**ANSWER:** GCE admits that it engages with students online and in-person and that it obtains contact information from prospective students interested in educational services. Except as expressly admitted herein, GCE denies the allegations in Paragraph 30.

31.     GCE has hundreds of sales representatives that solicit prospective students through a variety of means, including telemarketing. GCE's telemarketers tell prospective students that they are GCU counselors. The telemarketers' duties include describing the central characteristics of GCU to prospective students, and the requirements, costs, and projected length of GCU educational programs.

**ANSWER:** GCE admits that it employs counselors to engage with prospective students to advise them regarding GCU programs. Except as expressly admitted herein, GCE denies the allegations in Paragraph 31.

32.     GCE has established job "performance metrics" for telemarketers that include "Annual Student Counts" that specify the number of consumers each telemarketer should enroll and retain. GCE tracks, and its managers regularly review, the number of consumers each telemarketer enrolls, and the number of telemarketing calls telemarketers make to fulfill sales expectations. Telemarketers who fail to meet GCE's telemarketing metrics are placed on "Corrective Action Plans" that routinely include requiring telemarketers to make 80-89 telemarketing calls each day, and to spend three to four and a half hours a day on the telephone. Telemarketers that fail to comply with Corrective Action Plans are subject to disciplinary action, including termination.

**ANSWER:** GCE denies the allegations in the first two sentences of Paragraph 32. GCE admits that GCE's counselors may be subject to Corrective Action Plans or other disciplinary actions for issues related to work performance. GCE denies the remaining allegations in Paragraph 32.

33.     Since at least 2017, GCE has used its customer relationship management ("CRM") system to give telemarketers telephone numbers and other information about consumers that GCE telemarketers use to initiate telephone calls that urge individuals to purchase educational services from GCU.

**ANSWER:** GCE admits that its counselors use a CRM system to retrieve telephone numbers and other information about prospective students. GCE denies the remaining allegations in Paragraph 33.

34.     Since July 2018, Defendant GCE has initiated tens of millions of telemarketing

calls on behalf of GCU.

**ANSWER:** GCE admits the allegations in Paragraph 34.

35.     Consumers have requested that GCU and telemarketers acting on its behalf not make telemarketing calls to their numbers. GCE maintains a list of telephone numbers that have been identified in such requests.

**ANSWER:** GCE admits the allegations in Paragraph 35.

36.     Until at least March 2023, GCE did not remove from the CRM system, or block their telemarketers' access to, the telephone numbers of individuals who had requested that telemarketers acting on behalf of GCU not call their numbers.

**ANSWER:** GCE denies the allegations in Paragraph 36 insofar as they suggest GCE has not established and implemented written procedures to honor consumers' requests that they not be called, or has not used or maintained a process to prevent calls to any such numbers on an entity-specific Do Not Call list or a state or federal Do Not Call list.

37.     GCE telemarketers acting on behalf of GCU have initiated more than a million telemarketing calls to telephone numbers of consumers who had, prior to the call, specifically requested that telemarketing calls for GCU not be made to that telephone number.

**ANSWER:** GCE admits only that it has initiated more than one million calls to telephone numbers of consumers who had, prior to the call, requested not to receive telemarketing calls for GCU. GCE denies the allegations in Paragraph 37 insofar as they suggest GCE has not established and implemented written procedures to honor consumers' requests that they not be called, has not used or maintained a process to prevent calls to any such numbers on an entity-specific Do Not Call list or state or federal Do Not Call lists, or that any such calls that were initiated were anything other than the result of unintentional, good faith error.

38.     GCU and GCE have access to the National Do Not Call Registry maintained by the Federal Trade Commission.

**ANSWER:** GCE admits the allegations in Paragraph 38 only as to GCE.

39.     Until at least March 2023, GCE did not remove from the CRM system, or block their telemarketers' access to, the telephone numbers of any individuals whose telephone

1 numbers were listed on the Registry. GCE, in fact, provided its telemarketers with telephone

2 numbers listed on the Registry even if GCE had no basis for claiming that telemarketing calls

3 on behalf of GCU to a given number were permissible.

4 **ANSWER:** GCE denies the allegations in Paragraph 39 insofar as they suggest GCE has not

5 established and implemented written procedures to honor consumers' requests that they not be

6 called, and has not used or maintained a process to prevent calls to any such numbers on an

7 entity-specific Do Not Call list or a state or federal Do Not Call list.

8     40.    GCE telemarketers have initiated millions of telemarketing calls on behalf of

9 GCU to telephone numbers of consumers who had, prior to the call, placed their numbers on

10 the National Do Not Call Registry even though GCU did not have an established business

11 relationship with the person receiving the call or the consumer's express agreement, in writing,

12 to place such telemarketing calls to the person's telephone number.

13 **ANSWER:** GCE admits only that it has initiated more than one million calls to telephone

14 numbers of consumers who had, prior to the call, placed their numbers on the National Do Not

15 Call registry. GCE denies the remaining allegations in Paragraph 40 insofar as they suggest

16 GCE has not established and implemented written procedures to honor consumers' requests

17 that they not be called, has not used or maintained a process to prevent calls to any such

18 numbers on an entity-specific Do Not Call list or state or federal Do Not Call lists, or that any

19 such calls that were initiated were anything other than the result of unintentional, good faith

20 error.

21     41.    Defendants also have made millions of telemarketing calls to telephone numbers

22 on the National Do Not Call Registry after GCE notified telemarketers that the telephone

23 numbers are exempt from do-not-call restrictions. In fact, many of these telephone numbers

24 were collected through online and social media advertisements that do not clearly disclose to

25 consumers the language purporting to authorize telemarketing because they:

26         •    Present the language regarding telephone calls in small type;

27         •    Present the language regarding telephone calls in pale print or colors that

28

barely contrast with the background (*e.g.*, Paragraph 43);

- Surround the language regarding telephone calls with text in more prominent, contrasting type, that states that the purpose of the form is to confirm entries (*e.g.*, Paragraph 45);

- Instruct the consumer to advance to the next screen with terms that do not indicate that doing so constitutes an agreement or authorization;

- Place the language regarding telephone calls below the graphic the consumer engages with to submit the form or advance to the next screen (*e.g.*, Paragraphs 42, 44 and 45);

- Do not name GCU as the entity that is being authorized to place telemarketing calls to the consumer (*e.g.*, Paragraph 43); or

- Do not include the telephone number that is the subject of the purported authorization (*e.g.*, Paragraphs 41, 42).

**ANSWER:** GCE denies the allegations in Paragraph 41 only as to GCE.

42.    For example, at Grand Canyon University's main website (gcu.edu), Defendants have acquired telephone numbers by presenting the following and similar online forms to solicit consumers:

**ANSWER:** GCE admits that the identified form has appeared on GCU's website.  GCE further admits that students could submit telephone numbers through the identified form.  Except as expressly admitted, GCE denies the allegations in Paragraph 42 as to GCE only.

43.    Defendants have acquired telephone numbers by presenting the following and similar online forms to solicit consumers at other websites and digital advertising media:

**ANSWER:** GCE admits the allegations in Paragraph 43 as to GCE only.

44.    Defendants also purchase information about consumers from lead generators. Defendants have purchased telephone numbers and other information from lead generators that have used the following and similar online forms to solicit the information Defendants purchased:

1    **ANSWER:** GCE admits the allegations in Paragraph 44 as to GCE only.

2    45.    Defendants have also purchased information from lead generators that used the

3    following and similar online forms to solicit the information Defendants purchased:

4    **ANSWER:** GCE admits the allegations in Paragraph 45 as to GCE only.

5    46.    An individual who has been prompted to press or click "Next", "see results!",

6    "Submit Info" or similar prompts on the forms in Paragraphs 42, 43, 44, and 45, or similar

7    forms used by Defendants and lead generators from which Defendants have purchased leads,

8    has not signed a written agreement that clearly evidences the person's authorization that calls

9    made by or on behalf of GCU may be placed to a telephone number included in the writing.

10    **ANSWER:** GCE denies the allegations in Paragraph 46.

11    47.    In public guidance available throughout the relevant time period, the FTC has

12    advised that, to obtain valid express authorization to call a consumer, a seller must obtain the

13    consumers' affirmative assent to a written authorization that is not hidden; printed in small,

14    pale, or non-contrasting type; or buried in unrelated information where a person would not

15    expect to find such a request. GCE and GCU had actual notice of this FTC guidance and were

16    warned by professional telemarketing compliance services that, to constitute valid express

17    written agreement authorizing GCU telemarketing calls, a purported agreement must clearly

18    and conspicuously disclose that the person authorizes the seller to make telemarketing calls;

19    must specifically indicate the seller to whom consent is being provided; must include the

20    telephone number at which the person consents to receive calls; and must require that the

21    consumer take some affirmative action that indicates the consumer's assent.

22    **ANSWER:** The first sentence of Paragraph 47 references alleged public guidance, which

23    speaks for itself, and GCE denies any allegations inconsistent therewith. GCE denies the

24    remaining allegations of Paragraph 47 as to GCE only.

25    48.    Until the FTC inquired into GCE's history of calling telephone numbers on do-

26    not-call lists in 2022, Defendants did not examine GCE's call records to determine whether

27    telemarketers were initiating calls to telephone numbers of individuals who had requested that

28    GCU telemarketers not call their numbers and individuals who had placed their telephone

numbers on the Registry. Defendants also took no action to deter telemarketers who initiated telemarketing calls that were contrary to GCE's own do-not-call policies. Defendants' written plan for do-not-call compliance did not provide for monitoring or enforcement.

**ANSWER:** GCE denies the allegations in Paragraph 48 as to GCE only.

49.    After the FTC inquired into GCE's history of calling telephone numbers on do-not-call lists, GCE examined its telemarketer call logs and identified millions of illegal calls. In March 2023, GCE initiated changes to its CRM system to curtail telemarketer access to telephone numbers GCE deemed to be inconsistent with its do-not-call policy. The March 2023 changes, however, did not alter GCE's practice of using its CRM system to furnish telemarketers with telephone numbers provided on forms thatdo not authorize GCU calls, and encouraging GCE's telemarketers to call telephone numbers obtained through such forms by using the CRM to furnish these numbers to telemarketers with symbols indicating that GCE deems telemarketing calls to these numbers to be exempt from do-not-call restrictions.

**ANSWER:** GCE admits only that in March 2023 it initiated certain changes to its CRM system to improve compliance with its do-not-call policies. GCE denies the remaining allegations in Paragraph 49.

### Defendants' Marketing of GCU's Doctoral Programs

50.    Defendants market educational services for doctoral studies in the fields of psychology, education, health and business that promise training in independent research and supervised preparation of a doctoral dissertation. Defendants represent that GCU's College of Doctoral Studies will award individuals who complete the prescribed courses and produce a dissertation of academic quality research in their chosen field a Doctor of Philosophy (PhD), Doctor of Education (EdD), Doctor of Health Administration (DHA) or Doctor of Business Administration (DBA).

**ANSWER:** GCE admits the allegations in Paragraph 50 as to GCE only.

51.    Since at least 2018, in marketing GCU's doctoral programs, Defendants have described these programs as "accelerated" programs that enable students to quickly complete their degree, including quickly completing a dissertation. Among other statements,

Defendants' marketing for these programs has included the following:

> The College of Doctoral Studies at Grand Canyon University places doctoral learners on an accelerated path from the first day.

> From day one, you are on an accelerated path with the support needed to grow & thrive. Concerned about your dissertation? Don't be. At GCU, dissertations are built into your coursework so you move forward to graduation step by step.

> At Grand Canyon University, the doctoral journey is truly unique. From day one, you are placed on an accelerated path that will prepare you to succeed in your academic journey and career.

**ANSWER:** Paragraph 51 contains allegations about written marketing materials which speak for themselves, and GCE denies any allegations inconsistent therewith.

52.    Defendants have distributed descriptions of the doctoral programs to prospective students in online publications, catalogues, and charts. These materials describe the GCU programs as twenty course programs that require a total of 60 credits. For example, the description of requirements for an online Doctor of Education (EdD) on GCU's main website (https://www.gcu.edu/degree-programs/edd-organizational-leadership-development-qualitative), includes the following list of courses:

**ANSWER:** GCE admits that it has distributed materials to prospective doctoral students and that those materials speak for themselves. GCE denies any allegations in Paragraph 52 inconsistent therewith.

53.    Defendants have distributed enrollment agreements to prospective doctoral students for doctoral degrees like the enrollment agreement below. Many of these enrollment agreements, like the agreement below, include a list of twenty courses, and an itemized list of per credit costs and fees, and then state a specific amount as the "Total Program Tuition and Fees," for the doctoral program covered by the agreement. The "Total Program Tuition and Fees" listed in such agreements is based on the tuition and fees for twenty courses. The specific amounts in these agreements were between $40,850 and $50,000, depending on the program and date of the agreement.

In the agreement below, the specific amount quoted for Total Program Tuition and Fees" is $43,720:

**ANSWER:** GCE admits that it has distributed enrollment agreements to prospective doctoral students for doctoral degrees. The remaining allegations in Paragraph 53 reference written agreements, which speak for themselves, and GCE denies any allegations inconsistent therewith.

54.    Defendants also distribute estimates of tuition costs for doctoral programs to prospective doctoral students that describe the cost of the degree based on the cost for 60 credits, representing twenty courses.

**ANSWER:** GCE admits that it has distributed materials containing estimates of minimum tuition costs for doctoral programs to prospective doctoral students. Those materials speak for themselves, and GCE denies any allegations in Paragraph 54 inconsistent therewith.

55.    Defendants train telemarketers for GCU doctoral degree marketing campaigns with materials that describe the GCU doctoral programs as requiring twenty courses, which include only three dissertation courses. Defendants' telemarketers solicit doctoral candidates with statements like the following:

The doctorate goes for 20 courses, which is 60 credits. And what you're doing a little differently is you're working towards your dissertation at the same time you're doing your courses. So rather than a typical seven year doctorate, it could be completed a lot faster than that. . . . The ultimate goal is that you finish your coursework in about three years and then pretty soon after you have the opportunity to finish your dissertation and therefore graduate. So it's a very unique system.

**ANSWER:** GCE denies the allegations in Paragraph 55 as to GCE only.

56.    Defendants' telemarketers also direct prospective students to, or provide prospective students with, enrollment agreements, catalogues, online publications, charts, and other material, as described in Paragraphs 52 through 54.

**ANSWER:** GCE admits that its counselors may provide or direct prospective students to certain GCU-related materials.  The descriptions of those materials in Paragraphs 52 through

54 refer to written materials that speak for themselves, and GCE denies any allegations in Paragraphs 52 through 54 inconsistent therewith.

57.     In fact, GCU doctoral programs are not limited to the twenty courses identified in enrollment agreements, and dissertation courses in these programs are not limited to the three dissertation courses listed in these agreements (Dissertation I, II, and III). GCU's requirements for dissertations include eight distinct levels of review that students must complete from the initial prospectus to final approval. Throughout the multi-level review process, GCU requires students to produce multiple drafts with extensive revisions. After a student has completed two years of coursework, GCU appoints one or more faculty members to supervise satisfaction of the requirements. GCU often imposes these dissertation requirements in courses after the three dissertation courses listed in the agreements and requires any student satisfying these requirements to enroll in, and pay additional tuition for, "continuation courses."

**ANSWER:** GCE denies the allegations in the first sentence of Paragraph 57 because it is based on a false premise that GCE represents GCU's doctoral programs as "limited to twenty courses" and "limited to the three dissertation courses." GCE admits that GCU's doctoral programs include a multi-level review process and that some students may enroll in and pay for continuation courses. Except as expressly admitted herein, GCE denies the allegations in Paragraph 57.

58.     Continuation courses do not involve traditional instruction but are required by GCU while the student is conducting research and making revisions to satisfy dissertation requirements.

**ANSWER:** Paragraph 58 contains allegations about the programs of another Defendant, GCU. GCE is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 58, and on that basis denies them.

59.     The number of continuation courses and time required for doctoral students to advance through GCU's doctoral program depends, in substantial part, on services provided by GCU. Students' ability to satisfy GCU's requirements may be, and has been, thwarted and

1   delayed by GCU's actions or inaction, such as reassignment of faculty, inconsistent demands

2   during the dissertation review process, and delays caused by the conduct of faculty appointed

3   by GCU to various roles in the dissertation review process.

4   **ANSWER:** Paragraph 59 contains allegations about the programs of another Defendant, GCU,

5   and certain unidentified students. GCE is without knowledge or information sufficient to form

6   a belief as to the allegations in Paragraph 59, and on that basis denies them.

7       60.    The enrollment agreements Defendants have distributed to prospective doctoral

8   students with statements that identify the "Total Degree Requirements," "Total Program

9   Credits," or "Total Program Tuition and Fees" do not list the continuation courses that GCU

10  typically requires of doctoral candidates and do not include credits or costs associated with

11  such courses.

12  **ANSWER:** The allegations in Paragraph 60 reference enrollment agreements, which speak

13  for themselves, and GCE denies any allegations inconsistent therewith.

14      61.    GCU very rarely awards doctoral degrees to students upon completion of 60

15  credits, representing twenty courses. For example, between July 1, 2018, and December 31,

16  2022, of the students who obtained GCU doctoral degrees requiring a dissertation:

17      •   GCU required continuation courses for 98.5% of the doctoral students to

18          whom it awarded degrees; only 3 out of every 200 successful doctoral

19          students received a degree from GCU upon completing just 60 credits;

20      •   For 78% of these students, GCU required five or more continuation courses;

21      •   For more than half of these students, GCU required ten or more continuation

22          courses;

23      •   For fourteen percent of these students, GCU required twenty or more

24          continuation courses in addition to the twenty courses listed as the required

25          courses for their degree.

26  **ANSWER:** Paragraph 61 contains allegations about another Defendant, GCU, and certain

27  unidentified students, and therefore, a response is not required.

28      62.    The average number of courses GCU required of doctoral graduates awarded

degrees in 2019, 2020, 2021 and 2022 was thirty-one – the twenty courses listed in the enrollment agreements described above in Paragraph 53, plus eleven continuation courses. GCU's charges for eleven continuation courses exceed $10,000.

**ANSWER:** Paragraph 62 contains allegations about another Defendant, GCU, and therefore, a response is not required.

63.    Most of the students that enroll in GCU doctoral programs never receive the doctoral degree for which they enrolled. Many of these students are thwarted because they cannot afford the additional costs and time necessary to fulfill GCU's requirements beyond the twenty courses identified as required. Many students discover that GCU requires more funds or time than Defendants represented only after they have paid thousands of dollars in tuition and devoted years to GCU courses. Many of these students withdraw or are compelled to leave GCU without a doctoral degree.

**ANSWER**: Paragraph 63 contains allegations about another Defendant, GCU, and certain unidentified students. GCE is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 63, and on that basis, denies them.

64.    To the extent that Defendants have communicated to prospective students that GCU doctoral programs require more than the twenty courses, they have done so in buried disclaimers, misleading statements, or presentations that distort the program requirements. For example, in some enrollment agreements and other materials, Defendants have included a buried disclaimer, stating that "on average, doctoral students who graduated required 5.2 continuation courses to complete their doctoral degree." The 5.2 average was based on information about students graduating between 2011 and early 2017, and did not reflect the experience of recent graduates. Defendants, however, distributed materials referencing the 5.2 average to prospective students in 2019, 2020, 2021, and 2022. In fact, GCU has required recent graduates to number of continuation courses GCU required of the students who graduated in 2019 was 10.6 – more than twice the number stated in this disclaimer. The average number of continuation courses for students who graduated in 2022 was more than 12.

**ANSWER:** Paragraph 64 contains allegations about another Defendant, GCU. GCE is without

knowledge or information sufficient to form a belief as to the allegations in Paragraph 64, and on that basis, denies them. To the extent the allegation in Paragraph 64 are directed at GCE, GCE denies them.

65.    After Defendants received notice of the Commission's investigation, Defendants added a section to GCU's website that acknowledged that GCU, on average, required doctoral students to complete significantly more than 5.2 continuation courses. Initially, GCU posted a statement in this section that the average number of continuation courses for doctoral graduates since 2011 was 9.5. GCU later revised this section to state that, by the end of 2022, the average for all doctoral graduates since 2011 was 9.9 continuation courses. These statements acknowledging the number of continuation courses GCU has required are buried in the gcu.edu website and come too late for students enrolled prior to their release. Moreover, this addition to GCU's website does not acknowledge the cost of these continuation courses. Nor does GCU include these statements about the average number of continuation courses in the descriptions of the requirements for doctoral degrees, like those described in Paragraph 51, that appear on GCU's main website. Additionally, the number of continuation courses GCU has required has increased since 2011, and the average GCU reports in these statements understates the number of continuation courses GCU has required of recent doctoral graduates.

**ANSWER:** Paragraph 65 contains allegations about GCU's website, which speaks for itself, and GCE denies any allegations inconsistent therewith. Paragraph 65 also contains allegations about another Defendant, GCU. To the extent the allegations in Paragraph 65 are directed at GCE, GCE denies them.

66.    Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission because, among other things:

- Defendants continued their unlawful acts or practices despite complaints and lawsuits;

- Defendants acted to mitigate their abusive telemarketing practices only after Civil Investigative Demand from the FTC required that GCE acknowledge

the extent of GCE's violations;

- Defendants continued their deceptive marketing of doctoral practices despite investigations by the Department of Education and the FTC;

- Defendants have continued to characterize GCU as a nonprofit; and

- Defendants GCU and GCE engaged in their unlawful acts and practices willfully, and knowing that their representations were misleading and their telemarketing practices did not comply with restrictions on abusive telemarketing practices.

**ANSWER:** GCE denies the allegations in Paragraph 66 as to GCE only.

## **VIOLATIONS OF THE FTC ACT**

67.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

**ANSWER:** Paragraph 67 contains legal conclusions to which no response is required. To the extent a response is required, GCE denies the allegations in Paragraph 67.

68.    Misrepresentations or deceptive omissions of material fact are deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

**ANSWER:** Paragraph 68 contains legal conclusions to which no response is required. To the extent a response is required, GCE denies the allegations in Paragraph 68.

### **Count I**

### **Deceptive Representation of Being a Non-profit Institution**

69.    In numerous instances in connection with the advertising, marketing promotion, offering for sale, or sale of educational services, Defendants have represented, directly or indirectly, expressly or by implication, that GCU:

- is a non-profit institution; and

- transitioned back to its prior manner of operating as a non-profit institution.

**ANSWER:** GCE admits that at times it has represented GCU as a nonprofit entity.  Except as expressly admitted herein, GCE denies the allegations in Paragraph 69.

70.    The representations set forth in Paragraph 69 are false or misleading, or were not

1  substantiated at the time the representations were made.

2  **ANSWER:** GCE denies the allegations in Paragraph 70 as to GCE only.

3  71.    Therefore, Defendants' representations as set forth in Paragraph 68 constitute

4  deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

5  **ANSWER:** GCE denies the allegations in Paragraph 71 as to GCE only.

6  **Count II**

7  **Deceptive Representation of Doctoral Programs**

8  72.    In numerous instances in connection with the advertising, marketing, promotion,

9  offering for sale, or sale of GCU educational services, Defendants have represented, directly

10  or indirectly, expressly or by implication, that:

11         •    GCU doctoral degrees that include a dissertation are typically completed in

12              twenty courses or 60 credits; and

13         •    GCU's total charges for doctoral degrees that include a dissertation are the

14              tuition and fees for twenty courses.

15  **ANSWER:** GCE denies the allegations in Paragraph 72 as to GCE only.

16  73.    The representations set forth in Paragraph 72 are false or misleading, or were not

17  substantiated at the time the representations were made.

18  **ANSWER:** GCE denies the allegations in Paragraph 73 as to GCE only.

19  74.    Therefore, Defendants' representations as set forth in Paragraph 71 constitute

20  deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

21  **ANSWER:** GCE denies the allegations in Paragraph 74 as to GCE only.

22  **<u>VIOLATIONS OF THE TELEMARKETING SALES RULE</u>**

23  75.    Congress directed the Commission to prescribe rules prohibiting abusive and

24  deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§

25  6101-6108. The Commission adopted the original TSR in 1995, extensively amended it in

26  2003, and amended certain provisions thereafter. 16 C.F.R. Part 310.

27  **ANSWER:** Paragraph 75 contains allegations about Congressional directives, statues, and

28  regulations which speak for themselves, and GCE denies any allegations inconsistent

therewith.

76.     Among other things, the 2003 amendments to the TSR established a do-not-call registry, maintained by the Commission (the "National Do Not Call Registry" or "Registry"), of consumers who do not wish to receive certain types of telemarketing calls. Consumers can register their telephone numbers on the Registry without charge either through a toll-free telephone call or over the Internet at donotcall.gov.

**ANSWER:** Paragraph 76 contains allegations about regulatory amendments which speak for themselves, and GCE denies any allegations inconsistent therewith.

77.     Consumers who receive telemarketing calls to their registered numbers can complain of Registry violations the same way they registered, through a toll-free telephone call or over the Internet at donotcall.gov, or by otherwise contacting law enforcement authorities.

**ANSWER:** GCE is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 77, and on that basis, denies them.

78.     The FTC allows sellers, telemarketers, and other permitted organizations to access the Registry over the Internet at telemarketing.donotcall.gov, to pay the fee(s) if required, and to download the numbers not to call.

**ANSWER:** Paragraph 78 contains allegations about the FTC's conduct. GCE is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 78, and on that basis, denies them.

79.     Under the TSR, a "telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor. 16 C.F.R. § 310.2(ff). A "seller" means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration. *Id.* § 301.2(dd).

**ANSWER:** Paragraph 79 contains allegations about regulations that speak for themselves, and GCE denies any allegations inconsistent therewith.

80.     It is a deceptive telemarketing act or practice and a violation of the TSR for any

seller or telemarketer to misrepresent, directly or by implication, in the sale of goods or services, any of the following material information:

- The total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of a sales offer;

- Any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer.

16 C.F.R. § 310.3(a)(2)(i), (iii).

**ANSWER:** Paragraph 80 contains allegations about regulations that speak for themselves, and GCE denies any allegations inconsistent therewith.

81.    Under the TSR, an "outbound telephone call" means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution. 16 C.F.R. § 310.2(x).

**ANSWER:** Paragraph 81 contains allegations about a regulation that speaks for itself, and GCE denies any allegations inconsistent therewith.

82.    The TSR prohibits sellers and telemarketers from initiating outbound telephone calls to any consumer who has previously stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered, or made by or on behalf of the charitable organization for which a charitable contribution is being solicited (an "Entity-Specific Do Not Call request"). 16 C.F.R. § 310.4(b)(l)(iii)(A).

**ANSWER:** Paragraph 82 contains allegations about a regulation that speaks for itself, and GCE denies any allegations inconsistent therewith.

83.    The TSR prohibits sellers and telemarketers from initiating an outbound telephone call to numbers on the Registry unless the seller (1) has obtained the consumer's express agreement, in writing, to place such calls, or (2) has an established business relationship with that consumer, and the consumer has not stated that he or she does not wish to receive such calls. 16 C.F.R. § 310.4(b)(1)(iii)(B). Valid written agreement to receive a live telemarketing call to a number on the Registry requires a writing: (i) signed by the consumer,

1  (ii) clearly evidencing authorization to receive calls placed on behalf of a specific seller, and

2  (iii) stating the phone number to which such calls may be placed. *Id.* § 310.4(b)(1)(iii)(B)(1).

3  **ANSWER:** Paragraph 83 contains allegations about a regulation that speaks for itself, and

4  GCE denies any allegations inconsistent therewith.

5      84.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and

6  Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an

7  unfair or deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. §

8  45(a).

9  **ANSWER:** Paragraph 84 contains allegations about a statute that speaks for itself, and GCE

10  denies any allegations inconsistent therewith.

11      85.     Defendant GCE is a "telemarketer" engaged in "telemarketing" as those terms

12  are defined in the TSR.

13  **ANSWER:** Paragraph 85 contains a legal conclusion to which no response is required. To the

14  extent a response is required, GCE denies the allegations in Paragraph 85.

15      86.     Defendant GCU is a "seller" engaged in "telemarketing" as those terms are

16  defined in the TSR.

17  **ANSWER:** Paragraph 86 contains a legal conclusion to which no response is required. To the

18  extent a response is required, GCE denies the allegations in Paragraph 86.

19      87.     Defendants have engaged in telemarketing by a plan, program, or campaign

20  conducted to induce the purchase of educational services by the use of one or more telephones

21  and which involves more than one interstate telephone call.

22  **ANSWER:** GCE denies the allegations in Paragraph 87 as to GCE only.

23      88.     Defendants initiated outbound telephone calls to consumers in the United States

24  to induce the purchase of educational services.

25  **ANSWER:** GCE denies the allegations in Paragraph 88 as to GCE only.

26  / / /

27  / / /

28  / / /

**Count III**
**Deceptive Telemarketing Acts or Practices**

89.    In numerous instances, in connection with the telemarketing of educational services, Defendants have misrepresented, directly or indirectly, expressly or by implication, material information regarding GCU and its services, including, but not limited to representations that:

- GCU is a non-profit institution;
- GCU transitioned back to its prior manner of operation as a non- profit educational institution;
- GCU doctoral degrees that include a dissertation are typically completed in twenty courses or 60 credits; and
- GCU's total charges for doctoral degrees that include a dissertation are the tuition and fees for twenty courses.

**ANSWER:** GCE denies the allegations in Paragraph 89 as to GCE only.

90.    Therefore, Defendants' acts or practices as set forth in Paragraph 88 violate Section 3103(a)(2)(i), (iii) of the TSR. 16 C.F.R. § 310.3(a)(2)(i), (iii).

**ANSWER:** GCE denies the allegations in Paragraph 90 as to GCE only.

**Count IV**
**Calls to Persons Who Have Requested GCU Not Contact Them**
**Through Telemarketing**

91.    In numerous instances, in connection with telemarketing, Defendants have initiated or caused others to initiate an outbound telephone call to a person who has previously stated that he or she does not wish to receive such a call made by or on behalf of the seller whose goods or services are being offered in violation of the TSR. 16 C.F.R. § 310.4(b)(1)(iii)(A).

**ANSWER:** GCE denies the allegations in Paragraph 91 as to GCE only.

**Count V**
**Calls to Persons Registered on the National Do Not Call Registry**

92.    In numerous instances, in connection with telemarketing, Defendants have initiated or caused others to initiate an outbound telephone call to a person's telephone number

on the National Do Not Call Registry in violation of the TSR. 16 C.F.R. § 310.4(b)(1)(iii)(B).

**ANSWER:** GCE denies the allegations in Paragraph 92 as to GCE only.

### CONSUMER INJURY

93.     Consumers are suffering, have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the TSR. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

**ANSWER:** GCE denies the allegations in Paragraph 93 as to GCE only.

**ANSWER:** Finally, GCE denies any and all allegations contained in the Complaint not specifically admitted above. GCE further denies that the FTC is entitled to any relief requested in the "Prayer for Relief" and any "WHEREFORE" clauses in the Complaint.

### AFFIRMATIVE DEFENSES

GCE reserves the right to assert additional Affirmative Defenses as discovery progresses and, by alleging the matters set forth herein as defenses, GCE does not allege or admit that it has the burden of proof or persuasion with respect to any of these matters. Subject to the foregoing, GCE asserts the following further and affirmative defenses:

1.     The FTC's Amended Complaint fails to state a claim upon which relief can be granted.

2.     The FTC's Amended Complaint fails to satisfy the requirement that it be pleaded with particularity as required by Fed. R. Civ. P. 9(b).

3.     The FTC's Amended Complaint fails to allege any plausible harm to consumers.

4.     The FTC's Amended Complaint fails to allege any alleged deceptive representations that are material.

5.     Granting the relief sought is inequitable and contrary to the public interest.

6.     Any monetary relief to which the FTC may be entitled, in whatever form, is subject to offset by amounts which may be paid in the future to the Department of Education related to the same conduct.

7.      Any monetary relief to which the FTC may be entitled, in whatever form, is subject to offset by the benefits received by customers.

8.      The FTC's claims against GCE are barred by the statute of limitations.

9.      GCE satisfies the Telemarketing Sales Rules safe harbor requirements as set forth in 16 C.F.R. § 310.4(b)(3).

10.     GCE had an Established Business Relationship, as that term is defined in 16 C.F.R. § 310.2(q), with consumers to whom it directed its telemarketing activities.

11.     GCE had the express agreement to place calls to consumers to whom it directed its telemarketing activities, as provided for in 16 C.F.R. § 310.4(b)(1)(iii)(B).

Dated:  March 20, 2025                     Respectfully submitted,

                                           /s/ *Derin B. Dickerson*
                                           Derin B. Dickerson, GA Bar #220620*
                                           Kathleen Benway, DC Bar #474356*
                                           Caroline R. Strumph, GA Bar #250168*
                                           Shanique Campbell, GA Bar #346659*
                                           Lisa L. Garcia, CA Bar #301562*
                                           Graham Gardner, DC Bar #1672612*
                                           *(*admitted pro hac vice*)
                                           ALSTON & BIRD LLP
                                           1201 West Peachtree Street
                                           Atlanta, GA  30309-3424
                                           Telephone:  404-881-7000

                                           *Attorneys for Defendant Grand Canyon*
                                           *Education, Inc.*

1

**<u>CERTIFICATE OF SERVICE</u>**

2

     I hereby certify that on this March 20, 2025, I caused to be electronically transmitted

3

the attached document entitled DEFENDANT GRAND CANYON EDUCATION, INC.'S

4

AMENDED ANSWER TO THE FTC'S FIRST AMENDED COMPLAINT to the Clerk of

5

Court using the CM/ECF System, which will send notification of such filing and transmittal

6

of a Notice of Electronic Filing to all registered CM/ECF users.

7

8

                        /s/ *Derin B. Dickerson*
                        Derin B. Dickerson

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28